UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

JILL SIKKELEE, individually and as
personal representative of the estate of
DAVID SIKKELEE, deceased;

                    Plaintiff,

v.

PRECISION AIRMOTIVE
CORPORATION
14800 40th Avenue NE, Bldg. D
Marysville, WA 98271


and


PRECISION AIRMOTIVE LLC,
Individually and as Successor-in-Interest
to PRECISION AIRMOTIVE
CORPORATION
14800 40th Avenue NE, Bldg. D
Marysville, WA 98271


and


PRECISION AEROSPACE CORPORATION

Case No: 4:07-cv-00886-JEJ
(The Honorable John E. Jones, III)

Complaint Filed: May 16, 2007

**FIRST AMENDED COMPLAINT
FOR WRONGFUL DEATH AND
SURVIVAL ACTION; AND
DEMAND FOR JURY TRIAL**

1

c/o     LPSL Corporate Services, Inc.
         1420 Fifth Avenue, Suite 4100
         Seattle, WA 98101
c/o     CT Corporation System
         818 West Seventh St.
         Los Angeles, CA 90017

and

PRECISION AEROSPACE SERVICES LLC
f/k/a PRECISION AEROSPACE
GROUP LLC
1100 Carillon Point
Kirkland, WA 98033

and

PRECISION AVIATION PRODUCTS
CORPORATION a/k/a
PRECISION AEROSPACE PRODUCTS
c/o     LPSL Corporate Services, Inc.
         1420 Fifth Avenue, Suite 4100
         Seattle, WA 98101

and

PRECISION PRODUCTS LLC
c/o     LPSL Corporate Services, Inc.
         1420 Fifth Avenue, Suite 4100
         Seattle, WA 98101

and

ZENITH FUEL SYSTEMS LLC as
Successor-in-Interest to ZENITH FUEL
SYSTEMS INCORPORATED;
1100 Carillon Point
Kirkland, Washington 98033

2

c/o    LPSL Corporate Services, Inc.
        1420 Fifth Avenue, Suite 4100
        Seattle, WA 98101
and

BURNS INTERNATIONAL SERVICES
CORPORATION, Individually and as
Successor-in-Interest to BORG-WARNER
CORPORATION, and MARVEL-SCHEBLER,
a Division of BORG-WARNER
CORPORATION;
2 Campus Drive
Parsippany, NJ 07054,

and

FORMER FUEL SYSTEMS, INC.
f/k/a FACET FUEL SYSTEMS, INC.,
Individually and as Successor-in-Interest
to FACET AEROSPACE PRODUCTS
COMPANY
6120 South Yale Avenue,
Tulsa, Oklahoma 74136, and
501 John James Audubon Parkway,
Amerherst, New York 14226
c/o    The Corporation Trust Company
        Corporation Trust Center
        1209 Orange Street
        Wilmington, DE 19801;

and

MARK IV INDUSTRIES, INC., Individually
and as Successor-in-Interest to FACET
ENTERPRISES, INC. and FACET
AEROSPACE PRODUCTS COMPANY
501 John James Audubon Parkway

3

P.O. Box 810
Amherst, NY 14226

and

TEXTRON LYCOMING RECIPROCATING
ENGINE DIVISION, A Division of AVCO
CORPORATION
652 Oliver Street
Williamsport, PA  17701, and
40 Westminster Street
Providence, RI  02903,
c/o     The Corporation Company
        Corporation Center
        1209 Orange Street
        Wilmington, DE 19801

and

TEXTRON, INC.
40 Westminster Street
Providence, RI  02903, and
CT Corporation System10 Weybosset Street
Providence, RI  02903,
c/o     The Corporation Company
        Corporation Center
        1209 Orange Street
        Wilmington, DE 19801
and

AVCO CORPORATION
652 Oliver Street
Williamsport, PA  17701, and
40 Westminster Street
Providence, RI  02903,
c/o     CT Corporation System10 Weybosset Street
        Providence, RI  02903

4

c/o    The Corporation Company
       Corporation Center
       1209 Orange Street
       Wilmington, DE 19801
and

KELLY AEROSPACE, INC.,
Individually and Joint Venturer
and as Successor-in-Interest;
1400 East South Boulevard
Montgomery, AL 36116
c/o    CSC Lawyers Incorporating Service Inc.
       150 S. Perry St.
       Montgomery, AL 36104
c/o    The Corporation Company
       Corporation Trust Center
       1209 Orange Street
       Wilmington, DE 19801
and

KELLY AEROSPACE POWER
SYSTEMS, INC., a/k/a ELECTROSYSTEMS,
INC. a/ka  CONSOLIDATED FUEL
SYSTEMS, INC. a/k/a CONFUEL INC.,
Individually and as Joint Venturer and
Successor-in-Interest;
1400 East South Blvd
Montgomery, AL  36116, and
Airport Road Complex
PO Box 273
Ft. Deposit, AL 36032, and
2 Oliver St.
Boston, MA 02109
c/o    CSC Lawyers Incorporating Service Inc.
       150 S. Perry St.
       Montgomery, AL 36104
c/o    The Corporation Company

Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

c/o   The Corporation Company
60 Commerce Street
Montgomery, AL 36104

and

ELECTROSYSTEMS, INC.,
a/k/a CONSOLIDATED FUEL SYSTEMS, INC.
a/k/a CONFUEL, INC.,
Individually and as Joint Venturer and
as Successor-in-Interest;
1400 East South Blvd
Montgomery, AL  36116, and
Airport Road Complex
PO Box 273
Ft. Deposit, AL 36032, and
2 Oliver St.
Boston, MA 02109

c/o   CSC Lawyers Incorporating Service Inc.
150 S. Perry St.
Montgomery, AL 36104

c/o   The Corporation Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

c/o   The Corporation Company
60 Commerce Street
Montgomery, AL 36104

and

CONSOLIDATED FUEL SYSTEMS, INC.
a/k/a CONFUEL, INC.
1400 East South Blvd
Montgomery, AL  36116, and

6

Airport Road Complex
PO Box 273
Ft. Deposit, AL 36032, and
2 Oliver St.
Boston, MA 02109
c/o     CSC Lawyers Incorporating Service Inc.
       150 S. Perry St.
       Montgomery, AL 36104
c/o     The Corporation Company
       Corporation Trust Center
       1209 Orange Street
       Wilmington, DE 19801
c/o     The Corporation Company
       60 Commerce Street
       Montgomery, AL 36104

       Defendants, jointly and severally;

_____|

## FIRST AMENDED
## COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL ACTION; AND
## DEMAND FOR A JURY TRIAL

     COMES NOW Plaintiff JILL SIKKELEE, individually and as personal

representative of the estate of DAVID SIKKELEE, deceased, by and through

undersigned counsel, and for her cause of action against PRECISION AIRMOTIVE

LLC, Individually and as Joint Venturer and Successor-in-Interest to PRECISION

AIRMOTIVE CORPORATION; PRECISION AIRMOTIVE CORPORATION;

PRECISION AEROSPACE CORPORATION, Individually and as Joint Venturer;

7

PRECISION AEROSPACE SERVICES LLC f/k/a PRECISION AEROSPACE

GROUP LLC, Individually and as Joint Venturer; PRECISION AVIATION

PRODUCTS CORPORATION a/k/A PRECISION AEROSPACE PRODUCTS,

Individually and as Joint Venturer; PRECISION PRODUCTS LLC, Individually

and as Joint Venturer; ZENITH FUEL SYSTEMS LLC, Individually, as Joint

Venturer and as Successor in Interest to ZENITH FUEL SYSTEMS

INCORPORATED; BURNS INTERNATIONAL SERVICES CORPORATION,

Individually, as Joint Venturer and as Successor-in-Interest to BORG-WARNER

CORPORATION, and MARVEL-SCHEBLER, a Division of BORG-WARNER

CORPORATION, Individually and as Joint Venturer; FORMER FUEL SYSTEMS,

INC. f/k/a FACET FUEL SYSTEMS, INC., Individually, as Joint Venturer and as

Successor-in-Interest to FACET AEROSPACE PRODUCTS COMPANY,

Individually and as Joint Venturer; MARK IV INDUSTRIES, INC., Individually, as

Joint Venturer and as Successor-in-Interest to FACET ENTERPRISES, INC. and

FACET AEROSPACE PRODUCTS COMPANY, Individually and as Joint

Venturer; TEXTRON LYCOMING RECIPROCATING ENGINE DIVISION, A

Division of AVCO CORPORATION; TEXTRON, INC.; AVCO CORPORATION;

KELLY AEROSPACE, INC., Individually and as Joint Venturer and as Successor-

in-Interest; KELLY AEROSPACE POWER SYSTEMS, INC., a/k/a

8

ELECTROSYSTEMS, INC. a/k/a CONSOLIDATED FUEL SYSTEMS, INC. a/k/a

CONFUEL, INC., Individually and as Joint Venturer and as Successor-in-Interest;

ELECTROSYSTEMS, INC. a/k/a CONSOLIDATED FUEL SYSTEMS, INC. a/k/a

CONFUEL, INC., Individually and as Joint Venturer and as Successor-in-Interest;

and CONSOLIDATED FUEL SYSTEMS, INC. a/k/a CONFUEL, INC.;

defendants, jointly and severally, states as follows:

**THE PARTIES AND
COMMON JURISDICTIONAL AND FACTUAL ALLEGATIONS**

1.      All conditions precedent to maintaining this cause of action have

accrued.  The amount in controversy exceeds the minimum jurisdictional amount,

exclusive of costs and interest, and jurisdiction is otherwise proper before this court

as more fully alleged below.

2.      Jurisdiction is founded, in whole or in part, upon diversity of

citizenship, 28 U.S.C. § 1332, in that (a) the amount in controversy exceeds

$75,000.00 exclusive of costs and interest; (b) at all times material hereto, plaintiff

and her decedent were residents of the State of South Carolina; and (c) at all times

material hereto, the defendants were all incorporated in a state other than South

Carolina and have their principal places of business in a state other than South

Carolina, as more fully alleged below.

9

3.      At all times material to this cause of action, plaintiff Jill Sikkelee was lawfully married to David Sikkelee, deceased, a resident of the State of South Carolina, and is the duly appointed personal representative of the estate of David Sikkelee, deceased.

4.      At all times material to this cause of action, defendant Kelly Aerospace, Inc. was and is a Delaware corporation for profit maintaining its principal place of business in the state of Alabama, but conducting substantial, continuous and systematic business in the State of Pennsylvania, that business being the marketing, design, manufacture and sale of aircraft, fuel system and engine related component products, and also the marketing, sale, repair, maintenance, service, overhaul, inspecting and testing of aircraft fuel systems and components.  Defendant Kelly Aerospace, Inc. manufactured, sold, repaired and/or overhauled a certain MA-4SPA carburetor and/or its components installed in a Textron Lycoming O-320-D2C, Serial no. L-6540-39A, engine installed in a Cessna 172N aircraft, federally registered as N73747 giving rise to this litigation. (Hereinafter in this complaint, the Cessna 172N aircraft, federally registered as N73747, is referred to the "subject aircraft"; the  Textron Lycoming O-320-D2C, Serial no. L-6540-39A, engine installed in the subject aircraft is referred to as "subject engine"; and the MA-4SPA carburetor installed in the subject engine is referred to as "subject carburetor.")

10

5.     At all times material, defendant Kelly Aerospace Power Systems, Inc. was and is a Delaware or Alabama corporation for profit (wholly owned and operated by defendant Kelly Aerospace, Inc.),  maintaining its principal place of business in the State of Alabama, but conducting substantial, continuous and systematic business in the State of Pennsylvania, that business being the designing, manufacturing, selling, distributing and marketing of fuel system and engine components for aircraft, including components, overhaul and repair kits for MA-4SPA and other carburetors including the subject carburetor.  It is believed and therefore alleged that defendant Kelly Aerospace Power Systems, Inc. changed its name from Electrosystems, Inc. and/or purchased and merged with Consolidated Fuel Systems, Inc. a/k/a Confuel, Inc., all of which were also Delaware or Alabama corporations for profit having their principal place of business in the State of Alabama but also conducting substantial, continuous and systematic business in Pennsylvania, and likewise at all times material designed, manufactured, sold, distributed, and marketed aircraft, fuel system and engine component parts and provided overhaul and repair services, including for MA-4SPA and similar carburetors, including the subject carburetor.  Defendant Kelly Aerospace Power Systems, Inc.  (a/k/a Electrosystems, Inc. a/k/a Consolidated Fuel Systems, Inc. a/k/a Confuel, Inc.) is responsible for the actions and inactions of Electrosystems, Inc. and

Consolidated Fuel Systems, Inc. and Confuel Inc.under various legal doctrines,

including without limitation, agency, respondeat superior, vicarious liability,

successor liability, alter ego, joint venturer, and related doctrines. (Hereinafter,

defendants Kelly Aerospace, Inc., Kelly Aerospace Power Systems, Inc.,

Electrosystems, Inc., which merged with Consolidated Fuel Systems, Inc. a/k/a

Confuel, Inc., and Consolidated Fuel Systems, Inc. will be collectively referred to as

"the Kelly defendants")

6.     The Kelly defendants caused a tort, part of a tort, and/or consequences

of a tort in this state.

7.     The Kelly defendants are liable for each other's actions and/or inactions

under the doctrines of alter ego, community of interest, apparent agency, agency,

vicarious liability, respondeat superior, joint venturer, successor liability, piercing

the corporate veil, and related doctrines.

8.     In December 1998 a "factory new Lycoming engine D2C 'SN. 6540-

30A using new Cessna engine mounts and bolts" was installed on the subject

aircraft.

9.     In 2004 a complete major overhaul and/or rebuild of the subject engine

was performed restoring it to a factory new or as new condition with new or as new

components. Installed at that time was the subject carburetor that was completely

12

rebuilt or overhauled in 2004 by the Kelly defendants, which installed new or as new parts and components within the carburetor.  The engine overhauler "certifie[d] that this engine has been disassembled, inspected and overhauled to manufacturer's overhaul manual new limits.  Engine tested in accordance with recommended procedures and is approved for return to service.  All applicable A.D. Notes and Service Bulletins are complied with at the time of overhaul."

10.    The engine was installed along with the subject carburetor on the subject aircraft.

11.    On or about July 10, 2005, David Sikkelee, deceased, was piloting the subject aircraft when the aircraft lost power as a result of an engine fuel delivery system malfunction/defect shortly after takeoff from Transylvania County Airport located in Brevard, North Carolina, causing the aircraft and its pilot to lose control and crash.  Plaintiff's decedent, David Sikkelee, suffered severe injuries and burns during and after the crash landing, and ultimately died therefrom.

12.    Defendant Precision Airmotive, LLC ("Precision Airmotive, LLC") is believed and therefore alleged to be a corporation organized under the laws of the State of Washington, with its principal place of business in Marysville, Washington, and at all times material hereto was the Successor and Real Party in Interest to the manufacturers of the subject carburetor and its components on the subject engine in

13

the subject aircraft and, as such, assumed all responsibility for providing overhaul, repair, replacement, inspection, and other information with respect to the carburetor line.  This defendant is the alter ego and a joint venturer as to the remaining Precision defendants.  Defendant Precision Airmotive, individually, in concert and combination, and as a joint venturer, engaged in business within the State of Pennsylvania, by availing itself to the business opportunities here, advertising the availability of parts and information, shipping parts, literature and engine parts including carburetors into the State of Pennsylvania, and receiving money from those persons and businesses in this State who order such carburetors and parts and pay for them.  In addition, said defendant, individually, in concert and combination, and as a joint venturer, does supply literature to aircraft owners located within the State of Pennsylvania, and to mechanics, fixed base operators, and others who perform engine maintenance in this State for purposes of providing information and knowledge as to parts that can be purchased from this defendant for the repair or replacement of carburetors.  Upon information and belief, defendant, individually, in concert and combination, and as a joint venturer, sent parts to Pennsylvania for incorporation on the subject aircraft and/or other similar type aircraft.

13.    Defendant Precision Airmotive Corporation ("Precision Airmotive") is believed and therefore alleged to be a corporation organized under the laws of the

State of Washington, and at all times material hereto was the Successor and Real

Party in Interest to the manufacturer of the subject carburetor and its components on

the subject engine in the subject aircraft and, as such, assumed all responsibility for

providing overhaul, repair, replacement, inspection, and other information with

respect to the carburetor line. This defendant is the alter ego and a joint venturer as

to the remaining Precision defendants. Defendant Precision Airmotive, individually,

in concert and combination, and as a joint venturer, engaged in business within the

State of Pennsylvania, by availing itself to the business opportunities here,

advertising the availability of parts and information, shipping parts, literature and

engine parts including carburetors into the State of Pennsylvania, and receiving

money from those persons and businesses in this State who order such carburetors

and parts and pay for them. In addition, said defendant, individually, in concert and

combination, and as a joint venturer, does supply literature to aircraft owners located

within the State of Pennsylvania, and to mechanics, fixed base operators, and others

who perform engine maintenance in this State for purposes of providing information

and knowledge as to parts that can be purchased from this defendant for the repair or

replacement of carburetors. Upon information and belief, defendant, individually, in

concert and combination, and as a joint venturer, sent parts to Pennsylvania for

incorporation on the subject aircraft and/or other similar type aircraft.

15

14.     Defendant Precision Aerospace Corporation ("Precision Aerospace Corporation") is believed and therefore alleged to be a corporation organized under the laws of the State of Washington, and at all times material hereto was the Successor and Real Party in Interest to the manufacturer of the subject carburetor and its components on the subject engine in the subject aircraft and, as such, assumed all responsibility for providing overhaul, repair, replacement, inspection, and other information with respect to the carburetor line.  This defendant is the alter ego and joint venturer as to the remaining Precision entities.  Defendant Precision Aerospace Corporation, individually, in concert and combination, and as a joint venturer, does business within the State of Pennsylvania, by availing itself to the business opportunities here, advertising the availability of parts and information, shipping parts, literature and engine parts including carburetors into the State of Pennsylvania, and receiving money from those persons and businesses in this State who order such carburetors and parts and pay for them.  In addition, said defendant, individually, in concert and combination, and as a joint venturer, does supply literature to aircraft owners located within the State of Pennsylvania, and to mechanics, fixed base operators, and others who perform engine maintenance in this State for purposes of providing information and knowledge as to parts that can be purchased from this defendant for the repair or replacement of carburetors.  Upon

16

information and belief, defendant, individually, in concert and combination, and as a joint venturer, sent parts to Pennsylvania for incorporation on the subject aircraft and/or other similar type aircraft.

15.     Defendant Precision Aerospace Services, LLC f/k/a Precision Aerospace Group, LLC ("Precision Aerospace Services") is believed and therefore alleged to be a corporation organized under the laws of the State of Washington, and at all times material hereto was the Successor and Real Party in Interest to the manufacturer of the subject carburetor and its components on the subject engine in the subject aircraft and, as such, assumed all responsibility for providing overhaul, repair, replacement, inspection, and other information with respect to the carburetor line. This defendant is the alter ego and a joint venturer as to the remaining Precision entities. Defendant Precision Aerospace Services, individually, in concert and combination, and as a joint venturer, does business within the State of Pennsylvania, by availing itself to the business opportunities here, advertising the availability of parts and information, shipping parts, literature and engine parts including carburetors into the State of Pennsylvania, and receiving money from those persons and businesses in this State who order such carburetors and parts and pay for them. In addition, said defendant, individually, in concert and combination, and as a joint venturer, does supply literature to aircraft owners located within the

17

State of Pennsylvania, and to mechanics, fixed base operators, and others who

perform engine maintenance in this State for purposes of providing information and

knowledge as to parts that can be purchased from this defendant for the repair or

replacement of carburetors.  Upon information and belief, defendant, individually, in

concert and combination, and as a joint venturer, sent parts to Pennsylvania for

incorporation on the subject aircraft and/or other similar type aircraft.

      16.    Defendant Precision Aviation Products Corporation a/k/a Precision

Aerospace Products ("Precision Aviation Products") is believed and therefore

alleged to be a corporation organized under the laws of the State of Washington, and

at all times material hereto was the Successor and Real Party in Interest to the

manufacturer of the subject carburetor and its components on the subject engine in

the subject aircraft and, as such, assumed all responsibility for providing overhaul,

repair, replacement, inspection, and other information with respect to the carburetor

line.  This defendant is the alter ego and a joint venturer as to the remaining

Precision entities.  Defendant Precision Aerospace Products, individually, in concert

and combination, and as a joint venturer, does business within the State of

Pennsylvania, by availing itself to the business opportunities here, advertising the

availability of parts and information, shipping parts, literature and engine parts

including carburetors into the State of Pennsylvania, and receiving money from

those persons and businesses in this State who order such carburetors and parts and pay for them.  In addition, said defendant, individually, in concert and combination, and as a joint venturer, does supply literature to aircraft owners located within the State of Pennsylvania, and to mechanics, fixed base operators, and others who perform engine maintenance in this State for purposes of providing information and knowledge as to parts that can be purchased from this defendant for the repair or replacement of carburetors.  Upon information and belief, defendant, individually, in concert and combination, and as a joint venturer, sent parts to Pennsylvania for incorporation on the subject aircraft and/or other similar type aircraft.

17.    Defendant Precision Products, LLC ("Precision Products") is believed and therefore alleged to be a corporation organized under the laws of the State of Washington, and at all times material hereto was the Successor and Real Party in Interest to the manufacturer of the subject  carburetor and its components on the subject engine in the subject aircraft and, as such, assumed all responsibility for providing overhaul, repair, replacement, inspection, and other information with respect to the carburetor line.  This defendant is the alter ego and joint venturer as to the remaining Precision entities.  Defendant Precision Products, individually, in concert and combination, and as a joint venturer, engaged in business within the State of Pennsylvania, by availing itself to the business opportunities here,

19

advertising the availability of parts and information, shipping parts, literature and engine parts including carburetors into the State of Pennsylvania, and receiving money from those persons and businesses in this State who order such carburetors and parts and pay for them.  In addition, said defendant, individually, in concert and combination, and as a joint venturer, does supply literature to aircraft owners located within the State of Pennsylvania, and to mechanics, fixed base operators, and others who perform engine maintenance in this State for purposes of providing information and knowledge as to parts that can be purchased from this defendant for the repair or replacement of carburetors.  Upon information and belief, defendant, individually, in concert and combination, and as a joint venturer, sent parts to Pennsylvania for incorporation on the subject aircraft and/or other similar type aircraft.

18.    Defendant Zenith Fuel Systems, LLC., Individually, as Joint Venturer and Successor-in-Interest to Zenith Fuel Systems, Incorporated ("Zenith") is believed and therefore alleged to be a corporation organized and existing under the laws of the State of Washington, and at all times material hereto was the Successor and Real Party in Interest to the manufacturer of the subject  carburetor and its components on the subject engine in the subject aircraft and, as such, assumed all responsibility for providing overhaul, repair, replacement, inspection, and other information with respect to the carburetor line.  Defendant Zenith, individually, in

concert and combination, and as a joint venturer, does business within the State of

Pennsylvania, by availing itself to the business opportunities here, advertising the

availability of parts and information, shipping parts, literature and engine parts

including carburetors into the State of Pennsylvania, and receiving money from

those persons and  businesses in this State who order such carburetors and parts and

pay for them.  In addition, said defendant, individually, in concert and combination,

and as a joint venturer, does supply literature to aircraft owners located within the

State of Pennsylvania, and to mechanics, fixed base operators, and others who

perform engine maintenance in this State for purposes of providing information and

knowledge as to parts that can be purchased from this defendant for the repair or

replacement of carburetors.  Upon information and belief, defendant, individually, in

concert and combination, and as a joint venturer, sent parts to Pennsylvania for

incorporation on the subject aircraft and/or other similar type aircraft.

19.    Defendant Burns International Services Corporation is a corporation

organized and existing under the laws of the State of Delaware, with its principal

place of business located at 2 Campus Drive, Parsippany, New Jersey 07054, and is

being sued individually, and as successor-in-interest to Borg-Warner Corporation,

and Marvel-Schebler, a Division of Borg-Warner Corporation. At all times material

hereto, Burns International Services Corporation conducted substantial, regular and systematic business in Pennsylvania.

20.     At all material times hereto, Borg-Warner Corporation did substantial business in the State of Pennsylvania by advertising the availability of parts and information, shipping parts, literature and other products into the State of Pennsylvania, and receiving money from those businesses in this State who order such products and pay for them, and is registered as a foreign corporation in the State of Pennsylvania.

21.     At all material times hereto, Burns International Services Corporation conducted substantial business in the State of Pennsylvania by providing services to and receiving money from customers in the State of Pennsylvania, and through the business of its wholly owned subsidiary, Borg-Warner Corporation.

22.     Borg-Warner Corporation, through its division, Marvel Schebler, manufactured the subject carburetor which was incorporated in the subject engine that was installed on the subject aircraft.

23.     In or around 1992 Borg-Warner Corporation changed its name to Borg-Warner Security Corporation, which around 1999 changed its name to Burns International Services Corporation; and therefore defendant Burns International Services Corporation is the successor-in-interest to Borg-Warner Corporation and is

22

liable for Plaintiff's decedent's injuries and death caused by the carburetor manufactured by Borg-Warner Corporation's Marvel Schebler division and installed in the subject aircraft.

24.     Defendant Burns International Services Corporation, and Borg-Warner Corporation are hereinafter referred to collectively as "Borg-Warner".

25.     Defendant, Former Fuel Systems, Inc., formerly known as Facet Fuel Systems, Inc. ("Facet Fuel") is believed and therefore averred to be a corporation organized under the laws of the State of Delaware, with an address believed to be at 6120 South Yale Avenue, Tulsa, Oklahoma 74136, 501 John James Audubon Parkway, Amerherst, New York 14226, and/or in Bristol, Virginia; and whose registered agent is located at 1209 Orange Street, Wilmington, Delaware 19801, and is being sued individually, and as successor-in-interest to Facet Aerospace Products Company ("Facet Aerospace").

26.     At all material times Facet Aerospace did substantial business in the State of Pennsylvania by advertising the availability of parts and information, shipping parts, literature and other products into the State of Pennsylvania, and receiving money from those persons and businesses in this State who order such products and pay for them.

27.     Facet Fuel does substantial business in the State of Pennsylvania by

advertising the availability of parts and information, shipping parts, literature and other products into the State of Pennsylvania, and receiving money from those persons and businesses in this State who order such products and pay for them.

28.     Upon information and belief, in or about 1989 defendant Facet Fuel and/or Facet Aerospace provided parts and/or services on the subject carburetor on the subject engine in the subject aircraft, and/or is responsible for and/or purchased the Marvel Schebler carburetor product line at all times material.

29.     Defendant Mark IV Industries, Inc. ("Mark IV") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 501 John James Audubon Parkway, Amherst, New York 14226, and is being sued individually, and as successor-in-interest to Facet Enterprises, Inc. ("Facet Enterprises") and Facet Aerospace; Mark IV does substantial business in the State of Pennsylvania by advertising the availability of parts and information, shipping parts, literature and other products into the State of Pennsylvania, and receiving money from those businesses in this State who order such products and pay for them.

30.     Defendants Facet Fuel and Mark IV are sometimes hereinafter collectively referred to as "the Facet defendants".

31.     In or around 1982 Facet Aerospace, Facet Fuel, and Facet Enterprises

acquired from Borg-Warner the product line for that certain carburetor installed in the accident aircraft's engine, holding status as the OEM, and responsible under the Federal Aviation Regulations and state law to report and provide warnings and information concerning any known dangers; and on information and belief, overhauled and/or supplied parts for that certain carburetor in 1989.

32.     In or around 1994, Facet Aerospace, Facet Fuel, and Facet Enterprises were acquired by defendant Mark IV.

33.     On information and belief during 1998-99, Facet Aerospace was merged, or *de facto* merged into its parent, Facet Fuel, or into Mark IV, and/or Facet Fuel or Mark IV became a continuation of, or mere continuation of Facet Aerospace.

34.     On information and belief during 1999-2000, Facet Enterprises was merged, or *de facto* merged into Mark IV, and/or Mark IV became a continuation of, or mere continuation of Facet Enterprises.

35.     Facet Fuel and/or Mark IV are the successors in interest to the liability of Facet Aerospace as OEM of the subject  carburetor on the subject engine in the subject aircraft, and based on services performed and/or parts provided in the overhaul of that certain carburetor.

36.     Mark IV is the successor-in-interest to the liability of Facet Enterprises as OEM of the subject carburetor on the subject engine in the subject aircraft, and

25

based on services performed and/or parts provided in the overhaul of said carburetor.

37.   Facet Fuel and Mark IV have operated and continue to operate as agents and/or alter egos of each other.

38.   Upon information and belief, the Precision defendants and each of them disregarded the corporate formalities, failed to functionally and legally act as independent companies, and failed to individually and independently control adequate capitalization to engage in their respective business functions.

39.   Upon information and belief, the Precision defendants expressly and impliedly co-mingled corporate funds and resources so as to act as a quasi single corporate unit.

40.   Precision Airmotive, LLC; Precision Airmotive Corporation; Precision Aerospace Corporation; Precision Aerospace Services f/k/a Precision Aerospace Group, LLC; Precision Aviation Products Corporation and Precision Products, LLC; Zenith Fuel Systems, LLC; Burns International Services Corporation; Former Fuel Systems, Inc. f/k/a Facet Fuel Systems, Inc.; and Mark IV Industries, Inc. dominated and controlled the financial, legal, and technical decisions of Precision Airmotive Corporation and Precision Airmotive, LLC such that both Precision entities could not, and did not act with the requisite independent corporate abilities so as to perpetrate a fraud.

41.     As a result of the above noted co-mingling, the lack of independence and the disregard of corporate formalities, the Precision defendants are alter egos of each other.

42.     As a result of the above noted disregard of the corporate formalities, the corporate veils of the Precision defendants should be pierced.

43.     The Precision defendants' disregard of the corporate formalities, the co-mingling of corporate funds and resources, the disregard of corporate independence, and the joint venture nature of the Precision defendants' activities results in the Precision defendants acting as joint venturers and as a single enterprise and are thus individually, and in combination, liable for the tortious activities described herein.

44.     Precision Airmotive, LLC; Precision Airmotive Corporation; Precision Aerospace Corporation; Precision Aerospace Services f/k/a Precision Aerospace Group, LLC; Precision Aviation Products Corporation and Precision Products, LLC; Zenith Fuel Systems, LLC; Burns International Services Corporation; Former Fuel Systems, Inc. f/k/a Facet Fuel Systems, Inc.; and Mark IV Industries, Inc. are collectively referred to as "the Precision defendants" and are  individually, jointly, and in combination sued individually and collectively in their corporate names. These defendants are the designer, manufacturer, seller, supplier, certifier, overhauler, repairer, maintainer, and product support servicer of the carburetor and

27

fuel delivery system installed on the accident aircraft engine. These defendants, in concert and combination, and as a joint venturer, do business in the State of Pennsylvania, and caused a tort, portions thereof, and/or consequences of a tort to occur in that state.

45.    Defendant, Textron Lycoming Reciprocating Engine Division, a Division of Avco Corporation ("Textron Lycoming"), is believed and therefore averred to be an unincorporated division and/or a wholly owned subsidiary of defendants Avco Corporation and/or Textron, Inc., with its principal place of business located at 652 Oliver Street, Williamsport, Pennsylvania, and at all times material hereto was the manufacturer, supplier, certifier, and maintainer of the subject engine.

46.    Defendant, Textron, Inc. ("Textron") is a Delaware corporation with its principal place of business in Rhode Island, which does business in the State of Pennsylvania by operating various subsidiary corporations and divisions and ships goods into the State of Pennsylvania.

47.    Defendant, Avco Corporation ("Avco"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Connecticut, and does extensive business in the State of Pennsylvania.

48.    Defendants Textron, Inc., Avco Corporation, and Textron Lycoming

Reciprocating Engine Division, a Division of Avco Corporation are collectively referred to as "the Textron defendants" and individually sued in their individual and collective corporate names.  These defendants are the designer, manufacturer, seller, supplier, certifier, overhauler, repairer, maintainer, and product support servicer of the subject engine installed on the subject aircraft. These Textron defendants cause a tort, portions thereof, and/or consequences of a tort to occur in the State of Pennsylvania.

49.    All defendants in this matter do business within the State of Pennsylvania, by availing themselves to the business opportunities here, advertising their products and services, the availability of parts and information, shipping parts and literature into the State of Pennsylvania, and receiving money from those businesses in this state who order goods, services and parts and pay for them.  In addition, defendants supply literature to aircraft owners located within the State of Pennsylvania, and to mechanics, fixed base operators, and others who perform aircraft maintenance in this state for purposes of providing information and knowledge as to parts that can be purchased from the defendants for the repair or replacement of aircraft and their components.

50.    Venue is proper pursuant to Pennsylvania and/or federal statutes in that one or more defendants reside and/or conduct substantial business in the County of

Lycoming.

51.     At all times material hereto, the Textron defendants designed, manufactured, and provided product support materials and component replacement parts for the subject engine.

52.     For a long time prior to July, 2005, the Precision and Textron defendants were aware of numerous problems with the fuel delivery, carburetor system, and attaching system for the carburetor halves utilized on carburetors such as were installed on the subject aircraft.

53.     For a long time prior to July, 2005, the Precision and Textron defendants were aware of numerous problems and defects with the screws and locking mechanism that attaches the carburetor halves together.

54.     For a long time prior to July, 2005, the Precision and Textron defendants were aware that instructions necessary to provide service facilities, fixed base operators, or repairmen were inadequate and insufficient as to their products. In particular, defendants were aware that there was inadequate information provided regarding post-installation checking of the torque on the carburetor screws, no information relating to defective fuel delivery system and for the attaching screws coming loose, and no information concerning failure of the carburetor system.  This information was omitted from instructions contained in the carburetor major and

30

minor repair kits, the carburetor parts and service manuals, maintenance and repair manuals and service instructions, and other product support materials distributed by these defendants.

55.    The Precision and Textron defendants were also aware of numerous conditions that had been found in the field which resulted in carburetor failures and resultant engine malfunction as a further result of the malfunction of carburetor components.

56.    Industry standards required these defendants to keep repairmen, operators, pilots, mechanics, fixed base operators, and the regulatory authorities informed of the requirements to keep such engines and carburetors safe and airworthy.  The Precision and Textron defendants did not supply the necessary or appropriate instructions or warnings appropriate to maintaining continued safety of the carburetors and engines.

57.    Industry standards and state and federal regulations had minimum safety standards that were breached by the Textron and Precision defendants in the design and manufacture of the subject engine, its carburetor and fuel system. Federal aviation regulations also mandate continued airworthiness reporting of malfunctions and defects to the Federal Aviation Administration relative to the subject engine, its carburetor and fuel system, which were not complied with by these defendants.

31

58.	The rules governing the issuance and application for an engine type certificate are found at 14 CFR §§ 21 *et seq.*; 33 *et seq.*, and their predecessor Civil Air Regulations (CARs), in particular CAR §§ 1 *et seq.*, 13 *et seq.* The Textron defendants and Precision defendants owed at all times material minimum duties under these CARs and CFRs. The minimum regulations require truthful submissions to the Federal Aviation Administration (14 CFR § 21.2), truthful reporting of malfunctions and defects (14 CFR §§ 21.3; 145.221; *see also* CAR § 52.47), a description of the engine operating features (14 CFR § 21.14), proof that the engine meets applicable airworthiness standards (14 CFR § 21.21; 14 CFR § 33.35; *see also* CAR § 13), and instructions for continued airworthiness (14 CFR § 33.4). Defendants violated these and other regulations as more fully explained below, which were a causal factor in the crash at issue.

59.	The Textron Lycoming O-320 series engine at issue is comprised of similar models authorized under Federal Aviation Administration Type Certificate Data Sheet E-274. The O-320 series engine represent an assembly of separate parts that constitute the type design of the engine for which Textron Lycoming is ultimately responsible for safety, reporting defects, continued

32

airworthiness, and design. **14 CFR §§ 21.3, 21.31, 21.41, 33.**

**60.     The Federal Aviation Administration considers Textron Lycoming to have ultimate responsibility through the federal regulatory process as to the type design and correction of service problems with Marvel Schebler carburetors:**

> **Marvel Schebler carburetors are a part of the engine type design and are not approved separately.  The type certificate holder is responsible for the type design and also the correction of service problems.  Marvel Schebler manufactures carburetors under PMA procedures, but this is based on a licensing agreement with the manufacturers and the Great Lakes Region [FAA] exercises no design control over these parts.  Service problems which may be design related should be referred to the engine manufacturer for corrective action.**

**Internal FAA Correspondence dated June 22, 1972, *Re: Marvel Schebler Carburetor Responsibility*.  Textron Lycoming sits at the top of the aviation food chain per federal regulations with respect to all components comprising the type certificated engine. *See Pridgen v. Parker Hannifin, Corp.* 591 Pa. 305, 310, 916 A.2d 619, 623 (Pa. 2007).**[1]

---

[1]**Precision Airmotive, in a recent lawsuit filed in the United States District Court for the Western District of Washington, alleged the following facts through  a Declaration attached to a pleading:**

> **22. All of the MSA carburetors that Precision has built for Lycoming in the past have been manufactured in accordance with**

61.     Although the Textron defendants are ultimately responsible for the type design and its type certificated O-320 engine pursuant to minimum federal aviation regulations,  the Precision defendants at all times material also had continued airworthiness obligations as the Original Equipment Manufacturer (OEM) of the MA-4SPA carburetor, the owner of the Marvel Schebler carburetor product line (to include the MA-4SPA), and the Parts Manufacturer Approval (PMA) holder pursuant to 14 CFR § 21 *et seq.*[2]

---

the Lycoming SQA 2000 quality system. They have been manufactured under Lycoming's FAA Type Certificate, and under Lycoming's direct supervision.

23. Lycoming has done its own test run on every single MSA carburetor it has purchased from Precision.

24. Because of the direct involvement it has had in the MSA carburetor manufacturing process, and because of its extensive engineering resources, Lycoming has as much ability as Precision to detect and prevent potential manufacturing defects in MSA carburetors.

Precision Airmotive's Opposition to Lycoming's Motion for Preliminary Injunction, *Lycoming Engines v. Precision Airmotive LLC*, No. C07-1854, Declaration of Scott Grafenauer, (W.D. Wash. Dec. 17, 2007).

[2]Precision Airmotive purchased the Marvel Schebler carburetor line in 1990. Precision Airmotive applied for and was issued a PMA by the Federal Aviation Administration in 1990 based upon the same engineering data used by its predecessors.  Precision Airmotive became the OEM for the Marvel Schebler carburetor line. From 1990 to the date of the crash at issue in this litigation, Precision Airmotive was the only carburetor company required pursuant to federal regulations to correct airworthiness issues with the MA-

34

62.     Pursuant to CAR § 13.100, "(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable.  The suitability of all questionable design details or parts shall be established by tests."  Pursuant to CAR § 13.101, "[a]ll materials used in the engine shall conform to approved specifications which will insure their having the strength and other properties assumed in the design data." *See also* 14 CFR § 33.15 (the "suitability and durability of materials used in the engine must (a) be established on the basis of experience or test; and (b) conform to approved specifications....that ensure their having the strength and other properties assumed in the design data.")  These regulations were knowingly violated by the Textron defendants and the Precision defendants,[3] and proof of a violation was actively and knowingly concealed from the Federal Aviation

---

[4]SPA carburetor, to investigate failures, malfunctions and defects, and to report failures, malfunctions and defects to the Federal Aviation Administration. *See generally Burroughs v. Precision,* 78 Cal.App.4th 681, 93 Cal.Rptr.2d 124 (Cal.App.6th Dist. 2000).

[3]As a PMA holder, 14 CFR § 21.303(c)(4) provided at all times material that the Precision defendants were required to submit "test reports and computations necessary to show that the design of the part meets the airworthiness requirements of the Federal Aviation Regulations applicable to the product on which the part is to be installed, unless the applicant shows that the design of the part is identical to the design of a part that is covered under a type certificate. If the design of the part was obtained by a licensing

Administration as already explained in the original complaint below.  The O-320 engine and its MA-4SPA carburetor were shown by experience to be hazardous and/or unreliable.  Experience and/or tests did not properly establish the durability of materials.  Warranty records, Return Material Authorizations, repair records, Service Difficulty Reports and other information exists showing that the throttle body to bowl screws and lock tab washer design was not strong enough nor durable enough to affix the throttle body to the bowl of the MA-4SPA carburetor on the Textron Lycoming O-320 engine, and related defects.

63.     Pursuant to CAR § 13.104, "[a]ll parts of the engine shall be designed and constructed to minimize the development of an unsafe condition of the engine between overhaul periods."  *See* 14 CFR § 33.19 ("(a) Engine design and construction must minimize the development of an unsafe condition of the engine between overhaul periods.")  The Textron and Precision defendants (through 14 CFR § 21.303) knowingly violated these minimum federal regulations in that the O-320 engine and its MA-4SPA carburetor was/were not designed or constructed to minimize the development of an

---

agreement, evidence of that agreement must be furnished."

unsafe condition of the engine between overhaul periods, which was a causal factor in the crash at issue.

64.     Pursuant to CAR § 13.110 and 14 CFR § 33.35, the Textron defendants and Precision defendants (through 14 CFR § 21.303) had a minimum duty and responsibility to assure: "The fuel system of the engine must be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions." The subject Textron Lycoming O-320 engine and its MA-4SPA carburetor were known to defendants to not be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions, in violation of this minimum federal regulation. These defendants' knowing violation of these minimum federal aviation regulations was a causal factor in the crash at issue.

65.     In the alternative, by way of analogy to 14 CFR § 91.13 ("No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."), the Textron defendants and Precision defendants each had a duty not to design or manufacture the subject engine and carburetor in a "careless or reckless" manner. The subject O-320

engine and its MA-4SPA carburetor was/were designed and manufactured

carelessly and also recklessly, which was a causal factor in the subject crash.

Defendants knew that the O-320 engine fuel system did not properly meter fuel

and air to the engine under normal, foreseeable conditions.  The MA-4SPA

carburetor as installed on the O-320 engine was knowingly defective in that

throttle body to bowl screws would loosen which could cause a loss of engine

power and failure.  This careless and/or reckless action by these defendants was

a causal factor in the loss of engine power and crash at issue.

66.    As to the PMA duties, pursuant to 14 CFR § 21.303(f) and (k):

(f) Each applicant for a Parts Manufacturer Approval must make
all inspections and tests necessary to determine—
(1) Compliance with the applicable airworthiness requirements;
(2) That materials conform to the specifications in the design;
(3) That the part conforms to the drawings in the design; and
(4) That the fabrication processes, construction, and assembly
conform to those specified in the design.
    ****
(k) Each holder of a Parts Manufacturer Approval shall determine
that each completed part conforms to the design data and is safe
for installation on type certificated products.

67.    The subject MA-4SPA carburetor was known by the Textron

defendants and the PMA holder Precision defendants to not conform to proper

design data, to not comply with applicable airworthiness requirements, to not

properly conform to proper specifications in design, and/or to not be safe for

installation on the type certificated Lycoming O-320 engine.  The Textron

defendants and Precision defendants knew the MA-4SPA carburetor was not

safe for installation on the type certificated engine as explained in detail above

and below in this Complaint.  This knowing failure to comply with minimum

duties under the aforementioned CAR § 13 and 14 CFR § 21.303(a) *et seq.* and

14 CFR § 33.35 *et seq.* was a causal factor in the crash.

68.     At all times material, the Textron defendants and Precision

defendants had a minimum duty of continued airworthiness and a duty to

report malfunctions, defects and failures pursuant to 14 CFR §§ 21.3; 21.303.[4]

Pursuant to 14 CFR § 21.3 (1970):

> Notification of failures, malfunctions, and defects.  The holder of a
> Type Certificate (including a Supplemental Type Certificate), or a
> Parts Manufacturer Approval (PMA), or the licensee of a Type
> Certificate, shall within twenty-four (24) hours after it discovers or
> is informed of a failure, malfunction, or defect in any product or
> part manufactured by it, notify the FAA Regional Office in the
> region in which the holder or licensee is located of any such failure,
> malfunction, or defect that could result in a hazard to flight. The
> notification shall be made by the most expeditious method available
> and shall include as much of the following information as is
> available: (1) Model designation. (2) Serial number. (3)
> Identification of the part, component, or system involved. (4)

---

[4]The Federal Aviation Administration relies upon the aircraft
component manufacturers during type certification and approval process.  See
*United States v. Varig Airlines,* 467 U.S. 797, 807, 816-817 (1984).

Nature of the failure, malfunction, or defect.

Pursuant to 14 CFR § 21.3 (1989):

> Reporting of failures, malfunctions, and defects.  (a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

> (b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

14 CFR § 21.3(c) includes as examples "engine failure."[5]  The Precision defendants' and Textron defendants' knowingly failed to comply with these

---

[5]*See also Robinson v. Hartzell Propeller*, Inc., 326 F. Supp.2d 631 (E.D. Pa. 2004) ("Under this Court's reading of 14 CFR 21.3 and the applicable DOA regulations, aircraft component manufacturers, such as Hartzell, are required to investigate component failures and accurately report the results of such investigation to the FAA….A manufacturer's failure to produce evidence of its investigation into reported component failures is sufficient to raise an inference of concealment or withholding."); *Hetzer Young v. Precision Airmotive,* 184 Ohio App.3d 516 (Ohio App. 2009) ("the reporting requirements under 14 C.F.R. 21.3 impose a responsibility not only to report failures, but also to investigate failures and report to the FAA design defects that detract from flight safety.")

minimum federal aviation regulations, which was a causal factor in the crash at issue.[6]

69.     The Precision defendants and Textron defendants were Federal Aviation Administration licensed/certified repair facilities.  As such, those defendants had at all times material an independent minimum duty to report any serious failure, malfunction or defect.  CAR § 52.47; 14 CFR § 145.221 (previously 145.63).  CAR § 52.47 provided: "Reports of Defects or Unairworthy Conditions....a certified repair station shall submit to the Administrator an immediate report of serious defects in, or other recurring unairworthy conditions of, a...powerplant...or any component thereof, on a form and in a manner acceptable to the Administrator."  Section 145.221(a) provides:  "A certified repair station must report to the FAA within 96 hours after it discovers any serious failure, malfunction, or defect of an article. The report must be in a format acceptable to the FAA."  The Precision defendants and Textron defendants knowingly violated these minimum federal aviation regulations which were a causal factor in the subject crash.

---

[6]"[T]he FAA cannot fulfill its obligation to promote civil aircraft safety if information which may be highly relevant to safety is withheld in the first instance." *Butler v. Bell Helicopter Textron*, 109 Cal.App.4th 1073, 1086 (Cal. App. 2003).

70.    The Precision defendants and Textron defendants knowingly
misrepresented and concealed and failed to report to the Federal Aviation
Administration pursuant to 14 CFR § 21.3, CAR § 52.47 and 14 CFR § 145.221
various failures, malfunctions and defects, showing loose throttle body to bowl
screws (or loose throttle bodies, loose bowls, and gasket issues), attachment
problems, and related design problems and defects in the MA-3 and MA-4
series small updraft carburetors installed on the O-320 series engine and
similar Lycoming engines, which were a direct causal factor in the loss of
engine power and crash giving rise to this litigation.  These defendants failed to
properly investigate the failures, malfunctions, and defects in the MA-4SPA
carburetor and similar MA updraft carburetors, and continued, even after the
subject crash, to patently misrepresent to the Federal Aviation Administration
and public the true nature of the design/manufacturing flaw in the MA-4SPA
carburetor and Textron Lycoming O-320 engine.

71.    As an example, on September 8, 2004, approximately 10 months
before the July 2005 accident involved in this litigation, Peter Nielson of
Precision Airmotive sent Rick Moffett at Textron Lycoming a letter indicating
there was a problematic trend discovered in Service Difficulty Reports with
throttle body to bowl screws loosening in Cessna 172 aircraft equipped with

Lycoming O-320 engines and MA-4SPA carburetors, seeking Textron

Lycoming's help in determining whether corrective action was needed.  (See

September 8, 2004, Letter from Peter Nielson to Rick Moffett, Textron

Lycoming).  Precision was doing this per its known minimum duty under the

federal aviation regulations to investigate failures of its MA-4SPA product line

and to monitor Service Difficulty Reports.  Various Service Difficulty Reports

exist showing knowledge by the Precision and Textron defendants of a latent

defect in the throttle body to bowl screw and lock tab washer design with the

MA-4SPA carburetor line.  Peter Nielson of Precision Airmotive even recently

admitted in a Florida courtroom (in a case involving a Continental engine) that

the issues of throttle body to bowl screws loosening in the field was limited to

the MA-4SPA carburetor installed on Textron Lycoming O-320 engines due to

the unique environment in which that engine operates.[7]  This defect was at all

times material knowingly concealed and withheld from the Federal Aviation

Administration, and continues to be concealed and withheld from the Federal

---

[7]*See July 23, 2007, Transcript of Testimony of Peter Nielson,* in
*Godfrey/Grace v. Precision Airmotive et al.,* Circuit Court, Seventh Judicial
Circuit, Volusia County, Florida, Case no. 2001-30640-CICI.  That case led to
a jury verdict against the defendants approximating $55 million. See Internet,
 http://www.airlaw.com/verdicts.htm.

**Aviation Administration, which was a causal factor in the loss of engine power and crash at issue.**

**72.**     Despite their continuing knowledge of problems related to the accident aircraft's engine and type of carburetor resulting from fuel delivery, carburetor system, and attaching system for the carburetor halves utilized, and inadequately locking attachment screws on the carburetor halves, and their product support material, the Precision and Textron defendants failed to inform **the** requisite entities, i.e., **Federal Aviation Administration,** of these problems so as to conceal and withhold these dangerous defects.  These actions were continued by the Precision and Textron defendants for many years.

**73**.     The Precision and Textron defendants had knowledge of the defects stated herein as a result of numerous complaints from operators of aircraft, aircraft manufacturers, and aircraft maintenance facilities.  The Precision and Textron defendants also had knowledge of the defects as a result of litigation arising from other fatal crashes involving this carburetor and similar carburetors and fuel systems.  The Precision and the Textron defendants had further knowledge of these problems as a result of their own in-house documents and memoranda.

**74.**     Despite numerous meetings, telephone conversations, and exchange of correspondence, the Precision and Textron defendants knowingly misrepresented,

and/or concealed and withheld, information of the problem by failing to notify the regulatory authorities of the extent and seriousness of these problems with the fuel delivery system, the carburetor system, attaching system for the carburetor halves utilized, and product support materials utilized on and for the subject aircraft's engine and other similar engines. The knowing misrepresentation, and/or concealment or withholding of required information, was at the time of certification and/or thereafter.  The knowing misrepresentations, and withholding and concealment from the FAA are facts and circumstances to be pled and are hereby pled pursuant to the General Aviation Revitalization Act ("GARA") if it is deemed to apply.  The knowing misrepresentations, and the omissions and concealment are related to information that was material and relevant to the certification, performance, maintenance, operation and continued airworthiness of the subject engine and its components, accessories, and hardware and directly relate to the cause of the accident and plaintiff's decedent's injuries and death.

75.    At all times material hereto, the Textron defendants designed, rebuilt, overhauled, manufactured, and assembled aircraft engines and component parts, including the fuel delivery system, and engaged in the certification of same, including that from the subject aircraft.

76.    During the period relevant to the operation of the aircraft, and long

prior thereto, the Precision and Textron defendants failed to make available adequate replacement parts of non-defective design or of superior materials such that the risk of catastrophic failure of the carburetor  system, the carburetor attachment system, and fuel delivery system could be avoided.

77.    During the period relevant to the operation of the aircraft, and long prior thereto, the Precision and Textron defendants failed to make available adequate replacement parts which could be used by operators to prevent failures of the carburetor, carburetor attachment system and fuel delivery system between inspections, thus avoid loss of life and damage to property.

78.    Prior to July, 2005, the defendants knew or should have known that the carburetor and fuel delivery systems of the subject  aircraft were unsuitable because they allowed defects to impede the proper operation of the engine.

79.    Despite the knowledge described above, the Precision and Textron defendants failed to redesign the carburetor and fuel delivery systems of the subject aircraft,  nor did these defendants change the pertinent materials used for these systems as required **by the minimum federal aviation regulations cited above** for the safe use and continued airworthiness of the product.

80.    Upon information and belief, during all material times herein, the Precision and Textron defendants had knowledge of certain defects in the engine, its

components, and its carburetor and fuel delivery systems utilized on the subject aircraft by reason of previous accidents, communications with regulatory authorities **(i.e., the Federal Aviation Administration)**, litigation, previous problems with engine failures and other metallurgical and chemical problems in these and other similar model engines and hardware; knowledge that certain engine, carburetor and fuel delivery systems were being used with fatal effects; knowledge of carburetor and fuel delivery system problems in these and other model engines installed on single engine aircraft; knowledge that carburetor and fuel delivery components were of inferior quality; knowledge that the defendants' engine and carburetor and fuel delivery system was defective; and knowledge that the model of engine and carburetor and fuel delivery systems on the subject aircraft and similar aircraft were experiencing failures.

**81**.    The Precision and Textron defendants furthered the intentional misrepresentation and concealment **from the Federal Aviation Administration in violation of the minimum federal regulations cited above**, which is believed to have begun in the early 1960's or thereafter and continues to the present, by providing overhaul, maintenance, and operating information that intentionally covered up, concealed and withheld the defects described above.

**82**.    The Precision and Textron defendants furthered the intentional

47

misrepresentation and concealment **to/from the Federal Aviation Administration in violation of the minimum federal regulations cited above** by generating service publications, and service related documents in such a manner as to lull owners, operators and maintenance facilities into believing that defects in the above mentioned engine and carburetor system, its float and attachment system, and the fuel delivery systems were not a serious operating problem that could result in death.

**83**.    The Textron and Precision defendants knew that the carburetor float and attachment system was defective yet they continued to represent that the system was safe for use, all the while, developing a replacement product intended by the defendants to address the defect that lead to this crash.

**84.**    The Precision and Textron defendants failed to warned the Federal Aviation Administration **as required under the minimum federal regulations cited above**, owners, operators, and/or maintenance facilities about the previous carburetor failures and that those failures were causing airplanes to crash.

**85**.    Instead, Precision and Textron chose not to disclose the defects so they could enhance their corporate profits by more frequently overhauling carburetors; thus, selling more parts and by avoiding the need to develop a new carburetor and new fuel delivery system and recertifying its engines.

**86**.    Like most others experiencing a carburetor failure and fuel delivery

48

malfunction, the subject aircraft crashed shortly after experiencing a malfunction.

**87**.   The carburetor and fuel delivery system malfunction described herein has been known to these defendants because they were put on notice through litigation, warranty claims, reports from other failures, and communication with their various suppliers.  Precision is well aware of the problem because it was a defendant in the many lawsuits arising over this carburetor and similar carburetors and fuel delivery systems.

**88**.   The defendants received notice that their engine, carburetors and fuel delivery system were defective by way of warranty claims. The warranty documents show over a large period of time the existence of defects in the needle valves, the sticking of the float, the screws becoming loose in the carburetor halves, improper air and fuel combustion and delivery in the fuel system, and related failures and malfunctions of the system.

**89**.   Service Difficulty Reports (SDRs) provided the manufacturing defendants with notice and direct evidence of how their product was performing in the field. SDRs are the methodology by which field problems are reported in an effort to provide notice of these problems.  These documents are utilized by the defendants to keep track of field related problems.  In this case, the defendants chose to ignore the common failure mode and not to admit why the carburetors were

failing.

**90**.    The field service problems provided notice over a number of years that there were malfunctions of this carburetor and engine fuel delivery system. However, the defendants, contrary to their duty as manufacturers **under the minimum federal aviation regulations cited above**, failed to disclose the cause of the problem to the requisite entities.

**91**.    Despite the knowledge of the manufacturing defendants obtained through litigation, warranty claims, service reports, and other methods, they failed to warn the owners, operators, and maintainers in the field of the potential life threatening defect that exists through normal use and operation of their product.

**92**.    The aviation community in general rely on full and fair disclosure of problems and defects from the manufacturers.  In this case, the manufacturers did not warn the operators in the field.  The manufacturers had a duty to warn of defects in their product.  The manufacturing defendants are required to report problems that could cause fatal crashes resulting from engine stoppages **pursuant to 14 CFR § 21.3**.  They did not let anyone know what caused the problem, instead they decided to misrepresent and omit material elements from these notifications and general service publications.

**93**.    The manufacturing defendants chose not to report the problems **to the**

**Federal Aviation Administration as required under the minimum federal regulations cited above** because there was an extremely large supply of spare parts dating back to the early 1990's in the form of carburetor and fuel delivery system replacement parts. These in-house inventories and the overhauls relating therefrom are a substantial source of revenue derived from the many thousands of carburetors existing in the field today. The defendants have not generated adequate service bulletins, advisory letters, or service information letters addressing the problems that have been reported to them.

94. The manufacturing defendants' conduct does not stop with their knowledge or failure to notify the aviation community **as required under federal regulations**. The defendants' reckless disregard for human life becomes apparent when one considers the defendants could develop a fix for the problem, but instead misrepresented its significance to owners and operators in the field. The defendants have attempted to deal with some of the float systems by incorporating a metal plate that would be used to move the needle valve up and down. This provided a much more secure and efficient way to shut off the flow of fuel. In fact, the procedure itself describes one of the purposes as being used to reduce the wear on the float plate needle valve interface, which would reduce the function of the float sticking. Internal documents at Precision indicate that the engineering change notice is to

reduce wear on the needle valve float assembly.  Defendant Textron was the holder of the type certificate and changes to the carburetor could not be made without Textron's approval.  Textron agreed and signed off with the timing and extent of the Precision float replacement.  Additionally, Precision has also developed a longer screw to provide more clamp up between the carburetor halves; thus preventing the failure mode of its carburetor.  However, Precision chose not to tell the owners and operators in the field of the necessity of replacing the screws to ensure that the carburetor did not become ~~lose~~loose; thus, causing the needle valve to stick and the engine to fail.  An alternative feasible design existed with the attachment screws at the time of design and manufacture.

**95**.    The manufacturing defendants, individually and in concert and conspiracy, with actual knowledge and with willful refusal to know and accept the defects in the engine and in the carburetor relating to the attaching mechanism of the halves, the float system and the fuel delivery system, fraudulently concealed the defects in the carburetor, its components and maintenance instructions, and fuel delivery system.  These defendants did so in order to maximize corporate profits continuing the fraudulent scheme with a conscious and deliberate disregard for the foreseeable harm that these defects would cause including engine failures and death such as occurred in the instant case.  This reckless abandon is evidenced as noted

below:

a.      As a result of their investigation of aircraft accidents and the ensuing litigation, the defendants knew that the Marvel Schebler carburetor and engine fuel delivery system could cause engine power interruptions and a fatal crash.

b.      Earlier Marvel Schebler carburetors utilized safety wire so as to prevent loosening of the carburetor halves.

c.      Aircraft engine fuel control units utilized lock wire to attach critical screws in the unit thus providing knowledge of an industry standard.

d.      Aircraft engine fuel delivery systems manufacturers other than defendants required safety wire and critical installations of fuel delivery systems components.

e.      The defendants conducted numerous tests which indicated that the carburetor gaskets would lose their set on the clamping of the two carburetor halves and operation of the aircraft engine.

f.      Defendants attended numerous meetings concerning the one piece venturi issue over the years but never discussed the attaching problem of the screws and the float system as being a cause of the problems attributed to the venturi.

g.      Precision Service Bulletin MSA-2 dated October 15, 1990, and

revisions thereto intentionally concealed the problems relating to the gasket, float system, and attaching mechanism and blamed engine roughness and failures on the two piece venturi. This Service Bulletin was designed as a money making venture to enhance spare parts sales for a financially troubled company.

        h.     The Precision defendants failed to disclose their findings of loose screws in the crash of a Piper PA-28-181 at Walls, Mississippi.  The investigation was conducted on July 24, 1997, by Precision.

        i.     The Precision defendants' fraudulent concealment is noted in a May 23, 1985, letter from John R. James to Mr. Bill Smith at Facet Aerospace Products Company concerning a required design change for the venturiis of the carburetors.  However, at no time did the Precision defendants indicate that the main problem with the looseness of the two piece venturi was being caused by the failure and defects of the system used to attach the two carburetor halves.

        j.     The Precision defendants were aware of dangerous situations as noted in Aviation Maintenance Alerts. Such an Alert, dated November 1998 referenced a Cessna 172 carburetor whereby an investigation of the unit discovered that all of the carburetor attachment bolts had come loose.

        k.     A June 13, 1988, letter from Alan Spicer to Dave Kupfer indicates that Precision was attempting to influence the issuance of a directive

requiring that certain portions of the defendant's carburetor be replaced.  This ended up being a windfall financially for the defendants.

1.   Initially, as noted by the June 23, 1988, letter from Mr. Bill Smith to Alan Spicer of the defendants, the defendants did not disclose its defect because of the unfavorable comment surrounding the price increases.  However, Precision insisted on an Airworthiness Directive requiring the replacement of the venturiis.

m.   A January 4, 1984, letter from John B. Vassallo, Project Engineer at defendant Avco Lycoming, Williamsport to Mr. William Smith of the defendants was attached to copies of Malfunction and Defect Reports. The letter further goes on to request that the defendants conduct a design study to improve the retaining characteristics of the carburetor.

n.   A December 22, 1983, letter from Raymond J. Borowski to Mr. Allen Light at Avco Lycoming referenced 27 reports on venturi failures causing rough operation or engine power loss. This document, with the accompanying references, was transmitted to the Precision defendants giving them, as well as the Textron defendants, actual knowledge of the carburetor's design defects.

o.   The September 12, 1989, letter from R.W. Fullerton, Senior Project Engineer at Textron Lycoming placed Lycoming's stamp of approval by way

of Engineering Change Order No. 22674 on the primary venturi changes. However, the defendants concealed the defects in the attaching mechanism and float system.

p.     Various Facet costing and billing estimates for the replacement parts of the carburetor indicate approximately 250,000 replacement venturiis along with float kits and repair kits would prove to be a windfall profit for Precision.

q.     As noted in the April 5, 1990, letter from Irvin N. Brumer, the Precision defendants received authorization to incorporate one piece venturiis into their product line and PMA Production Approval Listing Supplement Number 1, by intentionally failing to notify of other defects in the carburetor such as the attaching mechanism and float system.

r.     As noted by the August 18, 1989, letter from Roger Allan, Design Supervisor at Continental Teledyne Motors to Mr. William Smith at Facet Aerospace, Precision also succeeded in convincing Textron that the one piece venturi would be no problem, this even without referencing the attaching deficiencies.

s.     On August 15, 1989, William C. Smith of Facet transmitted Precision's Engineering Change Request No. AC 184 to Mr. Roger Allan of Teledyne Continental Motors; however, so as to continue the fraudulent scheme of concealing the attaching defects.

t.      The June 1, 1988, Internal Memorandum from Alan Spicer to Jim Malone states that Facet did not have any capital in their budget for fiscal year 1988 to begin manufacturing one piece venturiis; however, he did attach a notice from Mr. Jake Pendley which showed that Facet would increase sales with the new one piece venturi.

u.      Facet Service Bulletin Al-89 relating to a one piece primary and main venturi speaks to reported instances of primary venturi failures in two piece venturi operations but fails to note that the venturi is failing because of the defective attaching mechanism in the carburetor. This bulletin lulled owners, operators and maintenance facilities with the intent of promoting the fraudulent concealment.

v.      Facet further investigated an accident on June 10, 1989, in St. Augustine, Florida involving a PA22, aircraft, federally registered as N834D, and failed to note the problems with the attaching mechanism of the carburetor halves and float system. The witnesses to the accident indicated that the engine was cutting out off and on and the aircraft turned left, stalled and crashed.

w.      In 1989, Mr. Bill Smith of Facet sent Mr. Pat Perrotta a request to replace the two piece venturi with a one piece venturi pursuant to an attached Facet Engineering Change Request No. AC 184.  Nowhere in the attached documents did Mr. Smith advise of the problem with the attaching defect in design

and the float system of their carburetor thus furthering the fraudulent concealment.

x.    The Precision defendants had numerous indications coming from the field by way of SDR's and Malfunction and Defect reports that screws were coming loose on the carburetors and float system problems resulting in engine roughness. The defendants chose to ignore this problem thus furthering the concealment by lulling the operators and maintenance facilities into disregarding the problem with the defective attaching design and float system.

y.    The Precision defendants were successful in lulling and concealing the attaching defect in design as noted by a letter of April 17, 1990, that was sent at approximately 3:00 p.m. EST from Henry K. Cooper to Mr. Larry Hale at Facet Aerospace granting approval for the manufacture of the one piece venturi. This was done without any reference by the Precision defendants to the defective design of the attaching of the carburetor halves.

z.    As noted by the July 17, 1986, Engineering Change Order No. 22674 from the engine manufacturers, Precision was successful in concealing from them the problems concerning the defects in the attaching mechanism and that the one piece venturi represented a product improvement.

aa.    The Precision defendants were further successful early on in concealing from the engine manufacturers the nature of the attaching defects as

58

noted by the approval letter by Richard W. Fullerton, Senior Project Engineer at Lycoming to Mr. William Smith at Facet Fuel Systems granting approval to Precision for the incorporation of one piece venturiis in carburetors.

        bb.    The Precision defendants have furthered their concealment and money-making scheme through the use of a company called Airpac to promote the sales of their various replacement after market parts.

        cc.    The Precision defendants furthered their fraudulent scheme by operating through a repair station and in doing so failed to report defects in the attaching mechanism, float system, and general design of the Marvel Schebler carburetors.

        dd.    The Precision defendants had actual knowledge of the need for safety retention as a result of their overseeing the Bendix fuel injector line.

        ee.    The Precision defendants furthered the fraudulent concealment by failing to note in the Precision Service Bulletins the fact that the Marvel Schebler carburetors had a defective design relating to their float system and attaching system for the carburetor halves.

        ff.    The Precision defendants furthered the fraudulent scheme by failing to note that despite their actual knowledge their Maintenance and Overhaul Manuals failed to reference the problem of the attaching screw mechanism coming

loose and float system failures.

   gg. The Precision defendants' Service Bulletin No. 10-60 failed to discuss problems associated with the defective attaching design thus furthering the fraudulent scheme.

   hh. The Precision defendants' Service Bulletin No. Al-61 failed to note the defects in the attaching system for the carburetor halves thus continuing the fraudulent concealment.

   ii. The Precision defendants' Service Bulletin No. A1-62 failed to reveal the defects in the attaching mechanism in the carburetor thus continuing the fraudulent concealment.

   jj. The Precision defendants' Service Bulletin No. Al-76 failed to warn of the defects in the attaching design.

   kk. The Precision defendants' Service Bulletin Al-90 failed to reveal and warn of the defects in the carburetor attaching mechanism and float system thus furthering the fraudulent concealment.

   ll. The Precision defendants' Service Bulletin MSA-2 failed to reveal and warn of the defects of the attaching mechanism of the carburetor.

   mm. The Precision defendants' Service Bulletin MSA-3 further concealed and failed to warn of the defects relating to the attaching mechanisms of

the carburetor and the float system defects.

nn.     The Precision defendants' Service Information Letters 10-15-90 and 2-25-92 failed to warn of the problems with the defective attaching mechanism of the carburetor halves and the float system.

oo.     The Precision defendants knew of the screws coming loose on various installations as noted in the January 17, 1962, letter from C.A. DuBois sent to the Precision defendants, Mr. Graham, Mr. Massey, and Mr. Ridel.  However, they failed to notify that one of the problems was being caused by the defective attaching mechanism.

pp.     As noted by a January 29, 1992 memo, Precision operators were not told about the defects in the design of the attachment for the carburetor halves and the float system. The letter goes on to indicate that Precision had indicated that approximately 100,000 airplanes would be affected by the Airworthiness Directive thus creating huge profits to be generated by the sale of their replacement parts.

qq.     The Precision defendants furthered the fraudulent concealment and failed to notify the Safety Board of problems with the defective attaching design and float system thus resulting in the Board's January 24, 1992, release of Safety Recommendation A-92-5, which did not address the reason why the primary venturiis were coming loose and causing problems, because they were not told by

the Precision defendants.

rr.    The Precision defendants have admitted that they actually knew that the screws attaching the carburetor halves can lose their torque.

ss.    The Precision defendants have admitted that they actually received SDR's from the field evidencing that the screws in the carburetor attaching system come loose.

tt.    The Precision defendants furthered the fraudulent scheme by blaming maintenance facilities for improperly installing the new one piece venturiis, when in fact the problems were also a result of a defective attaching design and float system.

uu.    The Precision defendants furthered the fraudulent scheme by failing to warn operators and maintenance facilities of the need to continuously recheck the torque on the defective design of the attaching screws.

vv.    The Precision defendants continued the fraudulent scheme by failing to notify the gasket supplier, Farnam Meillor Sealing Systems, that the attaching system for the carburetor halves was failing as a result of the gasket set.

ww.    The Precision defendants were actually aware of the need and effectiveness of safety wire as noted by the January 6, 1972, letter from the Chief of Engineering and Manufacturing, Mr. John Carran to Mr. R.N.Little at Marvel

Schebler.

xx.    The Precision defendants were actually aware of problems with rough running engines caused by their carburetor as noted by the May 23, 1985, letter from John R. James to Mr. Bill Smith at defendant Facet.  Design changes should have been made to the carburetor.  Service Difficulty Reports indicated that a potentially unsafe condition existed and therefore a redesign was indicated.  In response thereto, the Precision defendants did not inform the operators of the problems associated with the defective design of the attaching mechanism and gasket set, thus continuing the fraudulent scheme.

yy.    The Precision defendants had knowledge of alternative methods for securing the carburetor halves as indicated by their usage by long lock screws and safety soldered screws to attach the carburetor halves.  Additionally, it is standard procedure in the aviation industry to drill holes in screw heads and secure them with safety wire.

zz.    The Precision defendants had actual knowledge of the attaching problem pursuant to their participation in the aircraft carburetor investigation and subsequent report number 115 dated October 23, 1980.  Precision's inspection of the part number 10-3346-1 indicated that the four body to bowl screws were loose and the throttle body not tight against the bowl gasket.

aaa.    As noted in the July 11, 1986, internal memorandum from David Lang to the various distribution network noted in the cc section, the Precision defendants were developing a financial plan to increase profits by way of spare parts sales. This would also pertain to the sale of venturiis and replacement kits thus maximizing corporate profit.

bbb.   The Precision defendants had further actual knowledge of the problems with the attaching mechanism as a result of the April 1967 Technical Report, Analysis of Marvel Schebler Carburetors, Maintenance and Reliability Problems prepared by the Maintenance Analysis Center.

ccc.    The January 19, 1962, letter from Mr. Donald K. Graham, Project Engineering to Mr. Ray Jay Fennel, Service Manager at TCM, fully explains the actual knowledge that the Precision defendants had concerning the carburetor halves coming loose and the resultant problems were explained. Notwithstanding this knowledge, the defendants continued to conceal the problem so as to maximize the corporate profits.

ddd.   The Precision defendants Aircraft Carburetors and Parts Price Schedule Suggested List Prices delineate how much profit is actually involved by way of spare parts sales as a result of the defendant's fraudulent schemes.

eee.   The Precision defendants were actually aware by reports filtering

64

back to them from the field that certain Cessna installations were suffering severe vibration problems causing distress in the carburetors.

fff.   The Precision defendants were further actually aware of the attaching defects as a result of a April 7, 1972, letter from John A. Carran to Mr. R.M. Little of the Precision defendants whereby the Precision defendants were told of problems with the attachment of the carburetor halves.

ggg.   The Precision defendants furthered the fraudulent scheme by failing to inform owners, operators and maintenance facilities of the problem with the attaching mechanism and forcing the purchase of millions of dollars of Precision spare parts.

hhh.   During the 1990 through 1993 time-frame, the Precision defendants submitted numerous correspondences addressing the one piece venturi issue and failed every time to notify the defects in the attaching system and float system, thus furthering the fraudulent scheme.

iii.   Safety Board investigator, Paul Alexander, on January 17, 1992, sent a letter to Randy Jensen, transmitting Board Safety Recommendation dated January 24, 1992. Notwithstanding the Safety Recommendation, the defendants continued to fraudulently conceal from the NTSB the defective design in attaching the halves of the carburetors and also with the float system.

jjj.    The Precision defendants had actual knowledge concerning defects in the carburetor as a result of their participation in Williamson v. Cessna Aircraft, a case proceeding from a fatal crash in Harris County, Texas and additionally, in the matter of Ferguson v. Heli-K Aviation in the court of the Queens Bench of Alberta, Judicial District of Red Deer, and other lawsuits.

kkk.    During the negotiations leading to the purchase of the carburetor line by Precision, the replacement of the two piece venturi with the one piece venturi was described as a money making opportunity for Precision defendant Zenith.

lll.    Precision doubled the price of the one piece venturi to $74.00 within the first three months after it took over the aviation carburetor line, further evidencing their intent to reap financial rewards from this carburetor failure.

mmm.Internal Precision documents indicate the cost to Precision for the one piece venturiis was $1.49, which was being sold to the public for $74.00. At this time there were 129,000 aircraft to be affected by the change to the one piece venturi.

nnn.    The Precision defendants furthered the fraudulent scheme by failing to report defects concurring the attaching system and float system utilized on the carburetor halves.

ooo.    The Precision defendants were notified in 1964 of a Proposed

Airworthiness Directive resulting from numerous reports of operational malfunctions.

ppp.   By way of their February 15, 1965, letter, Marvel Schebler continued the concealment of the problem. Mr. R.T. Massey, Service Sales Manager for the Precision defendants at that time, sent a letter Mr. John A. Carran, indicating that it would be too expensive to continue using drill headed hex screws and safety wire. Only the new screws and safety washers need be used at a profit of $10.00 per carburetor to Precision.

qqq.   The Precision defendants began trying to make money on spare part sales on the attaching devices for the carburetors as noted by an April 30, 1965, letter to the Chief Engineer at Continental Motors Corporation indicating that the Precision defendants had come up with a new method of safety in the carburetor halves by use of a hex head cap screw with a special Marvel Schebler lock washer.

rrr.   The Precision defendants continued their fraudulent concealment of the screw and float system defects by responding to customer inquiries concerning the one piece venturi by stating that mechanics were causing the operating problems by not inserting the one piece venturi properly.

sss.   The Precision defendants were aware of solutions of the loosening screw problem because problems that this same carburetor had with

throttle arms. The solution to the throttle arm loosening problem was to recheck the torque and safety wire the screws. This simple solution would have also worked on the throttle body to fuel bowl screws; however, the Precision defendants chose not to go this route so as to reap the financial rewards of many millions of dollars in spare parts sales.

ttt.    Solutions to the loosening problem are also evidenced by a July 6, 1970, letter from The Cessna Aircraft Company, Obed T. Wells, Executive Engineer, to Mr. John A. Carran;

uuu.    On July 11, 1986, an Internal Memorandum from the Precision defendants authored by David Lang, the subject matter being an aircraft carburetor meeting in Bristol, Virginia, set forth the financial scheme that the Precision defendants were going to implement to foster spare parts sales.

vvv.    The actual problem of loose screws was also brought to the attention of Mr. R.N. Little of the Precision defendants by way of an Inter-Office Correspondence dated March 5, 1969, from H. N. Hartz.  Mr. Hartz indicated that the one complaint that was brought to his attention was that they have found carburetors with loose bowl cover screws. Mr. Hartz goes on to indicate, "this is the complaint that you will recall that was brought to your attention on Tuesday, March 4th." The actual knowledge of the design defects and the scheme to reap financial

rewards from spare parts sales was evidenced in the aircraft carburetor study completed in June 1986 by the Precision defendants.

www.    The Precision defendants have admitted knowledge of fuel leaking and discoloring the gasket that is positioned between the carburetor halves, however, they continue to advance the fraudulent scheme by adopting the position that this is normal, thus, fostering more sales.

xxx.   The Precision defendants admit that they have actual knowledge concerning screws working in the holes of the throttle body casting; however, they continue the fraudulent scheme by adopting a position that this is a result of normal operation and/or installation problems.

yyy.   The Precision defendants' actual knowledge of the looseness of two piece venturiis and the looseness of attaching screws is further evidenced by the April 24, 1962, letter from William A. Wiseman, Chief Engineer and Quality Director at Continental Motors.

zzz.    The Precision defendants' knowledge of the looseness and vibration problem is noted in the August 17, 1962, letter from Mr. R. Massey, Service Sales Manager for the Precision Defendants to Mr. Walter J. O'Toole Mr. Massey acknowledges the vibration problem causing looseness in the carburetor.

aaaa.  The Precision defendants furthered the fraudulent concealment

by recommending that MA4-SPA carburetors be excluded from one piece venturi replacements. A letter from Mr. Massey dated August 17, 1962, guaranteed that MA4-SPA carburetors would need multiple replacement parts over the years, thus further increasing corporate profits.

bbbb.  The Precision defendants, by way of a February 19, 1963 letter from Mr. R. Massey to Mr. Frank M. Bondor continued the fraudulent cover-up by failing to disclose to the FAA that the vibration problems with the venturi were caused by a loosening of the carburetor attaching mechanism.

cccc.  The Precision defendants had actual knowledge of the attaching problem as a result of the March 27, 1963, transmittal of 131 Malfunction or Defect Reports by Mr. Walter J. O'Toole.

dddd.  The Precision defendants had actual knowledge concerning the defects in their attaching system of the carburetor as a result of the July 2, 1964, letter from John A. Carran to Mr. R.J. Massey, Service Sales Manager for the Precision defendants at the time. He advised the Precision defendants of loose bowl screws that were being reported on their carburetors.

eeee.  The Precision defendants have had actual knowledge of the defects in the attaching system as a result of the many transmissions of Malfunction and Defect Reports to the Precision defendants as exemplified by the July 31, 1964,

70

transmittal letter from John A. Carran to Mr. R.J. Massey, Service Sales Manager for the Precision defendants.

ffff.   The Precision defendants continued the fraudulent scheme by intentionally failing to warn in their maintenance publications that the screws attaching the carburetor halves should be continuously checked for looseness. Such failure guaranteed that parts would have to be replaced in the carburetor thus ensuring continued spare parts sales for the defendants.

gggg. The Precision defendants' knowledge of defects in the attaching mechanism of carburetors was admitted to by former product support department manager, Mr. Randy Jensen.  Upon information and belief, Mr. Jensen stated under oath that he discussed screws coming loose with Mr. Peter Neilson, the Precision defendants' employee and listed expert in many lawsuits.  Mr. Jensen later became employed by the Textron defendants.

hhhh. The Precision defendants engaged in the above-noted fraudulent activities so as to conceal defects, avoid liability, and reap financial windfalls. Such activities in aid of fraudulent concealment began in the early 1960's and continue until the present.

iiii.   The Precision defendants, and each of them, have distributed manuals, service bulletins, and product support materials which contain false and

71

misleading material information and which omitted any and all reference to defects in the carburetor attaching design and float system, so as to mislead and intentionally conceal the problem, thereby permitting defendants to avoid the responsibility and cost for the correction of the defect with the resultant financial gain.

jjjj.    Despite numerous occurrences of looseness in the carburetor, tests conducted by the Precision defendants and other evidence of design defects, the Precision defendants, and each of them, intentionally concealed the problem by failing to inform aircraft owners.

kkkk. The Precision defendants, and each of them, having participated in investigations of carburetor failures resulting in engine power irregularities and accidents, had accurate knowledge of the potentially catastrophic consequences of the defect.  Notwithstanding this knowledge, all defendants chose to fraudulently conceal the defect. The Precision defendants willfully, wantonly, and with actual malice and ill motive disregarded the design defects and mechanical safety of aircraft and thus deliberately jeopardized the lives and safety of Plaintiffs' decedent and others similarly situated.

llll.    The Kelly defendants knew that the same or similar model carburetors and fuel delivery systems were failing in the field, and did not appropriately disclose same to the regulatory authorities. The Kelly defendants

72

designed and manufactured new and replacement parts for the same or similar model carburetors and made substantial profits from that operation, as well as from overhauling these carburetors.

      **mmmm.**    **September 8, 2004, letter from Peter Nielson to Rick Moffett at Textron Lycoming, admitting a trend of throttle body to bowl screws loosening on MA-4SPA carburetors in Cessna 172 aircraft and asking for Textron Lycoming's help as type certificate holder in determining whether corrective action was needed discussed above.**

      **nnnn.**  The defendants knew that owners, pilots, and passengers such as the plaintiff's decedent would rely on the expertise and the representations made by the defendants.

      **oooo.** The pilot on board the subject aircraft had no prior knowledge concerning the latent defects with the carburetor and engine fuel delivery system, and in fact would have justifiably relied on the misrepresentation concerning carburetor and fuel delivery system problems to the owners, operators, and maintenance personnel.

    **96**.    The manufacturing defendants had actual knowledge of the defects and issues relating to the continued airworthiness of the subject engine, its carburetor and fuel delivery system, and yet failed to warn owners, operators or mechanics in

the field or fix the problems **as required by the minimum federal aviation regulations discussed above**.  The defendants, with full knowledge that there was a problem and knowing full well that owners, operators, and maintenance persons and entities in the field would rely on the information streaming from the manufacturers, deliberately decided not to inform anyone concerning this problem.  The fraudulent omissions on behalf of the defendants are particularly apparent on the airworthiness release forms provided with new carburetors.  This release assures owners that the product is airworthy and safe for flight as designed.   Their doing so and certifying the product carburetor as airworthy **under the minimum federal aviation regulations** was in fact knowingly fraudulent.

**97.**    These defendants had an obligation to protect consumers and their safety **under the minimum federal aviation regulations cited above**, but failed and refused to do so.  This is the most egregious disregard for the safety and welfare of others.  This type of conduct needs to be punished to deter future people and manufacturers such as the Precision and Textron **and Kelly** defendants from knowingly selling a defective product.

**98**.    The manufacturing defendants chose to put financial gain above the health and welfare of the individuals killed and injured in the crash of the subject aircraft.

74

**99**.      Defendants Precision and Textron have known for many years that the screws that attached the carburetor halves and the float system utilized in the carburetors are defective and dangerous. These defendants could have fixed the problems at the time of manufacture and thereafter **as required under the minimum federal aviation regulations cited above**.  They chose not to.  They also did not adequately warn of the problem.  Family members of the decedent will bear the burden of the defendant's reckless indifference for the rest of their lives.

**100.**   The Precision and Textron defendants further engaged in intentional misrepresentation and concealment by failing to notify owners and operators that a float system failure, a failure of the attaching hardware for the carburetor, and/or a fuel delivery system failure could result in an engine failure.

**101**.      During the period relevant to the operation of the subject aircraft, and long prior thereto, the Precision and Textron defendants further engaged in intentional misrepresentation and concealment by failing to notify owners and operators of the necessity to properly and continuously inspect the carburetor system, the attachment hardware for the carburetor, and fuel delivery system so as to provide for adequate operation of aircraft engine.

**102.**   The Precision and Textron defendants further engaged in intentional misrepresentation and concealment by failing to notify owners and operators that the

attachment of the accident aircraft's carburetor halves resulted in a dangerous and inadequate retention.

**103**.    The Precision and Textron defendants further engaged in intentional misrepresentation and concealment by failing to notify owners and operators that improper fuel metering could result in fatal consequences.

**104**.    The Precision and Textron defendants further engaged in intentional misrepresentation and concealment by failing to notify owners and operators of the true nature and circumstances of improper fuel metering and float system sticking and attachment defects.

**105**.    The Precision and Textron defendants further engaged in intentional misrepresentation and concealment by failing to notify owners and operators that the fuel delivery should be regularly inspected to determine their future operational status.

**106**.    The Precision and Textron defendants engaged in the above misrepresentations and concealment in part by distribution of service bulletins, service letters, service information letters, advisory letters, maintenance manuals, overhaul manuals, and other product support materials, and further concealed the true nature of the problems with the aircraft, its engines, float system and fuel delivery system, and components by way of submitting misleading documents **in**

**violation of the minimum federal aviation regulations cited above**.

107.   The Precision and Textron defendants engaged in the above-noted intentional misrepresentation and concealment so as to further the sale of parts, aid in concealing the defects **from the Federal Aviation Administration in violation of minimum federal aviation regulations cited above**, and avoid liability for numerous fatal crashes and other accidents.  It is believed and therefore alleged that numerous activities began in the 1960's and continue to this date.

108.   It is believed and therefore alleged that the Precision and Textron defendants in concert and combination participated in numerous accident and other investigations concerning engine and fuel delivery system failures on the instant and similar model single engine aircraft, their engines and components, and knew of the potentially catastrophic consequences of the defects.  Notwithstanding this knowledge, the defendants intentionally misrepresented and concealed the defects from owners, operators and maintenance and repair facilities instead of bearing the financial burden of replacing the defective parts.

109.   The Precision and Textron defendants knew that owners, operators, and repair facilities would rely on the defendants' expertise and representations, including those made to the regulatory authorities **i.e., the Federal Aviation Administration.**

77

**110.**   The plaintiff's decedent had no prior knowledge concerning the above-noted defects and, in fact, did justifiably rely on the misrepresentations made by the defendants concerning the subject aircraft, the subject engine, the subject carburetor and hardware, and the subject fuel delivery system.

**111**.   Notwithstanding the Precision and Textron defendants' knowledge of the defects associated with the engine, components, carburetor system, and fuel delivery system of the type installed on the subject aircraft, the manufacturing defendants further failed to warn owners, operators, repair shops, and the regulatory authorities concerning these problems all of which affected the safe operation of the subject aircraft's engine assembly.

**112**.   At all times mentioned herein, the Precision and Textron defendants, and each of them, were joint venturers and the expressed and implied agents and employees of each of the other defendants and in doing the things hereinafter specified, were acting within the course of and scope of said agency and employment and on behalf of, and with the knowledge, consent, permission, concert and ratification (express, implied, actual and/or apparent) of each of the  defendants. Similarly, the Kelly defendants were joint venturers and the expressed and implied agents and employees of each other.

78

**Count I**
**Strict Liability**
**Plaintiffs v. The Precision Defendants**

**113**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.  **This includes, without limitation, all facts and minimum federal standards of care cited above, and violations thereof as if restated specifically in this Count, paragraph for paragraph and word for word.**

**114**.   At all times material hereto, the above-named Precision defendants were in the business of designing, manufacturing, overhauling, selling, distributing, maintaining, and assembling carburetors, their overhaul and repair kits and their accompanying installation and product support materials utilized on aircraft carburetors including the subject carburetor.

**115**.   These Precision defendants supplied and sold carburetors and their components, including the subject carburetor, its overhaul and repair kits, and the accompanying instructional products that were incorporated and used on the subject engine installed in the subject aircraft.

**116**.   The subject carburetor, its components, overhaul and repair kits, and attaching screws and locking mechanisms and overhaul manuals and instructional products were supplied, sold and introduced into the stream of commerce by these

79

defendants and were in the same or substantially similar condition at the time of the accident giving rise to this litigation as they were when designed, manufactured and sold.

**117**. At all times material herein, these defendants' carburetor, its components, attaching screws and locking mechanisms, overhaul manuals, and instructional products utilized on the accident aircraft were defective, resulting in an unreasonably dangerous condition which was a proximate cause of the happening of the subject accident and the plaintiff's decedent's injuries and death.

**118**. The defects in the defendants' carburetor, its components, overhaul kits, overhaul manuals, and instructional products consisted of the following:

a.   defective and inadequate instructions, warnings, and information concerning the installation of the carburetor utilized on the accident aircraft;

b.   defective and inadequate instructions, warnings, and information regarding the use and maintenance and overhaul of the carburetor installed on the accident aircraft;

c.   defective and inadequate instructions, warnings, and information concerning the inspection requirements for the carburetor utilized on the accident aircraft;

d.      defective design and manufacture of the fuel delivery system

utilized on the accident aircraft's carburetor;

e.      defective design and manufacture of carburetor, its float system

and needle valve utilized on the accident aircraft;

f.      defective and inadequate warnings concerning the failures caused

by the carburetor designed and manufactured by the Precision defendants;

g.      lack of adequate component parts for the accident carburetor

including a proper attaching and locking mechanism for the carburetor halves;

h.      defective design and manufacture of the fuel delivery system;

i.      defective design and manufacture of the overhaul kits for the

subject carburetor; and

j.      defective design and manufacture of the float system on the

accident carburetor.

**119.   These defects listed in paragraph 118 violated the minimum federal**

**aviation regulations listed below:**

> **a.      The minimum federal aviation regulations required truthful
> submissions to the Federal Aviation Administration (14 CFR
> § 21.2), truthful reporting of malfunctions and defects (14
> CFR §§ 21.3; 145.221; *see also* CAR § 52.47), a description of
> the engine operating features (14 CFR § 21.14), proof that
> the engine meets applicable airworthiness standards (14 CFR
> § 21.21; 14 CFR § 33.35; *see also* CAR § 13), and instructions**

for continued airworthiness (14 CFR § 33.4).  These regulations were knowingly violated by the Textron and Precision defendants as to the fuel delivery system for the O-320 engine, incorporating the MA-4SPA carburetor's defective throttle body to bowl screw/lock tab washer attachment mechanism/assembly and related defects detailed above.

b.      Pursuant to CAR § 13.100, "(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable.   The suitability of all questionable design details or parts shall be established by tests."  Pursuant to CAR § 13.101, "[a]ll materials used in the engine shall conform to approved specifications which will insure their having the strength and other properties assumed in the design data."  *See also* 14 CFR § 33.15 (the "suitability and durability of materials used in the engine must (a) be established on the basis of experience or test; and (b) conform to approved specifications....that ensure their having the strength and other properties assumed in the design data.")  These regulations were knowingly violated by the Textron defendants and Precision defendants, and proof of a violation was actively and knowingly concealed from the Federal Aviation Administration as already explained in this Complaint.  The O-320 engine and its MA-4SPA carburetor were shown by experience to be hazardous and/or unreliable.   Experience and/or tests did not properly establish the durability of materials.  Warranty records, Return Material Authorizations, repair records, Service Difficulty Reports and other information exists showing that the throttle body to bowl screws and lock tab washer design was not strong enough nor durable enough to affix the throttle body to the bowl of the MA-4SPA carburetor and withstand the operating parameters of the Textron Lycoming O-320 engine.

82

c.    Pursuant to CAR § 13.104, "[a]ll parts of the engine shall be designed and constructed to minimize the development of an unsafe condition of the engine between overhaul periods." *See* 14 CFR § 33.19 ("(a) Engine design and construction must minimize the development of an unsafe condition of the engine between overhaul periods.")  The Textron and Precision defendants knowingly violated these minimum federal regulations in that O-320 engine and its MA-4SPA carburetor was/were not designed or constructed to minimize the development of an unsafe condition of the engine between overhaul periods.  The defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.

d.    Pursuant to CAR  § 13.110 and 14 CFR § 33.35, the Textron defendants and Precision defendants had a minimum duty and responsibility to assure:  "The fuel system of the engine must be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions."  The subject Textron Lycoming  O-320 engine and its MA-4SPA carburetor were known to defendants to not be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions, in violation of this minimum federal regulation.  These defendants' knowing violation of these minimum federal aviation regulations was a causal factor in the crash at issue.

e.    In violation of 14 CFR § 33.4, the defendants' instructions for continued airworthiness were defective as to the throttle body to bowl screw/lock tab washer and attaching mechanism/assembly for the MA-4SPA carburetor.  These defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.

f.    As PMA duties, 14 CFR § 21.303(c)(4) provided at all times
material that the Precision defendants were required to
submit "test reports and computations necessary to show
that the design of the part meets the airworthiness
requirements of the Federal Aviation Regulations applicable
to the product on which the part is to be installed, unless the
applicant shows that the design of the part is identical to the
design of a part that is covered under a type certificate. If the
design of the part was obtained by a licensing agreement,
evidence of that agreement must be furnished."
Additionally, pursuant to 14 CFR § 21.303(f) and (k):

> (f) Each applicant for a Parts Manufacturer
> Approval must make all inspections and tests
> necessary to determine—
> (1) Compliance with the applicable airworthiness
> requirements;
> (2) That materials conform to the specifications
> in the design;
> (3) That the part conforms to the drawings in the
> design; and
> (4) That the fabrication processes, construction,
> and assembly conform to those specified in the
> design.
>             ****
> (k) Each holder of a Parts Manufacturer
> Approval shall determine that each completed
> part conforms to the design data and is safe for
> installation on type certificated products.

The subject MA-4SPA carburetor was known by the
Precision defendants and Textron defendants to not conform
to proper design data, to not comply with applicable
airworthiness requirements, to not properly conform to
proper specifications in design, and/or to not be safe for
installation on the type certificated Lycoming O-320 engine.
The Textron defendants and Precision defendants knew the

MA-4SPA carburetor was not safe for installation on the type certificated engine as explained in detail above and below in this Complaint.  This knowing failure to comply with minimum duties under the aforementioned CAR § 13 and 14 CFR § 21.303(a) *et seq*. and 14 CFR § 33.35 *et seq*. was a causal factor in the crash.

g.     The Textron defendants and Precision defendants had a minimum duty of continued airworthiness and a duty to report malfunctions, defects and failures pursuant to 14 CFR §§ 21.3; 21.303.  Pursuant to 14 CFR § 21.3 (1970):

Notification of failures, malfunctions, and defects. The holder of a Type Certificate (including a Supplemental Type Certificate), or a Parts Manufacturer Approval (PMA), or the licensee of a Type Certificate, shall within twenty-four (24) hours after it discovers or is informed of a failure, malfunction, or defect in any product or part manufactured by it, notify the FAA Regional Office in the region in which the holder or licensee is located of any such failure, malfunction, or defect that could result in a hazard to flight. The notification shall be made by the most expeditious method available and shall include as much of the following information as is available: (1) Model designation. (2) Serial number. (3) Identification of the part, component, or system involved. (4) Nature of the failure, malfunction, or defect.

Pursuant to 14 CFR § 21.3 (1989):

Reporting of failures, malfunctions, and defects.  (a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval

85

(PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

(b) The holder of a Type Certificate (including a upplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

14 CFR § 21.3(c) includes as examples "engine failure."  The Precision defendants' and Textron defendants' knowingly failed to comply with these minimum federal aviation regulations, which was a causal factor in the crash at issue.

h.     The Precision defendants and Textron defendants were Federal Aviation Administration licensed/certified repair facilities.  As such, those defendants had at all times material an independent minimum duty to report any serious failure, malfunction or defect. CAR § 52.47; 14 CFR § 145.221 (previously 145.63).  CAR § 52.47 provided: "Reports of Defects or Unairworthy Conditions...a certified repair station shall submit to the Administrator an immediate report of serious defects in, or other recurring unairworthy conditions of, a...powerplant...or any component thereof, on a form and in a manner acceptable to the Administrator."  Section 145.221(a) provides:  "A certificated repair station must report to the FAA within 96 hours after it discovers any serious failure, malfunction, or defect of an article. The report must be in a format acceptable to the FAA."  The

Precision defendants and Textron defendants knowingly violated these minimum federal aviation regulations which were a causal factor in the subject crash.

i.      The Precision defendants and Textron defendants knowingly misrepresented and concealed and failed to report to the Federal Aviation Administration pursuant to 14 CFR § 21.3, CAR § 52.47 and 14 CFR § 145.221 various failures, malfunctions and defects, showing loose throttle body to bowl screws (or loose throttle bodies, loose bowls, and gasket issues), attachment problems, and related design problems and defects in the MA-3 and MA-4 series small updraft carburetors installed on the O-320 series engine and similar Lycoming engines, which were a direct causal factor in the loss of engine power and crash giving rise to this litigation. These defendants failed to properly investigate the failures, malfunctions, and defects in the MA-4SPA carburetor and similar MA updraft carburetors, and continued, even after the subject crash, to patently misrepresent to the Federal Aviation Administration and public the true nature of the design/manufacturing flaw in the MA-4SPA carburetor and Textron Lycoming O-320 engine.

As an example, on September 8, 2004, approximately 10 months before the July 2005 accident involved in this litigation, Peter Nielson of Precision Airmotive sent Rick Moffett at Textron Lycoming a letter indicating there was a problematic trend discovered in Service Difficulty Reports with throttle body to bowl screws loosening in Cessna 172 aircraft equipped with Lycoming O-320 engines and MA-4SPA carburetors, seeking Textron Lycoming's help in determining whether corrective action was needed.  Precision was doing this per its known minimum duty under the federal aviation regulations to investigate failures of its MA-4SPA product line and to monitor Service Difficulty Reports.  Various Service Difficulty Reports exist showing knowledge by the Precision and Textron defendants of a latent defect in

87

the throttle body to bowl screw and lock tab washer design with the MA-4SPA carburetor line.  Peter Nielson of Precision Airmotive even recently admitted in a Florida courtroom (in a case involving a Continental engine) that the issues of throttle body to bowl screws loosening in the field was limited to the MA-4SPA carburetor installed on Textron Lycoming O-320 engines due to the unique environment in which that engine operates.  This defect was at all times material knowingly concealed and withheld from the Federal Aviation Administration, and continues to be concealed and withheld from the Federal Aviation Administration, which was a causal factor in the loss of engine power and crash at issue.

j.      In the alternative, by way of analogy to 14 CFR § 91.13 ("No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."), the Textron defendants and Precision defendants each had a duty not to design or manufacture the subject engine and carburetor in a "careless or reckless" manner.  The subject O-320 engine and its MA-4SPA carburetor was/were designed and manufactured carelessly and also recklessly, which was a causal factor in the subject crash. Defendants knew that the O-320 engine fuel system did not properly meter fuel and air to the engine under normal, foreseeable conditions.  The MA-4SPA carburetor as installed on the O-320 engine was knowingly defective in that throttle body to bowl screws would loosen which could cause a loss of engine power and failure.  This careless and/or reckless action by these defendants was a causal factor in the loss of engine power and crash at issue.

120.   The defects/**violations of federal regulations** in the aforementioned

parts sold, supplied and introduced into the stream of commerce by these defendants

and their actions in that regard were a proximate cause in the happening of the accident and the plaintiff's decedent's injuries and death.

121.   As a direct and proximate result of one or more of the aforementioned defects and acts by the Precision defendants caused or substantially contributed to the crash, the plaintiff's decedent suffered fatal injuries as described herein.

WHEREFORE, the plaintiff demands judgment against these defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

**Count II**
**Breach of Warranties**
**Plaintiff v. The Precision Defendants**

122.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.  **This includes, without limitation, all facts and minimum federal standards of care cited above, and violations thereof as if restated specifically in this Count, paragraph for paragraph and word for word.**

123.   The Precision defendants warranted, expressly and impliedly, that they complied with minimum industry standards and ~~state and~~ federal regulations **cited above** during the design and manufacture of the subject carburetor and its components, that the subject carburetor and its components and replacement parts

89

and overhaul kits were not defective, in an airworthy condition, and reasonably fit for their intended and foreseeable uses and purposes on the subject engine.

124.   The Precision defendants further warranted, expressly and impliedly, that its overhaul manuals and instructional literature were not defective, that if followed would allow the carburetor and its components to function properly and in an airworthy manner, and were reasonably fit for their intended and foreseeable uses and purposes **pursuant to the minimum federal regulations cited above**.

125.   Notwithstanding these express and implied warranties, the Precision defendants breached them in that the subject carburetor and its components did not comply with minimum industry standards and state and federal regulations **cited above**, the subject carburetor and its components and replacement parts and overhaul kits were defective, not in an airworthy condition, and were not reasonably fit for their intended and foreseeable uses and purposes on the subject engine, **and violated the minimum federal aviation regulations as follows:**

**126.   These breaches listed in paragraph 125 violated the minimum federal aviation regulations listed below:**

    **a.   The minimum federal aviation regulations required truthful submissions to the Federal Aviation Administration (14 CFR § 21.2), truthful reporting of malfunctions and defects (14 CFR §§ 21.3; 145.221; *see also* CAR § 52.47), a description of the engine operating features (14 CFR § 21.14), proof that**

the engine meets applicable airworthiness standards (14 CFR § 21.21; 14 CFR § 33.35; *see also* CAR § 13), and instructions for continued airworthiness (14 CFR § 33.4). These regulations were knowingly violated by the Textron and Precision defendants as to the fuel delivery system for the O-320 engine, incorporating the MA-4SPA carburetor's defective throttle body to bowl screw/lock tab washer attachment mechanism/assembly and related defects detailed above.

b.    Pursuant to CAR § 13.100, "(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable. The suitability of all questionable design details or parts shall be established by tests." Pursuant to CAR § 13.101, "[a]ll materials used in the engine shall conform to approved specifications which will insure their having the strength and other properties assumed in the design data." *See also* 14 CFR § 33.15 (the "suitability and durability of materials used in the engine must (a) be established on the basis of experience or test; and (b) conform to approved specifications....that ensure their having the strength and other properties assumed in the design data.") These regulations were knowingly violated by the Textron defendants and Precision defendants, and proof of a violation was actively and knowingly concealed from the Federal Aviation Administration as already explained in this Complaint. The O-320 engine and its MA-4SPA carburetor were shown by experience to be hazardous and/or unreliable. Experience and/or tests did not properly establish the durability of materials. Warranty records, Return Material Authorizations, repair records, Service Difficulty Reports and other information exists showing that the throttle body to bowl screws and lock tab washer design was not strong enough nor durable enough to affix the throttle body to the bowl of the MA-4SPA carburetor and withstand the operating parameters of the Textron Lycoming O-320 engine.

c.  Pursuant to CAR § 13.104, "[a]ll parts of the engine shall be designed and constructed to minimize the development of an unsafe condition of the engine between overhaul periods." *See* 14 CFR § 33.19 ("(a) Engine design and construction must minimize the development of an unsafe condition of the engine between overhaul periods.") The Textron and Precision defendants knowingly violated these minimum federal regulations in that O-320 engine and its MA-4SPA carburetor was/were not designed or constructed to minimize the development of an unsafe condition of the engine between overhaul periods. The defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.

d.  Pursuant to CAR  § 13.110 and 14 CFR § 33.35, the Textron defendants and Precision defendants had a minimum duty and responsibility to assure:  "The fuel system of the engine must be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions."  The subject Textron Lycoming  O-320 engine and its MA-4SPA carburetor were known to defendants to not be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions, in violation of this minimum federal regulation.  These defendants' knowing violation of these minimum federal aviation regulations was a causal factor in the crash at issue.

e.  In violation of 14 CFR § 33.4, the defendants' instructions for continued airworthiness were defective as to the throttle body to bowl screw/lock tab washer and attaching mechanism/assembly for the MA-4SPA carburetor.  These defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.

f.     As PMA duties, 14 CFR § 21.303(c)(4) provided at all times material that the Precision defendants were required to submit "test reports and computations necessary to show that the design of the part meets the airworthiness requirements of the Federal Aviation Regulations applicable to the product on which the part is to be installed, unless the applicant shows that the design of the part is identical to the design of a part that is covered under a type certificate. If the design of the part was obtained by a licensing agreement, evidence of that agreement must be furnished." Additionally, pursuant to 14 CFR § 21.303(f) and (k):

> (f) Each applicant for a Parts Manufacturer Approval must make all inspections and tests necessary to determine—
> (1) Compliance with the applicable airworthiness requirements;
> (2) That materials conform to the specifications in the design;
> (3) That the part conforms to the drawings in the design; and
> (4) That the fabrication processes, construction, and assembly conform to those specified in the design.
>
> ****
>
> (k) Each holder of a Parts Manufacturer Approval shall determine that each completed part conforms to the design data and is safe for installation on type certificated products.

The subject MA-4SPA carburetor was known by the Precision defendants and Textron defendants to not conform to proper design data, to not comply with applicable airworthiness requirements, to not properly conform to proper specifications in design, and/or to not be safe for installation on the type certificated Lycoming O-320 engine.

93

**The Textron defendants and Precision defendants knew the MA-4SPA carburetor was not safe for installation on the type certificated engine as explained in detail above and below in this Complaint. This knowing failure to comply with minimum duties under the aforementioned CAR § 13 and 14 CFR § 21.303(a) *et seq*. and 14 CFR § 33.35 *et seq*. was a causal factor in the crash.**

g.   **The Textron defendants and Precision defendants had a minimum duty of continued airworthiness and a duty to report malfunctions, defects and failures pursuant to 14 CFR §§ 21.3; 21.303.  Pursuant to 14 CFR § 21.3 (1970):**

> **Notification of failures, malfunctions, and defects. The holder of a Type Certificate (including a Supplemental Type Certificate), or a Parts Manufacturer Approval (PMA), or the licensee of a Type Certificate, shall within twenty-four (24) hours after it discovers or is informed of a failure, malfunction, or defect in any product or part manufactured by it, notify the FAA Regional Office in the region in which the holder or licensee is located of any such failure, malfunction, or defect that could result in a hazard to flight. The notification shall be made by the most expeditious method available and shall include as much of the following information as is available: (1) Model designation. (2) Serial number. (3) Identification of the part, component, or system involved. (4) Nature of the failure, malfunction, or defect.**

**Pursuant to 14 CFR § 21.3 (1989):**

> **Reporting of failures, malfunctions, and defects.  (a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental**

94

Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

(b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

14 CFR § 21.3(c) includes as examples "engine failure." The Precision defendants' and Textron defendants' knowingly failed to comply with these minimum federal aviation regulations, which was a causal factor in the crash at issue.

h.    The Precision defendants and Textron defendants were Federal Aviation Administration licensed/certified repair facilities. As such, those defendants had at all times material an independent minimum duty to report any serious failure, malfunction or defect. CAR § 52.47; 14 CFR § 145.221 (previously 145.63). CAR § 52.47 provided: "Reports of Defects or Unairworthy Conditions...a certified repair station shall submit to the Administrator an immediate report of serious defects in, or other recurring unairworthy conditions of, a...powerplant...or any component thereof, on a form and in a manner acceptable to the Administrator." Section 145.221(a) provides: "A certificated repair station must report to the FAA within 96 hours after it discovers any serious failure, malfunction, or defect of an article. The

95

report must be in a format acceptable to the FAA."  The
Precision defendants and Textron defendants knowingly
violated these minimum federal aviation regulations which
were a causal factor in the subject crash.

i.     The Precision defendants and Textron defendants knowingly
misrepresented and concealed and failed to report to the
Federal Aviation Administration pursuant to 14 CFR § 21.3,
CAR § 52.47 and 14 CFR § 145.221 various failures,
malfunctions and defects, showing loose throttle body to
bowl screws (or loose throttle bodies, loose bowls, and gasket
issues), attachment problems, and related design problems
and defects in the MA-3 and MA-4 series small updraft
carburetors installed on the O-320 series engine and similar
Lycoming engines, which were a direct causal factor in the
loss of engine power and crash giving rise to this litigation.
These defendants failed to properly investigate the failures,
malfunctions, and defects in the MA-4SPA carburetor and
similar MA updraft carburetors, and continued, even after
the subject crash, to patently misrepresent to the Federal
Aviation Administration and public the true nature of the
design/manufacturing flaw in the MA-4SPA carburetor and
Textron Lycoming O-320 engine.  See above detailed
examples.  Defects were at all times material knowingly
concealed and withheld from the Federal Aviation
Administration, and continues to be concealed and withheld
from the Federal Aviation Administration, which was a
causal factor in the loss of engine power and crash at issue.

j.     In the alternative, by way of analogy to 14 CFR § 91.13 ("No
person may operate an aircraft in a careless or reckless
manner so as to endanger the life or property of another."),
the Textron defendants and Precision defendants each had a
duty not to design or manufacture the subject engine and
carburetor in a "careless or reckless" manner.  The subject
O-320 engine and its MA-4SPA carburetor was/were
designed and manufactured carelessly and also recklessly,

> which was a causal factor in the subject crash. Defendants knew that the O-320 engine fuel system did not properly meter fuel and air to the engine under normal, foreseeable conditions.  The MA-4SPA carburetor as installed on the O-320 engine was knowingly defective in that throttle body to bowl screws would loosen which could cause a loss of engine power and failure.  This careless and/or reckless action by these defendants was a causal factor in the loss of engine power and crash at issue.

**127.**   The Precision defendants also breached them in that its overhaul manuals and instructional literature were defective, that if followed would not allow the carburetor and its components to function properly and in an airworthy manner, and that the manuals and instructional  literature were not reasonably fit for their intended and foreseeable uses and purposes, **in violation of the foregoing federal regulations.**

**128**.   Plaintiff's decedent was injured and killed by the subject aircraft incorporating the subject engine incorporating the subject carburetor and its manuals and instructions;  the injury and death occurred because the products were in a defective condition, unreasonably dangerous to the user; and the products at the time of the accident were in essentially the same condition as when they left the hands of the defendants.  The product defects **and violations of the minimum federal standards of care explained above** were the proximate cause of the injury and death sustained.

97

**129**.   As a direct and proximate result of the breach of express and implied warranties by the Precision defendants, plaintiff's decedent suffered severe injuries and death, including: a) prolonged conscious pain and suffering; b) increased emotional distress and suffering prior to death; and c) death.

WHEREFORE, the plaintiff demands judgment against these defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

**Count III**
**Negligence**
**Plaintiff v. The Precision Defendants**

**130**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.  **This includes, without limitation, all facts and minimum federal standards of care cited above, and violations thereof as if restated specifically in this Count, paragraph for paragraph and word for word.**

**131**.   The Precision defendants had **minimum federal duties cited above including** a duty to exercise reasonable care in regard to their respective activities relating to the subject carburetor, its components, the fuel system and overhaul manuals and instructional products. These defendants, however, were negligent and careless in the discharge of those activities and breached this duty.

**132**.   The negligence and carelessness of these defendants consisted of:

a.      failing to reasonably test the carburetor, attachment of carburetor halves, and fuel delivery systems utilized on the subject carburetor installed in the subject aircraft;

b.      failing to reasonably design the attachment of carburetor halves, fuel delivery system and float system utilized on the subject carburetor installed in the subject aircraft;

c.      failing to reasonably manufacture the carburetor, attachment of carburetor halves, float system, and fuel delivery systems utilized on the subject carburetor installed in the subject aircraft;

d.      failing to adequately instruct and warn the plaintiffs' decedent of the defects in the carburetor, attachment of carburetor halves, float system, and fuel delivery systems utilized on the subject carburetor installed in the subject aircraft;

e.      failing to comply with minimum industry standards and state and federal regulations during the design and manufacture of the subject carburetor and fuel system, and thereafter failing to report defects to the regulatory authorities;

f.  misrepresenting and failing to reasonably notify and warn of the defects in the carburetor, attachment of carburetor halves, float system, and fuel delivery system utilized on the subject carburetor installed in the subject aircraft;

99

g.      failing to correct known defects in the carburetor, attachment of carburetor halves, float system, fuel delivery system and instructional products utilized on the subject carburetor installed in the subject aircraft;

h.      failing to reasonably represent the true nature of the defects in the carburetor, attachment of carburetor halves, float system, and fuel delivery system utilized on the subject carburetor installed in the subject aircraft;

i.      unreasonably representing as airworthy the carburetor, attachment of carburetor halves, float system, and fuel delivery system utilized on the subject aircraft;

j.      failing to reasonably design, prepare, certify, and promulgate the performance, maintenance, and installation specifications, instructions, manuals, warnings, and instructional products for the carburetor, attachment of carburetor halves, float system, and fuel delivery system utilized on the subject carburetor installed in the accident aircraft; and

k.      failing to provide the proper attachment of carburetor halves, float system, and fuel delivery system for installation on the subject aircraft's carburetor.

**133**.   The negligence and carelessness of these ~~defendants~~ also consists of:

a.      failing to reasonably test their carburetor components and repair

100

and overhaul kits;

        b.     failing to reasonably design their carburetor components and repair and overhaul kits;

        c.     failing to reasonably manufacture their carburetor components and repair and overhaul kits;

        d.     failing to adequately warn the plaintiffs' decedent of the defects in their carburetor components and repair and overhaul kits;

        e.     misrepresenting and failing to reasonably notify and warn regulatory authorities of the defects in the carburetor components and repair and overhaul kits;

        f.     failing to correct known defects in their carburetor components and repair and overhaul kits;

        g.     failing to reasonably represent the true nature of the defects in their carburetor components and repair and overhaul kits;

        h.     unreasonably representing as airworthy their carburetor components and repair and overhaul kits; and

        i.     failing to reasonably design, prepare, certify, and promulgate the performance, maintenance and installation specifications, instructions, manuals, warnings, and instructional products for their carburetor components and repair and

overhaul kits.

**134**.    The negligence and carelessness of these defendants also consisted of:

a.    failing to reasonably test the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft;

b.    failing to reasonably design the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft;

c.    failing to reasonably manufacture the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft;

d.    failing to adequately warn the plaintiffs' decedent of the defects in the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft;

e.    misrepresenting and failing to reasonably notify and warn of the defects in the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft;

f.    failing to correct known defects in the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft;

g.      failing to reasonably represent the true nature of the defects in the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft;

h.      unreasonably certifying as airworthy the attaching screws and locking mechanisms of the carburetor halves utilized on the carburetor of the subject aircraft; and

i.      failing to reasonably design, prepare, certify, and promulgate the performance, maintenance and installation specifications, instructions, manuals, warnings, and instructional products for the attaching screws and locking mechanisms of the carburetor halves installed on the carburetor of the subject aircraft.

**135**.   The negligence described above was in violation of the minimum federal aviation regulations as follows:

> **a.      The minimum federal aviation regulations required truthful submissions to the Federal Aviation Administration (14 CFR § 21.2), truthful reporting of malfunctions and defects (14 CFR §§ 21.3; 145.221; *see also* CAR § 52.47), a description of the engine operating features (14 CFR § 21.14), proof that the engine meets applicable airworthiness standards (14 CFR § 21.21; 14 CFR § 33.35; *see also* CAR § 13), and instructions for continued airworthiness (14 CFR § 33.4).  These regulations were knowingly violated by the Textron and Precision defendants as to the fuel delivery system for the O-320 engine, incorporating the MA-4SPA carburetor's**

defective throttle body to bowl screw/lock tab washer attachment mechanism/assembly and related defects detailed above.

b.      Pursuant to CAR § 13.100, "(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable.   The suitability of all questionable design details or parts shall be established by tests."  Pursuant to CAR § 13.101, "[a]ll materials used in the engine shall conform to approved specifications which will insure their having the strength and other properties assumed in the design data."  *See also* 14 CFR § 33.15 (the "suitability and durability of materials used in the engine must (a) be established on the basis of experience or test; and (b) conform to approved specifications....that ensure their having the strength and other properties assumed in the design data.")  These regulations were knowingly violated by the Textron defendants and Precision defendants, and proof of a violation was actively and knowingly concealed from the Federal Aviation Administration as already explained in this Complaint.  The O-320 engine and its MA-4SPA carburetor were shown by experience to be hazardous and/or unreliable.  Experience and/or tests did not properly establish the durability of materials.  Warranty records, Return Material Authorizations, repair records, Service Difficulty Reports and other information exists showing that the throttle body to bowl screws and lock tab washer design was not strong enough nor durable enough to affix the throttle body to the bowl of the MA-4SPA carburetor and withstand the operating parameters of the Textron Lycoming O-320 engine.

c.      Pursuant to CAR § 13.104, "[a]ll parts of the engine shall be designed and constructed to minimize the development of an unsafe condition of the engine between overhaul periods."  *See* 14 CFR § 33.19 ("(a) Engine design and construction must minimize the development of an unsafe condition of the

engine between overhaul periods.")  The Textron and
Precision defendants knowingly violated these minimum
federal regulations in that O-320 engine and its MA-4SPA
carburetor was/were not designed or constructed to minimize
the development of an unsafe condition of the engine between
overhaul periods.  The defendants' knowing violation of this
minimum federal aviation regulation was a causal factor in
the crash at issue.

d.     Pursuant to CAR  § 13.110 and 14 CFR § 33.35, the Textron
defendants and Precision defendants had a minimum duty
and responsibility to assure:  "The fuel system of the engine
must be designed and constructed to supply an appropriate
mixture of fuel to the cylinders throughout the complete
operating range of the engine under all flight and
atmospheric conditions."  The subject Textron Lycoming  O-
320 engine and its MA-4SPA carburetor were known to
defendants to not be designed and constructed to supply an
appropriate mixture of fuel to the cylinders throughout the
complete operating range of the engine under all flight and
atmospheric conditions, in violation of this minimum federal
regulation.  These defendants' knowing violation of these
minimum federal aviation regulations was a causal factor in
the crash at issue.

e.     In violation of 14 CFR § 33.4, the defendants' instructions
for continued airworthiness were defective as to the throttle
body to bowl screw/lock tab washer and attaching
mechanism/assembly for the MA-4SPA carburetor.  These
defendants' knowing violation of this minimum federal
aviation regulation was a causal factor in the crash at issue.

f.     As PMA duties, 14 CFR § 21.303(c)(4) provided at all times
material that the Precision defendants were required to
submit "test reports and computations necessary to show
that the design of the part meets the airworthiness
requirements of the Federal Aviation Regulations applicable

to the product on which the part is to be installed, unless the applicant shows that the design of the part is identical to the design of a part that is covered under a type certificate. If the design of the part was obtained by a licensing agreement, evidence of that agreement must be furnished."
Additionally, pursuant to 14 CFR § 21.303(f) and (k):

> (f) Each applicant for a Parts Manufacturer Approval must make all inspections and tests necessary to determine—
> (1) Compliance with the applicable airworthiness requirements;
> (2) That materials conform to the specifications in the design;
> (3) That the part conforms to the drawings in the design; and
> (4) That the fabrication processes, construction, and assembly conform to those specified in the design.
>
> ****
>
> (k) Each holder of a Parts Manufacturer Approval shall determine that each completed part conforms to the design data and is safe for installation on type certificated products.

The subject MA-4SPA carburetor was known by the Precision defendants and Textron defendants to not conform to proper design data, to not comply with applicable airworthiness requirements, to not properly conform to proper specifications in design, and/or to not be safe for installation on the type certificated Lycoming O-320 engine. The Textron defendants and Precision defendants knew the MA-4SPA carburetor was not safe for installation on the type certificated engine as explained in detail above and below in this Complaint.  This knowing failure to comply with minimum duties under the aforementioned CAR § 13 and 14 CFR § 21.303(a) *et seq.* and 14 CFR § 33.35 *et seq.*

was a causal factor in the crash.

g.    **The Textron defendants and Precision defendants had a minimum duty of continued airworthiness and a duty to report malfunctions, defects and failures pursuant to 14 CFR §§ 21.3; 21.303. Pursuant to 14 CFR § 21.3 (1970):**

> **Notification of failures, malfunctions, and defects. The holder of a Type Certificate (including a Supplemental Type Certificate), or a Parts Manufacturer Approval (PMA), or the licensee of a Type Certificate, shall within twenty-four (24) hours after it discovers or is informed of a failure, malfunction, or defect in any product or part manufactured by it, notify the FAA Regional Office in the region in which the holder or licensee is located of any such failure, malfunction, or defect that could result in a hazard to flight. The notification shall be made by the most expeditious method available and shall include as much of the following information as is available: (1) Model designation. (2) Serial number. (3) Identification of the part, component, or system involved. (4) Nature of the failure, malfunction, or defect.**

**Pursuant to 14 CFR § 21.3 (1989):**

> **Reporting of failures, malfunctions, and defects. (a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in**

any of the occurrences listed in paragraph (c) of this section.

(b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

14 CFR § 21.3(c) includes as examples "engine failure." The Precision defendants' and Textron defendants' knowingly failed to comply with these minimum federal aviation regulations, which was a causal factor in the crash at issue.

h.    The Precision defendants and Textron defendants were Federal Aviation Administration licensed/certified repair facilities. As such, those defendants had at all times material an independent minimum duty to report any serious failure, malfunction or defect. CAR § 52.47; 14 CFR § 145.221 (previously 145.63). CAR § 52.47 provided: "Reports of Defects or Unairworthy Conditions...a certified repair station shall submit to the Administrator an immediate report of serious defects in, or other recurring unairworthy conditions of, a...powerplant...or any component thereof, on a form and in a manner acceptable to the Administrator." Section 145.221(a) provides: "A certificated repair station must report to the FAA within 96 hours after it discovers any serious failure, malfunction, or defect of an article. The report must be in a format acceptable to the FAA." The Precision defendants and Textron defendants knowingly violated these minimum federal aviation regulations which were a causal factor in the subject crash.

i.   **The Precision defendants and Textron defendants knowingly misrepresented and concealed and failed to report to the Federal Aviation Administration pursuant to 14 CFR § 21.3, CAR § 52.47 and 14 CFR § 145.221 various failures, malfunctions and defects, showing loose throttle body to bowl screws (or loose throttle bodies, loose bowls, and gasket issues), attachment problems, and related design problems and defects in the MA-3 and MA-4 series small updraft carburetors installed on the O-320 series engine and similar Lycoming engines, which were a direct causal factor in the loss of engine power and crash giving rise to this litigation. These defendants failed to properly investigate the failures, malfunctions, and defects in the MA-4SPA carburetor and similar MA updraft carburetors, and continued, even after the subject crash, to patently misrepresent to the Federal Aviation Administration and public the true nature of the design/manufacturing flaw in the MA-4SPA carburetor and Textron Lycoming O-320 engine.  See above detailed examples.**

j.   **In the alternative, by way of analogy to 14 CFR § 91.13 ("No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."), the Textron defendants and Precision defendants each had a duty not to design or manufacture the subject engine and carburetor in a "careless or reckless" manner.  The subject O-320 engine and its MA-4SPA carburetor was/were designed and manufactured carelessly and also recklessly, which was a causal factor in the subject crash. Defendants knew that the O-320 engine fuel system did not properly meter fuel and air to the engine under normal, foreseeable conditions.  The MA-4SPA carburetor as installed on the O-320 engine was knowingly defective in that throttle body to bowl screws would loosen which could cause a loss of engine power and failure.  This careless and/or reckless action by these defendants was a causal factor in the loss of engine power and crash at issue.**

109

**136.** The negligence of the defendants and all or any of them, ~~was~~**which constituted violations of the above federal regulations** was**/were** a proximate cause in the happening of the accident giving rise to this litigation and plaintiff's decedent's fatal injuries described herein.

**137**. The negligence of these defendants caused or substantially contributed to the accident in that the subject aircraft's carburetor and/or fuel system failed, the subject engine failed, and the airplane crashed, fatally injuring the plaintiff's decedent.

**138**. As a direct and proximate result of the negligence of the Precision defendants **and violations of the above federal regulations**, plaintiff's decedent suffered severe injuries and death, including: a) prolonged conscious pain and suffering; b) increased emotional distress and suffering prior to death; and c) death.

WHEREFORE, the plaintiff demands judgment against these defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

**Count IV**
**Strict Liability**
**Plaintiff v. The Textron Defendants**

**139.** Plaintiff incorporates by reference each prior allegation and fact, as if

110

specifically restated herein, paragraph for paragraph and word for word.  **This includes, without limitation, all facts and minimum federal standards of care cited above, and violations thereof as if restated specifically in this Count, paragraph for paragraph and word for word.**

140.   The Textron defendants designed, manufactured, assembled, certified, supplied, engineered, approved and sold the subject engine and its components, incorporating the subject carburetor and fuel delivery system.

141.   The Textron defendants are liable to the plaintiffs on the theory of strict liability in tort in that the subject engine, subject carburetor and its fuel delivery system and their various instructional products were defective **and not in compliance with the minimum federal aviation regulations cited above**.  These products were defective **and not in compliance with the minimum federal aviation regulations cited above** when they were manufactured, designed, generated and placed in the stream of commerce, and were in substantially the same condition at the time of the crash.  These defects **and non-compliance with the minimum federal aviation regulations** were causally related to the crash.

142.   **In violation of minimum federal aviation regulations,** the subject engine, subject carburetor, fuel delivery system, and instructional products were defective in the following respects:

111

a.      They had an improperly designed and manufactured propulsion system and product support materials;

b.      They had an improperly designed, generated and manufactured fuel delivery system and product support materials;

c.      They had an improperly designed, generated and manufactured carburetor attaching system, float system, and product support materials;

d.      They had improperly designed, generated and manufactured maintenance instructions and product support materials;

e.      They had improperly designed and generated warnings related to the fuel delivery system and carburetor;

f.      They had improperly generated, designed, assembled and manufactured engine components and their service instructions and service bulletins;

g.      They had an improperly designed and manufactured carburetor attachment system, float mechanism and fuel delivery system;

h.      They had an improperly designed, generated and manufactured service and maintenance instructions; and

i.      They did not have adequate fuel system troubleshooting instructions and techniques.

**143.   These defects listed in paragraph 141 violated the minimum federal aviation regulations listed below:**

a.   **The minimum federal aviation regulations required truthful submissions to the Federal Aviation Administration (14 CFR § 21.2), truthful reporting of malfunctions and defects (14 CFR §§ 21.3; 145.221; *see also* CAR § 52.47), a description of the engine operating features (14 CFR § 21.14), proof that the engine meets applicable airworthiness standards (14 CFR § 21.21; 14 CFR § 33.35; *see also* CAR § 13), and instructions for continued airworthiness (14 CFR § 33.4).  These regulations were knowingly violated by the Textron and Precision defendants as to the fuel delivery system for the O-320 engine, incorporating the MA-4SPA carburetor's defective throttle body to bowl screw/lock tab washer attachment mechanism/assembly and related defects detailed above.**

b.   **Pursuant to CAR § 13.100, "(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable.   The suitability of all questionable design details or parts shall be established by tests."  Pursuant to CAR § 13.101, "[a]ll materials used in the engine shall conform to approved specifications which will insure their having the strength and other properties assumed in the design data."  *See also* 14 CFR § 33.15 (the "suitability and durability of materials used in the engine must (a) be established on the basis of experience or test; and (b) conform to approved specifications....that ensure their having the strength and other properties assumed in the design data.")  These regulations were knowingly violated by the Textron defendants and Precision defendants, and proof of a violation was actively and knowingly concealed from the Federal Aviation Administration as already explained in this Complaint.  The O-320 engine and its MA-4SPA carburetor were shown by experience to be hazardous and/or unreliable.**

**Experience and/or tests did not properly establish the durability of materials.  Warranty records, Return Material Authorizations, repair records, Service Difficulty Reports and other information exists showing that the throttle body to bowl screws and lock tab washer design was not strong enough nor durable enough to affix the throttle body to the bowl of the MA-4SPA carburetor and withstand the operating parameters of the Textron Lycoming O-320 engine.**

c.    **Pursuant to CAR § 13.104, "[a]ll parts of the engine shall be designed and constructed to minimize the development of an unsafe condition of the engine between overhaul periods."  *See* 14 CFR § 33.19 ("(a) Engine design and construction must minimize the development of an unsafe condition of the engine between overhaul periods.")  The Textron and Precision defendants knowingly violated these minimum federal regulations in that O-320 engine and its MA-4SPA carburetor was/were not designed or constructed to minimize the development of an unsafe condition of the engine between overhaul periods.  The defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.**

d.    **Pursuant to CAR § 13.110 and 14 CFR § 33.35, the Textron defendants and Precision defendants had a minimum duty and responsibility to assure:  "The fuel system of the engine must be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions."  The subject Textron Lycoming  O-320 engine and its MA-4SPA carburetor were known to defendants to not be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions, in violation of this minimum federal regulation.  These defendants' knowing violation of these**

114

minimum federal aviation regulations was a causal factor in
the crash at issue.

e.     In violation of 14 CFR § 33.4, the defendants' instructions
for continued airworthiness were defective as to the throttle
body to bowl screw/lock tab washer and attaching
mechanism/assembly for the MA-4SPA carburetor.  These
defendants' knowing violation of this minimum federal
aviation regulation was a causal factor in the crash at issue.

f.     As PMA duties, 14 CFR § 21.303(c)(4) provided at all times
material that the Precision defendants were required to
submit "test reports and computations necessary to show
that the design of the part meets the airworthiness
requirements of the Federal Aviation Regulations applicable
to the product on which the part is to be installed, unless the
applicant shows that the design of the part is identical to the
design of a part that is covered under a type certificate. If the
design of the part was obtained by a licensing agreement,
evidence of that agreement must be furnished."
Additionally, pursuant to 14 CFR § 21.303(f) and (k):

>   (f) Each applicant for a Parts Manufacturer
>   Approval must make all inspections and tests
>   necessary to determine—
>   (1) Compliance with the applicable airworthiness
>   requirements;
>   (2) That materials conform to the specifications
>   in the design;
>   (3) That the part conforms to the drawings in the
>   design; and
>   (4) That the fabrication processes, construction,
>   and assembly conform to those specified in the
>   design.
>              ****
>   (k) Each holder of a Parts Manufacturer
>   Approval shall determine that each completed

part conforms to the design data and is safe for installation on type certificated products.

The subject MA-4SPA carburetor was known by the Precision defendants and Textron defendants to not conform to proper design data, to not comply with applicable airworthiness requirements, to not properly conform to proper specifications in design, and/or to not be safe for installation on the type certificated Lycoming O-320 engine. The Textron defendants and Precision defendants knew the MA-4SPA carburetor was not safe for installation on the type certificated engine as explained in detail above and below  in this Complaint.  This knowing failure to comply with minimum duties under the aforementioned CAR § 13 and 14 CFR § 21.303(a) *et seq.* and 14 CFR § 33.35 *et seq.* was a causal factor in the crash.

g.   The Textron defendants and Precision defendants had a minimum duty of continued airworthiness and a duty to report malfunctions, defects and failures pursuant to 14 CFR §§ 21.3; 21.303.  Pursuant to 14 CFR § 21.3 (1970):

Notification of failures, malfunctions, and defects. The holder of a Type Certificate (including a Supplemental Type Certificate), or a Parts Manufacturer Approval (PMA), or the licensee of a Type Certificate, shall within twenty-four (24) hours after it discovers or is informed of a failure, malfunction, or defect in any product or part manufactured by it, notify the FAA Regional Office in the region in which the holder or licensee is located of any such failure, malfunction, or defect that could result in a hazard to flight. The notification shall be made by the most expeditious method available and shall include as much of the following information as is available: (1) Model designation. (2) Serial

116

number. (3) Identification of the part, component, or system involved. (4) Nature of the failure, malfunction, or defect.

Pursuant to 14 CFR § 21.3 (1989):

Reporting of failures, malfunctions, and defects. (a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

(b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

14 CFR § 21.3(c) includes as examples "engine failure." The Precision defendants' and Textron defendants' knowingly failed to comply with these minimum federal aviation regulations, which was a causal factor in the crash at issue.

h.   The Precision defendants and Textron defendants were Federal Aviation Administration licensed/certified repair facilities. As such, those defendants had at all times material an independent minimum duty to report any serious failure, malfunction or defect. CAR § 52.47; 14 CFR § 145.221

117

(previously 145.63).  CAR § 52.47 provided: "Reports of Defects or Unairworthy Conditions...a certified repair station shall submit to the Administrator an immediate report of serious defects in, or other recurring unairworthy conditions of, a...powerplant...or any component thereof, on a form and in a manner acceptable to the Administrator."  Section 145.221(a) provides:  "A certificated repair station must report to the FAA within 96 hours after it discovers any serious failure, malfunction, or defect of an article. The report must be in a format acceptable to the FAA."  The Precision defendants and Textron defendants knowingly violated these minimum federal aviation regulations which were a causal factor in the subject crash.

i.    The Precision defendants and Textron defendants knowingly misrepresented and concealed and failed to report to the Federal Aviation Administration pursuant to 14 CFR  § 21.3, CAR § 52.47 and 14 CFR  § 145.221 various failures, malfunctions and defects, showing loose throttle body to bowl screws (or loose throttle bodies, loose bowls, and gasket issues), attachment problems, and related design problems and defects in the MA-3 and MA-4 series small updraft carburetors installed on the O-320 series engine and similar Lycoming engines, which were a direct causal factor in the loss of engine power and crash giving rise to this litigation. These defendants failed to properly investigate the failures, malfunctions, and defects in the MA-4SPA carburetor and similar MA updraft carburetors, and continued, even after the subject crash, to patently misrepresent to the Federal Aviation Administration and public the true nature of the design/manufacturing flaw in the MA-4SPA carburetor and Textron Lycoming O-320 engine.   See above detailed examples.  Defects were at all times material knowingly concealed and withheld from the Federal Aviation Administration, and continues to be concealed and withheld from the Federal Aviation Administration, which was a causal factor in the loss of engine power and crash at issue.

118

**j.      In the alternative, by way of analogy to 14 CFR § 91.13 ("No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."), the Textron defendants and Precision defendants each had a duty not to design or manufacture the subject engine and carburetor in a "careless or reckless" manner.  The subject O-320 engine and its MA-4SPA carburetor was/were designed and manufactured carelessly and also recklessly, which was a causal factor in the subject crash. Defendants knew that the O-320 engine fuel system did not properly meter fuel and air to the engine under normal, foreseeable conditions.  The MA-4SPA carburetor as installed on the O-320 engine was knowingly defective in that throttle body to bowl screws would loosen which could cause a loss of engine power and failure.  This careless and/or reckless action by these defendants was a causal factor in the loss of engine power and crash at issue.**

144.    As a direct and proximate result of the above-described defects in the aircraft engine propulsion, carburetor, fuel delivery system and instructional products **and violations of the federal standards of care cited above**,  plaintiff's decedent suffered severe injuries and death, including: a) prolonged conscious pain and suffering; b) increased emotional distress and suffering prior to death; and c) death.

WHEREFORE, the plaintiff demands judgment against these defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

119

### Count V
### Breach of Warranties
### Plaintiff v. The Textron Defendants

**145**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word. **This includes, without limitation, all facts and minimum federal standards of care cited above, and violations thereof as if restated specifically in this Count, paragraph for paragraph and word for word.**

**146**.   The Textron defendants warranted, expressly and impliedly, that the subject engine, its carburetor (and components and replacement parts) and fuel system were in compliance with minimum industry standards and state and federal regulations **cited above**, were not defective, in an airworthy condition, and reasonably fit for their intended and foreseeable uses and purposes on the subject engine.

**147.**   The Textron defendants further warranted, expressly and impliedly, that its manuals and instructional literature were not defective **and in compliance with the minimum federal regulations cited above**, that if followed would allow the engine, carburetor, and fuel system to function properly and in an airworthy manner, and were reasonably fit for their intended and foreseeable uses and purposes.

**148.**   Notwithstanding these express and implied warranties, the Textron

defendants breached them in that the subject engine and carburetor were not in

compliance with the minimum industry standards and state and federal regulations

**(cited in detail above)**, that the subject engine, subject carburetor and its

components and replacement parts were defective and not in an airworthy condition,

and were not reasonably fit for its intended and foreseeable uses and purposes on the

subject engine.  **The breaches of federal aviation regulations included:**

    **a.**    **The minimum federal aviation regulations required truthful submissions to the Federal Aviation Administration (14 CFR § 21.2), truthful reporting of malfunctions and defects (14 CFR §§ 21.3; 145.221; *see also* CAR § 52.47), a description of the engine operating features (14 CFR § 21.14), proof that the engine meets applicable airworthiness standards (14 CFR § 21.21; 14 CFR § 33.35; *see also* CAR § 13), and instructions for continued airworthiness (14 CFR § 33.4).  These regulations were knowingly violated by the Textron and Precision defendants as to the fuel delivery system for the O-320 engine, incorporating the MA-4SPA carburetor's defective throttle body to bowl screw/lock tab washer attachment mechanism/assembly and related defects detailed above.**

    **b.**    **Pursuant to CAR § 13.100, "(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable.   The suitability of all questionable design details or parts shall be established by tests."  Pursuant to CAR § 13.101, "[a]ll materials used in the engine shall conform to approved specifications which will insure their having the strength and other properties assumed in the design data."  *See also* 14 CFR § 33.15 (the "suitability and durability of materials used in the engine must (a) be established on the basis of experience or test; and (b) conform to approved specifications....that ensure their having the strength and other properties assumed in the design**

data.")  These regulations were knowingly violated by the Textron defendants and Precision defendants, and proof of a violation was actively and knowingly concealed from the Federal Aviation Administration as already explained in this Complaint.  The O-320 engine and its MA-4SPA carburetor were shown by experience to be hazardous and/or unreliable.  Experience and/or tests did not properly establish the durability of materials.  Warranty records, Return Material Authorizations, repair records, Service Difficulty Reports and other information exists showing that the throttle body to bowl screws and lock tab washer design was not strong enough nor durable enough to affix the throttle body to the bowl of the MA-4SPA carburetor and withstand the operating parameters of the Textron Lycoming O-320 engine.

c.     Pursuant to CAR § 13.104, "[a]ll parts of the engine shall be designed and constructed to minimize the development of an unsafe condition of the engine between overhaul periods."  *See* 14 CFR § 33.19 ("(a) Engine design and construction must minimize the development of an unsafe condition of the engine between overhaul periods.")  The Textron and Precision defendants knowingly violated these minimum federal regulations in that O-320 engine and its MA-4SPA carburetor was/were not designed or constructed to minimize the development of an unsafe condition of the engine between overhaul periods.  The defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.

d.     Pursuant to CAR § 13.110 and 14 CFR § 33.35, the Textron defendants and Precision defendants had a minimum duty and responsibility to assure:  "The fuel system of the engine must be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions."  The subject Textron Lycoming  O-320 engine and its MA-4SPA carburetor were known to defendants to not be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and

atmospheric conditions, in violation of this minimum federal regulation.  These defendants' knowing violation of these minimum federal aviation regulations was a causal factor in the crash at issue.

e.     In violation of 14 CFR § 33.4, the defendants' instructions for continued airworthiness were defective as to the throttle body to bowl screw/lock tab washer and attaching mechanism/assembly for the MA-4SPA carburetor.  These defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.

f.     As PMA duties, 14 CFR § 21.303(c)(4) provided at all times material that the Precision defendants were required to submit "test reports and computations necessary to show that the design of the part meets the airworthiness requirements of the Federal Aviation Regulations applicable to the product on which the part is to be installed, unless the applicant shows that the design of the part is identical to the design of a part that is covered under a type certificate. If the design of the part was obtained by a licensing agreement, evidence of that agreement must be furnished." Additionally, pursuant to 14 CFR § 21.303(f) and (k):

(f) Each applicant for a Parts Manufacturer Approval must make all inspections and tests necessary to determine—
(1) Compliance with the applicable airworthiness requirements;
(2) That materials conform to the specifications in the design;
(3) That the part conforms to the drawings in the design; and
(4) That the fabrication processes, construction, and assembly conform to those specified in the design.
                    ****
(k) Each holder of a Parts Manufacturer Approval shall determine that each completed part conforms to

123

the design data and is safe for installation on type certificated products.

The subject MA-4SPA carburetor was known by the Precision defendants and Textron defendants to not conform to proper design data, to not comply with applicable airworthiness requirements, to not properly conform to proper specifications in design, and/or to not be safe for installation on the type certificated Lycoming O-320 engine.  The Textron defendants and Precision defendants knew the MA-4SPA carburetor was not safe for installation on the type certificated engine as explained in detail above and below  in this Complaint.  This knowing failure to comply with minimum duties under the aforementioned CAR § 13 and 14 CFR § 21.303(a) *et seq.* and 14 CFR § 33.35 *et seq.* was a causal factor in the crash.

g.      The Textron defendants and Precision defendants had a minimum duty of continued airworthiness and a duty to report malfunctions, defects and failures pursuant to 14 CFR §§ 21.3; 21.303.  Pursuant to 14 CFR § 21.3 (1970):

Notification of failures, malfunctions, and defects.  The holder of a Type Certificate (including a Supplemental Type Certificate), or a Parts Manufacturer Approval (PMA), or the licensee of a Type Certificate, shall within twenty-four (24) hours after it discovers or is informed of a failure, malfunction, or defect in any product or part manufactured by it, notify the FAA Regional Office in the region in which the holder or licensee is located of any such failure, malfunction, or defect that could result in a hazard to flight. The notification shall be made by the most expeditious method available and shall include as much of the following information as is available: (1) Model designation. (2) Serial number. (3) Identification of the part, component, or system involved. (4) Nature of the failure, malfunction, or defect.

124

Pursuant to 14 CFR § 21.3 (1989):

Reporting of failures, malfunctions, and defects.  (a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

(b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

14 CFR § 21.3(c) includes as examples "engine failure."  The Precision defendants' and Textron defendants' knowingly failed to comply with these minimum federal aviation regulations, which was a causal factor in the crash at issue.

h.     The Precision defendants and Textron defendants were Federal Aviation Administration licensed/certified repair facilities.  As such, those defendants had at all times material an independent minimum duty to report any serious failure, malfunction or defect.  CAR § 52.47; 14 CFR § 145.221 (previously 145.63).  CAR § 52.47 provided: "Reports of Defects or Unairworthy Conditions...a certified repair station shall submit to the Administrator an immediate report of serious defects in, or other recurring unairworthy conditions of, a...powerplant...or any component thereof, on a form and in a manner acceptable to the

Administrator."  Section 145.221(a) provides:  "A certificated
repair station must report to the FAA within 96 hours after it
discovers any serious failure, malfunction, or defect of an article.
The report must be in a format acceptable to the FAA."  The
Precision defendants and Textron defendants knowingly violated
these minimum federal aviation regulations which were a causal
factor in the subject crash.

i.    The Precision defendants and Textron defendants knowingly
      misrepresented and concealed and failed to report to the Federal
      Aviation Administration pursuant to 14 CFR § 21.3, CAR § 52.47
      and 14 CFR § 145.221 various failures, malfunctions and defects,
      showing loose throttle body to bowl screws (or loose throttle
      bodies, loose bowls, and gasket issues), attachment problems, and
      related design problems and defects in the MA-3 and MA-4 series
      small updraft carburetors installed on the O-320 series engine and
      similar Lycoming engines, which were a direct causal factor in the
      loss of engine power and crash giving rise to this litigation.  These
      defendants failed to properly investigate the failures, malfunctions,
      and defects in the MA-4SPA carburetor and similar MA updraft
      carburetors, and continued, even after the subject crash, to
      patently misrepresent to the Federal Aviation Administration and
      public the true nature of the design/manufacturing flaw in the MA-
      4SPA carburetor and Textron Lycoming O-320 engine.  See above
      detailed examples.

j.    In the alternative, by way of analogy to 14 CFR § 91.13 ("No
      person may operate an aircraft in a careless or reckless manner so
      as to endanger the life or property of another."), the Textron
      defendants and Precision defendants each had a duty not to design
      or manufacture the subject engine and carburetor in a "careless or
      reckless" manner.  The subject O-320 engine and its MA-4SPA
      carburetor was/were designed and manufactured carelessly and
      also recklessly, which was a causal factor in the subject crash.
      Defendants knew that the O-320 engine fuel system did not
      properly meter fuel and air to the engine under normal, foreseeable
      conditions.  The MA-4SPA carburetor as installed on the O-320

126

**engine was knowingly defective in that throttle body to bowl screws would loosen which could cause a loss of engine power and failure. This careless and/or reckless action by these defendants was a causal factor in the loss of engine power and crash at issue.**

149.   The Textron defendants also breached them in that its overhaul manuals and instructional literature were defective **and not in compliance with the minimum federal regulations cited above**, that if followed would not allow the carburetor and its components to function properly and in an airworthy manner, and that the manuals and instructional  literature were not reasonably fit for their intended and foreseeable uses and purposes.

150.   Plaintiff's decedent was injured and killed by the subject aircraft incorporating the subject engine, subject carburetor and its manuals and instructions; the injury and death occurred because the products were in a defective condition, unreasonably dangerous to the user; and the products at the time of the accident were in essentially the same condition as when they left the hands of the defendants.  The product defects **and non-compliance with the minimum federal standards of care cited above** were the proximate cause of the injury and death sustained.

151.   As a direct and proximate result of the breach of express and implied warranties by the Precision defendants **and violations of the minimum federal standards of care cited above**, the plaintiff's decedent suffered severe injuries and

death, including: a) prolonged conscious pain and suffering; b) increased emotional distress and suffering prior to death; and c) death.

WHEREFORE, the plaintiff demands judgment against these defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

## Count VI
## Negligence
## Plaintiff v. The Textron Defendants

**152**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.  **This includes, without limitation, all facts and minimum federal standards of care cited above, and violations thereof as if restated specifically in this Count, paragraph for paragraph and word for word.**

**153**.   At all times material hereto, the Textron defendants, individually, in concert and combination, and as joint venturers, designed, represented, tested, manufactured, overhauled, approved, and supplied parts and instructional products for the subject engine and its components which powered the subject aircraft, and owed duties to the plaintiff's decedent to conduct such activities in a reasonable manner so that the engines would operate in a safe and airworthy manner.  **Federal regulations violated by these defendants included, without limitation:**

a.     The minimum federal aviation regulations required truthful submissions to the Federal Aviation Administration (14 CFR § 21.2), truthful reporting of malfunctions and defects (14 CFR §§ 21.3; 145.221; *see also* CAR § 52.47), a description of the engine operating features (14 CFR § 21.14), proof that the engine meets applicable airworthiness standards (14 CFR § 21.21; 14 CFR § 33.35; *see also* CAR § 13), and instructions for continued airworthiness (14 CFR § 33.4).  These regulations were knowingly violated by the Textron and Precision defendants as to the fuel delivery system for the O-320 engine, incorporating the MA-4SPA carburetor's defective throttle body to bowl screw/lock tab washer attachment mechanism/assembly and related defects detailed above.

b.     Pursuant to CAR § 13.100, "(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable.   The suitability of all questionable design details or parts shall be established by tests."  Pursuant to CAR § 13.101, "[a]ll materials used in the engine shall conform to approved specifications which will insure their having the strength and other properties assumed in the design data."  *See also* 14 CFR § 33.15 (the "suitability and durability of materials used in the engine must (a) be established on the basis of experience or test; and (b) conform to approved specifications....that ensure their having the strength and other properties assumed in the design data.")  These regulations were knowingly violated by the Textron defendants and Precision defendants, and proof of a violation was actively and knowingly concealed from the Federal Aviation Administration as already explained in this Complaint.  The O-320 engine and its MA-4SPA carburetor were shown by experience to be hazardous and/or unreliable.  Experience and/or tests did not properly establish the durability of materials.  Warranty records, Return Material Authorizations, repair records, Service Difficulty Reports and other information exists showing that the throttle body

to bowl screws and lock tab washer design was not strong enough nor durable enough to affix the throttle body to the bowl of the MA-4SPA carburetor and withstand the operating parameters of the Textron Lycoming O-320 engine.

c.      Pursuant to CAR § 13.104, "[a]ll parts of the engine shall be designed and constructed to minimize the development of an unsafe condition of the engine between overhaul periods." *See* 14 CFR § 33.19 ("(a) Engine design and construction must minimize the development of an unsafe condition of the engine between overhaul periods.")  The Textron and Precision defendants knowingly violated these minimum federal regulations in that O-320 engine and its MA-4SPA carburetor was/were not designed or constructed to minimize the development of an unsafe condition of the engine between overhaul periods.  The defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.

d.      Pursuant to CAR § 13.110 and 14 CFR § 33.35, the Textron defendants and Precision defendants had a minimum duty and responsibility to assure:  "The fuel system of the engine must be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions."  The subject Textron Lycoming  O-320 engine and its MA-4SPA carburetor were known to defendants to not be designed and constructed to supply an appropriate mixture of fuel to the cylinders throughout the complete operating range of the engine under all flight and atmospheric conditions, in violation of this minimum federal regulation.  These defendants' knowing violation of these minimum federal aviation regulations was a causal factor in the crash at issue.

e.      In violation of 14 CFR § 33.4, the defendants' instructions

130

**for continued airworthiness were defective as to the throttle body to bowl screw/lock tab washer and attaching mechanism/assembly for the MA-4SPA carburetor.  These defendants' knowing violation of this minimum federal aviation regulation was a causal factor in the crash at issue.**

f.      **As PMA duties, 14 CFR § 21.303(c)(4) provided at all times material that the Precision defendants were required to submit "test reports and computations necessary to show that the design of the part meets the airworthiness requirements of the Federal Aviation Regulations applicable to the product on which the part is to be installed, unless the applicant shows that the design of the part is identical to the design of a part that is covered under a type certificate. If the design of the part was obtained by a licensing agreement, evidence of that agreement must be furnished."**
**Additionally, pursuant to 14 CFR § 21.303(f) and (k):**

> **(f) Each applicant for a Parts Manufacturer Approval must make all inspections and tests necessary to determine—**
> **(1) Compliance with the applicable airworthiness requirements;**
> **(2) That materials conform to the specifications in the design;**
> **(3) That the part conforms to the drawings in the design; and**
> **(4) That the fabrication processes, construction, and assembly conform to those specified in the design.**
> **\*\*\*\***
> **(k) Each holder of a Parts Manufacturer Approval shall determine that each completed part conforms to the design data and is safe for installation on type certificated products.**

**The subject MA-4SPA carburetor was known by the**

131

Precision defendants and Textron defendants to not conform
to proper design data, to not comply with applicable
airworthiness requirements, to not properly conform to
proper specifications in design, and/or to not be safe for
installation on the type certificated Lycoming O-320 engine.
The Textron defendants and Precision defendants knew the
MA-4SPA carburetor was not safe for installation on the
type certificated engine as explained in detail above and
below in this Complaint.  This knowing failure to comply
with minimum duties under the aforementioned CAR § 13
and 14 CFR § 21.303(a) *et seq.* and 14 CFR § 33.35 *et seq.*
was a causal factor in the crash.

g.    The Textron defendants and Precision defendants had a
minimum duty of continued airworthiness and a duty to
report malfunctions, defects and failures pursuant to 14 CFR
§§ 21.3; 21.303.  Pursuant to 14 CFR § 21.3 (1970):

Notification of failures, malfunctions, and defects.
The holder of a Type Certificate (including a
Supplemental Type Certificate), or a Parts
Manufacturer Approval (PMA), or the licensee of
a Type Certificate, shall within twenty-four (24)
hours after it discovers or is informed of a failure,
malfunction, or defect in any product or part
manufactured by it, notify the FAA Regional
Office in the region in which the holder or
licensee is located of any such failure,
malfunction, or defect that could result in a
hazard to flight. The notification shall be made by
the most expeditious method available and shall
include as much of the following information as is
available: (1) Model designation. (2) Serial
number. (3) Identification of the part, component,
or system involved. (4) Nature of the failure,
malfunction, or defect.

Pursuant to 14 CFR § 21.3 (1989):

> Reporting of failures, malfunctions, and defects.  (a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

> (b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

14 CFR § 21.3(c) includes as examples "engine failure."  The Precision defendants' and Textron defendants' knowingly failed to comply with these minimum federal aviation regulations, which was a causal factor in the crash at issue.

h.     The Precision defendants and Textron defendants were Federal Aviation Administration licensed/certified repair facilities.  As such, those defendants had at all times material an independent minimum duty to report any serious failure, malfunction or defect. CAR § 52.47; 14 CFR § 145.221 (previously 145.63).  CAR § 52.47 provided: "Reports of Defects or Unairworthy Conditions...a certified repair station shall submit to the Administrator an immediate report of serious defects in, or other recurring unairworthy conditions

of, a...powerplant...or any component thereof, on a form and
in a manner acceptable to the Administrator." Section
145.221(a) provides: "A certificated repair station must
report to the FAA within 96 hours after it discovers any
serious failure, malfunction, or defect of an article. The
report must be in a format acceptable to the FAA." The
Precision defendants and Textron defendants knowingly
violated these minimum federal aviation regulations which
were a causal factor in the subject crash.

i.  The Precision defendants and Textron defendants knowingly
misrepresented and concealed and failed to report to the
Federal Aviation Administration pursuant to 14 CFR § 21.3,
CAR § 52.47 and 14 CFR § 145.221 various failures,
malfunctions and defects, showing loose throttle body to
bowl screws (or loose throttle bodies, loose bowls, and gasket
issues), attachment problems, and related design problems
and defects in the MA-3 and MA-4 series small updraft
carburetors installed on the O-320 series engine and similar
Lycoming engines, which were a direct causal factor in the
loss of engine power and crash giving rise to this litigation.
These defendants failed to properly investigate the failures,
malfunctions, and defects in the MA-4SPA carburetor and
similar MA updraft carburetors, and continued, even after
the subject crash, to patently misrepresent to the Federal
Aviation Administration and public the true nature of the
design/manufacturing flaw in the MA-4SPA carburetor and
Textron Lycoming O-320 engine.  See above detailed
examples.

j.  In the alternative, by way of analogy to 14 CFR § 91.13 ("No
person may operate an aircraft in a careless or reckless
manner so as to endanger the life or property of another."),
the Textron defendants and Precision defendants each had a
duty not to design or manufacture the subject engine and
carburetor in a "careless or reckless" manner.  The subject
O-320 engine and its MA-4SPA carburetor was/were

134

**designed and manufactured carelessly and also recklessly, which was a causal factor in the subject crash. Defendants knew that the O-320 engine fuel system did not properly meter fuel and air to the engine under normal, foreseeable conditions. The MA-4SPA carburetor as installed on the O-320 engine was knowingly defective in that throttle body to bowl screws would loosen which could cause a loss of engine power and failure. This careless and/or reckless action by these defendants was a causal factor in the loss of engine power and crash at issue.**

154. The subject carburetor is intended to supply the proper fuel-air mixture to the engine throughout its operating range. **See, e.g., 14 CFR § 33.35.**

155. The Textron defendants, individually, in concert and combination, and as joint venturers, were aware that the Precision defendants chose an unorthodox attaching system for carburetor halves and chose to use a float system design that was subject to failures **in violation of the minimum federal regulations cited above.**

156. The Textron defendants, individually, in concert and combination, and as joint venturers, were likewise aware that a float system malfunction had caused accidents, incidents and which resulted in serious personal injury and death, and that the subject carburetor was prone to a fuel-air mixture malfunction **in violation of the minimum federal regulations cited above.**

157. The Textron defendants, individually, in concert and combination, and

as joint venturers, knew that float system, carburetor attachment system and fuel delivery system failures, malfunctions and defects would continue to result in accidents and incidents unless design and manufacturing changes were made thereto.

**158**.   The Textron defendants, individually, in concert and combination, and as joint venturers, regularly participated in litigation arising out alleged float system, carburetor attachment system, and fuel delivery system failures in general aviation airplanes.

**159**.   Notwithstanding the full and complete knowledge of the Textron defendants of the failure modes and the reasons therefore of their engine, carburetor float system, carburetor attachment system, fuel delivery system, and manual and instructional products, these defendants did not reasonably address these failures, malfunctions, and defects **in violation of the minimum federal regulations cited above.**

**160**.   The Textron defendants, individually, in concert and combination, and as joint venturers, breached their duty to the plaintiffs' decedent, by:

a.   Negligently, carelessly, and recklessly participating in designing, representing, manufacturing and supporting the carburetor, float system and fuel delivery system **in violation of the minimum federal regulations cited above.**

136

b.      Negligently, carelessly, and recklessly participating in designing, representing, manufacturing, supporting and incorporating the carburetor and fuel delivery system on the subject engine **in violation of the minimum federal regulations cited above.**

c.      Negligently, carelessly, and recklessly participating in designing, representing, supporting and manufacturing the carburetor attaching system **in violation of the minimum federal regulations cited above.**

d.      Negligently, carelessly, and recklessly failing to comply with minimum industry standards and state and federal regulations **cited above**;

e.      Negligent, carelessly, and recklessly providing maintenance and overhaul information **in violation of the minimum federal regulations cited above.**

f.      Negligently, carelessly, and recklessly providing warnings to maintenance personnel **in violation of the minimum federal regulations cited above.**

g.      Negligently, carelessly, and recklessly selecting and selling instructional products **in violation of the minimum federal regulations cited above.**

h.      Negligently, carelessly, and recklessly failing to redesign the carburetor and fuel delivery system **in violation of the minimum federal regulations cited above.**

i.      Negligently, carelessly, and recklessly failing to remanufacture the carburetor, carburetor attachment system, and fuel delivery system **in violation of the minimum federal regulations cited above.**

j.      Negligently, carelessly, and recklessly failing to retrofit the carburetor float system, carburetor attachment system, and fuel delivery system **in violation of the minimum federal regulations cited above.**

k.      Negligently, carelessly, and recklessly failing to design the carburetor attachment, float, and fuel delivery system so as to insure continued safe and airworthy operation **in violation of the minimum federal regulations cited above.**

l.      Negligently, carelessly, and recklessly overhauling, recertifying, remanufacturing and failing to correct a known and dangerous deficiencies in the subject engine **in violation of the minimum federal regulations cited above.**

m.      Negligently failing to properly test the carburetor float system, carburetor attachment system, and fuel delivery systems and various components thereof **in violation of the minimum federal regulations cited above.**

138

n.    Negligently failing to account for foreseeable misuse given the high frequency of repair to the carburetor float system, carburetor attachment system, and fuel delivery system components **in violation of the minimum federal regulations cited above.**

o.    Negligently failing to implement timely changes in material and design to improve reliability of the carburetor float system, carburetor attachment system, and fuel delivery system components **in violation of the minimum federal regulations cited above.**

p.    Otherwise negligently violating the spirit, language, and intent of airworthiness requirements with respect to aircraft function and reliability **in violation of the minimum federal regulations cited above.**

**161**.   The conduct of the Textron defendants, individually, in concert and combination, and as joint venturers, was careless, reckless, and outrageous in that they had the power to effect timely changes that would correct, instruct, and warn of defects in the O-320 series engines which would have prevented what has proven to be a serious likelihood of personal injury or death.

**162**.   Plaintiff's decedent was injured and killed by the subject aircraft incorporating the subject engine, subject carburetor and its manuals and instructions; the injury and death occurred because the products were in a defective condition,

unreasonably dangerous to the user **in violation of minimum federal regulations cited above**; and the products at the time of the accident were in essentially the same condition as when they left the hands of the defendants.  The product defects **and violations of minimum federal regulations cited above** were the proximate cause of the injury and death sustained.

**163**.   As a direct and proximate result of the above-described negligence and the willful, deliberate, unjustified and outrageous conduct of the Textron defendants individually, in concert and combination, and as joint venturers, the carburetor attachment system and fuel delivery systems failed, causing a malfunction of the engine, the crash, and the plaintiff's decedent's severe injuries and death, including: a) prolonged conscious pain and suffering; b) increased emotional distress and suffering prior to death; and c) death.

WHEREFORE, the plaintiff demands judgment against these defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

### Count VII
### Strict Liability
### Plaintiff v. The Kelly Defendants

**164**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.

**165**.   At all times material hereto, the above-named Kelly defendants were in the business of designing, manufacturing, selling, distributing, overhauling, maintaining, and assembling carburetors and their components and overhaul kits and their accompanying installation and product support materials utilized on aircraft carburetors including the subject carburetor.

**166**.   These defendants designed, manufactured, supplied, sold, and marketed new and as new carburetor components and carburetor overhaul and repair kits. These defendants also overhauled the subject carburetor on the subject aircraft, installing new and as new replacement parts in the carburetor and/or a repair or overhaul kit.

**167**.   The subject carburetor, its components, overhaul  kit, attaching screws, locking mechanisms, and/or overhaul manuals and instructional products were supplied, sold and introduced into the stream of commerce by these defendants and were in the same or substantially similar condition at the time of the accident as they were when designed, manufactured and sold.

**168**.   At all times material herein, the subject carburetor, its components and attaching screws and locking mechanisms, kits, overhaul manuals, and instructional products utilized on the subject aircraft were defective, resulting in an unreasonably dangerous condition which was a proximate cause of the happening of this accident

141

and the plaintiffs' decedent's injuries and death.

**169**.    The defects in the subject carburetor, its components, replacement parts, overhaul kits and manuals, and instructional products consisted of the following:

      a.    defective design of the subject carburetor and its component and replacement parts and/or overhaul and repair kit;

      b.    defective manufacture of the subject carburetor and its component and  replacement parts and/or overhaul and repair kit;

      c.    lack of adequate and safe component parts for the subject carburetor including a proper attaching and locking mechanism for the carburetor halves.

**170**.    The defects in the aforementioned parts sold, supplied and introduced into the stream of commerce by these defendants and their actions in that regard were a proximate cause in the happening of the accident and the plaintiff's decedent's injuries and death.

WHEREFORE, the plaintiff demands judgment against the Kelly defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

### Count VIII

**Breach of Warranties**
**Plaintiff v. The Kelly Defendants**

**171**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.

**172**.   The Kelly defendants warranted, expressly and impliedly, that the subject carburetor and its overhaul kit were in compliance with minimum industry standards and state and federal aviation regulations, were not defective, that the carburetor was rebuilt and/or overhauled properly to new or as new specifications, was in an airworthy condition, was rebuilt and/or overhauled in a workmanlike manner in accordance with manufacturer recommendations and in accordance minimum federal, state and industry regulations and standards, and/or was reasonably fit for its intended and foreseeable uses and purposes.

**173**.   Notwithstanding these express and implied warranties, defendants breached them in that the subject carburetor and its components  were not in compliance with minimum industry standards and state and federal regulations were defective, defendants did not properly overhaul the subject carburetor to factory new or as new specifications, the carburetor was not in an airworthy condition, was not overhauled in a workmanlike manner in accordance with manufacturer recommendation and/or minimum federal, state and industry regulations and

143

standards, and/or was not reasonably fit for its intended and foreseeable uses and purposes.

174.   Plaintiff's decedent was injured and killed by the subject aircraft incorporating the subject carburetor, its components and manuals and instructions; the injury and death occurred because the products were in a defective condition, unreasonably dangerous to the user; and the products at the time of the accident were in essentially the same condition as when they left the hands of the defendant.  The product defects were the proximate cause of the injury and death sustained.

175.   As a direct and proximate result of the breach of express and implied warranties by the Kelly defendants, the plaintiff's decedent suffered severe injuries and death as more fully described below.

WHEREFORE, the plaintiff demands judgment against the Kelly defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

### Count IX
### Negligence
### Plaintiff v. Kelly Defendants

176.   Plaintiff incorporates by reference each prior allegation and fact, as if

144

specifically restated herein, paragraph for paragraph and word for word.

**177**.   The Kelly defendants had a duty to exercise reasonable care in regard to their respective activities relating to the design, manufacture, sale, distribution, overhaul, rebuild, replacement and maintenance of the subject carburetor and/or its overhaul kit. These defendants, however, were negligent and careless in the discharge of those activities and breached its duties in this regard.

**178**.   The negligence and carelessness of these defendants consisted of:

a.   failing to design and manufacture the subject carburetor component parts with due care and circumspection;

b.   failing to comply with minimum industry standards and state and federal regulations in the design, manufacture of carburetor components and overhaul and repair kits;

c.   failing to repair and overhaul the subject carburetor with due care and circumspection;

d.   failing to comply with minimum industry standards and state and federal aviation regulations in the overhaul and rebuild of the subject carburetor;

e.   failing to properly test the carburetor, attaching system for the carburetor halves and fuel delivery systems utilized on the carburetor of the accident aircraft;

f.      failing to properly torque, affix and install the carburetor

attachment screws and/or washers in a reasonable manner;

g.      failing to reasonably repair, overhaul and/or rebuild the

carburetor, attaching system for the carburetor halves and fuel delivery systems

utilized on the carburetor of the subject aircraft;

h.      failing to reasonably maintain the carburetor, carburetor float

system, attaching system for the carburetor halves and fuel delivery systems utilized

on the carburetor of the accident aircraft;

i.      failing to adequately instruct and warn the plaintiff's decedent of

the defects in the carburetor, float system, attaching system for the carburetor halves

and fuel delivery systems utilized on the carburetor of the subject aircraft;

j.      misrepresenting and failing to reasonably notify and warn of the

defects in the carburetor, float system, attaching system for the carburetor halves and

fuel delivery systems utilized on the carburetor of the subject aircraft.

k.      unreasonably representing as airworthy the carburetor, float

system, attaching system for the carburetor halves and fuel delivery systems utilized

on the subject aircraft;

l.      failing to reasonably design, prepare, certify, and promulgate the

performance, maintenance, and installation specifications, instructions, manuals,

146

warnings, and instructional products for the carburetor, float system, attaching

system for the carburetor halves and fuel delivery systems utilized on the carburetor

of the subject aircraft;

       m.     failing to retire the subject carburetor from service;

       n.     failing to provide a safe and airworthy carburetor, attaching

system for the carburetor halves and fuel delivery systems, and overhaul kit for

installation on the subject carburetor; and

       o.     failing to adhere to the Precision defendants' service bulletins,

service letters and manuals;

       p.     installing carburetor component parts during overhaul not

recommended by the Precision defendants;

       q.     otherwise failing to properly overhaul, rebuild, maintain, and

install the subject carburetor and its repair and overhaul kit.

**179.**   The negligence and carelessness of these defendants also consists of:

       a.     failing to reasonably test their carburetor components and repair

and overhaul kits;

       b.     failing to reasonably recall their carburetor components and/or

repair and overhaul kit;

       c.     failing to adequately warn the plaintiff's decedent of the defects

147

in the components and kits they installed, sold and released into the stream of

commerce;

       d.     misrepresenting and failing to reasonably notify and warn

regulatory authorities of the defects in the carburetors that they repair, maintain and

overhaul;

       e.     failing to correct its negligent repair and overhaul of the subject

carburetor;

       f.     knowingly misrepresenting, failing to report, and/or concealing

and withholding defects in the subject carburetor and similar model carburetors

to/from the regulatory authorities.

**180.**   The negligence and carelessness of these defendants also consisted of

failing to notify the owner and operator of deficiencies and problems with the

carburetor on the subject aircraft.

**181.**   The negligence of these defendants was a proximate cause in the

happening of the subject accident and plaintiff's decedent's fatal injuries described

herein.

**182**.   The negligence of these defendants caused or substantially contributed

to the accident in that the aircraft's carburetor and/or fuel system failed, the engine

failed, and the airplane crashed, fatally injuring the plaintiff's decedent.

148

WHEREFORE, the plaintiff demands judgment against these defendants for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

### Count X
### Misrepresentation
### Plaintiff v. The Precision and Textron Defendants

**183**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.

**184**.   For many years to the present, the Precision and Textron defendants have intentionally and/or negligently generated, prepared and distributed product literature, service and maintenance information and communications for aircraft manufacturers, owners and aircraft maintenance facilities which contained false representations that the engines and fuel delivery systems used on aircraft similar to the accident aircraft were safe and that various carburetors defects as described herein were not in the O-320 engines or the Precision fuel delivery systems of said engines, and said misrepresentations were intended to induce and mislead persons to believe that the engines and fuel delivery systems installed on the aircraft similar to the accident aircraft were safe.

**185**.   The engines manufactured by the Textron defendants, together with the Precision defendants' fuel delivery systems which were installed on the subject aircraft, were defective and not safe, **were in knowing violation of the minimum federal**

149

**regulations cited above,** and defendants' intentional and negligent representations to the contrary were false and known by defendants to be such as noted in the factual paragraphs incorporated here by reference.

186.   The Precision and Textron defendants knew and/or should have known that their false representations that their engines and fuel delivery systems were safe and not a safety problem would be passed onto others and relied upon by individuals such as plaintiffs' decedent.

187.   Plaintiff's decedent reasonably relied upon the Precision and Textron defendants false representations that the accident aircraft's engine carburetor and fuel delivery systems were safe and airworthy.  They were not able to adequately deliver or meter fuel and air to the engine as represented to the Federal Aviation Administration **pursuant to 14 CFR § 33.35, and not reasonably safe for installation on the type certificated engine.**

188.   As a direct and proximate result of the negligent and/or intentional misrepresentation by the Precision and Textron defendants **and violation of the federal regulations**, the plaintiff's decedent incurred fatal injuries as described herein.

WHEREFORE, the plaintiff demands judgment against this defendant for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

**Count XI**
**Concert of Action**
**Plaintiff v. The Precision and Textron Defendants**

**189.** Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.

**190.** Defendants, Precision and Textron, individually, acted vicariously and in combination, pursuant to a common plan, concert of action and a concerted course of conduct with respect to the activities referred to in the paragraphs and allegations above, which activities were performed *inter alia*, for their individual and mutual benefit.

**191.** Each defendant, individually, vicariously and in combination, knew or had a reason to know that the conduct of the other defendants subjected the plaintiffs' decedent to an unreasonable risk of harm, constituting numerous breaches of legal duties, and gave substantial assistance or encouragement to such defendants by, *inter alia*, cooperating with, assisting in, and furthering the activities referred to in the paragraphs and allegations above, and by adhering to a joint practice of refusing to provide adequate warnings and refusing to adequately design, re-design, manufacture, test and represent fuel delivery systems such as installed on the accident aircraft and others of similar design, **and in violating the minimum federal regulations cited above.**.

**192.** Each defendant, individually, vicariously, in combination, and as joint

151

venturers, gave substantial assistance to the other defendant and each defendant's own conduct, separately considered, subjected the plaintiffs' decedent to unreasonable risk of harm, constituting numerous breaches of legal duties **and violations of the minimum federal regulations cited above.**.

193.    Defendants, individually, vicariously, in combination, and as joint venturers, reached an agreement or tacit understanding to do the aforesaid unlawful acts with the intent of marketing and selling products in an unlawful manner, *inter alia*, by suppressing knowledge about the dangers of these products by designing, manufacturing, certifying, selling, and marketing without adequate testing and without adequate warning **in violation of the minimum federal regulations cited above.**.

194. The aforesaid acts, and similar acts, were committed, individually, vicariously, in combination, and as joint venturers, in furtherance of expressed and implied, and tactic agreements to market and sell defective aircraft engines and their components in a negligent and unreasonably dangerous manner likely to cause death and serious injury.

195.    Defendants' agreements and combinations, individually, vicariously, in combination, and as joint venturers, provided defendants with additional power to impose unsafe conditions on the plaintiffs' decedent and others; such power would not have otherwise existed absent such combination.

**196**.   Plaintiff's decedent suffered the harm described herein as a direct and proximate result of defendants' tortious, unlawful combination and concert of action.

WHEREFORE, the plaintiff demands judgment against this defendant for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

**Count XII**
**Misrepresentation**
**Plaintiff v. The Kelly Defendants**

**197**.   Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.

**198**.   The Kelly defendants knowingly and/or negligently misrepresented the nature of defects and malfunctions in carburetors to the regulatory authorities as required by industry standards and federal regulations.

**199**.   The Kelly defendants, as carburetor overhaulers and also as manufacturers of replacement carburetor parts and components, knowingly and/or negligently misrepresented and also failed to report defects in the carburetor.

**200**.   The Kelly defendants failed in their airworthiness obligations under applicable regulations relative to the carburetor and component parts that they designed, manufactured, serviced, repaired and overhauled.

**201**.   The Kelly defendants misrepresented that the carburetor was safe and in an

153

airworthy condition following an overhaul of the subject carburetor when it was not.

202.   Plaintiff's decedent reasonably relied upon the representations that the subject aircraft's engine carburetor and fuel delivery systems were safe and airworthy. They were not able to adequately deliver or meter fuel and air to the engine.

203.   As a direct and proximate result of the negligent and/or intentional misrepresentation by the Kelly defendants, the plaintiff's decedent incurred fatal injuries as described herein.

WHEREFORE, the plaintiff demands judgment against this defendant for all compensatory damages permitted by law and all other allowable damages, as more fully explained below.

## DAMAGES

204.   As a direct and proximate result of the actions and inactions, negligence, breach of warranties, strict liability, concert of action and misrepresentation of the various defendants described above, plaintiff's decedent suffered severe injuries, burns, and ultimately death, and plaintiff, individually and as personal representative of the estate of David Sikkelee, demands recovery under the applicable Survival Act, for all recoverable damages, including but not limited to loss of net accumulations, pecuniary losses, conscious pain and suffering, medical expenses, and punitive damages.

154

**205**.   As a direct and proximate result of the actions and inactions, negligence, breach of warranties, strict liability, concert of action and misrepresentation of the various defendants described above, plaintiff, individually and as personal representative of the estate of David Sikkelee, deceased, demand recovery under the applicable Wrongful Death statute, for all recoverable damages, including but not limited to, loss of pecuniary benefits, loss of contributions for support, loss of parental, marital, and household services, loss of society and comfort, loss of companionship, funeral expenses, emotional pain and anguish, and punitive damages.

Plaintiff demands a trial by jury on all counts so triable as of right.

WHEREFORE, Plaintiff herein, individually and as personal representative of the estate of David Sikkelee, deceased, requests a judgment be entered in plaintiff's favor for an amount which is just and reasonable in light of the facts, law and evidence, and also seeks any and all interest, costs and attorneys fees.

Respectfully submitted this 31st day of August, 2010.


 s/ John D. McClune_____
KATZMAN, LAMPERT & McCLUNE
David I. Katzman, Michigan Bar no. 39886
John D. McClune, Michigan Bar no. 51948
Out-of-state counsel for Plaintiff
100 W. Big Beaver Rd., Suite 130
Troy, MI 48084
(248) 258-4800 Telephone
(248) 258-2825 Fax
dikatzman@klm-law.com
jmcclune@klm-law.com

and

RIEDERS, TRAVIS, HUMPHREY, HARRIS,
WATERS & WAFFENSCHMIDT
Clifford A. Rieders, Esq.
Local counsel for Plaintiff
161 West Third Street
P.O. Box 215
Williamsport, PA 17703-0215
(570) 323-8711 Telephone
(570) 323-4192 Fax
lawoffices@riederstravis.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of August, 2010, I electronically filed Plaintiff's First Amended Complaint for Wrongful Death and Survival Action; and Demand for Jury Trial with the Clerk of the Court using the ECF system which will send a notification of such filing to the all CM/ECF participants.

I further certify that on this 31st day of August, 2010, Plaintiff's First Amended Complaint for Wrongful Death and Survival Action; and Demand for Jury Trial was furnished by placing the documents in a sealed envelope, properly addressed, post prepaid and sent by U.S. Mail to:

John DeVaney**,** Esq.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2003

s/ John D. McClune
David I. Katzman, pro hac vice
John D. McClune, pro hac vice
Katzman, Lampert & McClune
*Attorneys for Plaintiffs*
100 W. Big Beaver Road, Suite 130
Troy, Michigan 48084
(248) 258-4800
(248) 258-2825
dkatzman@klm-law.com
jmcclune@klm-law.com