IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL SIKKELEE, individually and as personal representative of the estate of DAVID SIKKELEE, deceased, | : : : : : | Case No. 4:07-cv-00886 |
| Plaintiff | : : | (Judge Brann) |
| v. | : : | |
| PRECISION AIRMOTIVE CORPORATION, PRECISION AIRMOTIVE LLC, PRECISION AEROSPACE CORPORATION, PRECISION AEROSPACE SERVICES LLC, PRECISION AVIATION PRODUCTS CORPORATION, PRECISION PRODUCTS LLC, ZENITH FUEL SYSTEMS LLC, BURNS INTERNATIONAL SERVICES CORPORATION, FORMER FUEL SYSTEMS, INC., MARK IV INDUSTRIES, INC., TEXTRON LYCOMING RECIPROCATING ENGINE DIVISION, TEXTRON, INC., AVCO CORPORATION, KELLY AEROSPACE, INC., KELLY AEROSPACE POWER SYSTEMS, INC., ELECTROSYSTEMS, INC., CONSOLIDATED FUEL SYSTEMS, INC., | : : : : : : : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | : | |

# MEMORANDUM

June 3, 2013

For the reasons that follow, the "Renewed Motion for Reconsideration of Order Entered July 3, 2012," filed on October 31, 2012 by defendant AVCO Corp. (hereinafter, "AVCO") on behalf of its Lycoming Engines Division (hereinafter, "Lycoming") (ECF No. 332), is denied.

## I.    Procedural Background

On May 16, 2007, plaintiff Jill Sikkelee commenced this suit by filing a complaint that asserted claims against seventeen defendants allegedly responsible for the death of her husband, David Sikkelee, who was piloting a 1976 Cessna 172N airplane (hereinafter, the "accident aircraft") when it crashed in 2005. (ECF No. 1). After a series of party terminations and dismissals of claims over years of litigation, by the time the Court issued the July 3, 2012 Memorandum & Order[1] presently under reconsideration (ECF No. 299) (hereinafter, the "subject Order" or "Mem. & Order"),[2] Sikkelee's only remaining claims alleged that Lycoming was

---

[1] By the Honorable John E. Jones III, who was then presiding over this matter. The matter was reassigned to the undersigned on January 17, 2013.

[2] The Court notes that the subject Order has been reported at 876 F. Supp. 2d 479.

liable under theories of negligence and strict liability[3] for design defects and inadequate warnings associated with the engine and carburetor installed in the accident aircraft.

The subject Order, which was prompted by Lycoming's motion for summary judgment on the remaining negligence and strict liability counts (the motion was filed in two steps, see Def.'s Mot. Part. Summ. J., Aug. 5, 2011, ECF No. 220; Def.'s Mot. Part. Summ. J., Oct. 3, 2011, ECF No. 252), pruned Sikkelee's claims further still by granting Lycoming's motion for summary judgment "to the extent [it sought] judgment as a matter of law with respect to the condition of the engine in 1969." (Mem. & Order at 35).[4] In all other respects, however, Lycoming's motion was denied, and the Court ordered that Sikkelee could "proceed on the negligence and strict liability design defect [and inadequate warning] theories asserted by [her] as they relate to the 2004 engine overhaul." (Id. at 36).

On July 17, 2012, Lycoming filed a first motion for reconsideration of the

---

[3]In a March 13, 2012 Memorandum & Order, the Court held that Pennsylvania's substantive law would apply to the liability issues in this case. (ECF No. 288).

[4]Even after summary judgment in Lycoming's favor on this issue, Sikkelee apparently maintains that the engine was defective when placed in the stream of commerce by Lycoming in 1969, (see, e.g., Pl.'s Opp'n Br., Nov. 28, 2012, ECF No. 341 at 10), but Sikkelee did not move for reconsideration of the subject Order's ruling on this issue and the Court does not consider it here.

subject Order, and the next day moved for amendment of the subject Order to include a 28 U.S.C. § 1292(b) statement that would prompt the United States Court of Appeals for the Third Circuit (hereinafter, the "Third Circuit") to permit, in its discretion, an interlocutory appeal of the subject Order. (See Def.'s First Mot. Recons., ECF No. 300; Def.'s Mot. Amend, ECF No. 302). Specifically, Lycoming sought an interlocutory appeal of this Court's decision to apply the law of the Restatement (Second) of Torts § 402A (hereinafter, "Restatement 2d") to Sikkelee's claims, as opposed to §§ 1 & 2 of the Restatement (Third) of Torts (Products Liability) (hereinafter, "Restatement 3d"). (See Def.'s Mot. Amend, ECF No. 302). The Court subsequently amended the subject Order to include the § 1292(b) statement, "specifically and limited to the issue of whether the Pennsylvania Supreme Court would adopt the Restatement (Third) of Torts or continue in its application of the Restatement (Second) of Torts." (July 26, 2012, ECF No. 306).

The Third Circuit declined to accept Lycoming's interlocutory appeal, but, in a brief Order rejecting Lycoming's petition for rehearing en banc, reaffirmed the holdings of Covell v. Bell Sports, Inc., 651 F.3d 357 (3d Cir. 2011) and Berrier v. Simplicity Mfg., Inc., 563 F.3d 38 (3d Cir. 2009): "federal courts sitting in diversity and applying Pennsylvania law to products liability cases should look to

sections 1 and 2 of the Restatement (Third) of Torts." <u>Sikkelee v. Precision Airmotive Corp.</u>, 2012 WL 5077571 (3d Cir. Oct. 17, 2012).

On the same day of the Third Circuit's Order, this Court – "[g]uided by [the Third Circuit's] clarification" and recognizing that the "application of the Restatement (Third) may be perceived to require the Court to revisit its earlier decision . . ., which applied the Restatement (Second) of Torts" – denied Lycoming's pending motion for reconsideration as moot, but permitted counsel to file new motions for reconsideration "guided by the Circuit's direction that the Restatement (Third) is applicable to this action." (Order, ECF No. 324).

Accordingly, on October 31, 2012, Lycoming briefed a "Renewed Motion for Reconsideration" of the subject Order (ECF No. 333) (hereinafter, "Def.'s Br."); Sikkelee submitted a brief in opposition on November 28, 2012 (ECF No. 341) (hereinafter "Pl.'s Opp'n Br."); and Lycoming filed a reply brief on December 17, 2012 (ECF No. 344) (hereinafter "Def.'s Reply Br.").

## II.    Standard

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." <u>Harsco Corp. v. Zlotnicki</u>, 779 F.2d 906, 909 (3d Cir.1985). The Court may amend its prior ruling "if the party seeking reconsideration shows at least one of the following grounds: (1) an

intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Howard Hess Dental Lab. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 251 (3d Cir. 2010) (quoting Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir.1999)). In the absence of such grounds or another appropriate circumstance, the law of the case controls.[5]

## III.    Substantive Background

The Court quotes the entirety of the subject Order's "Statement of Material Facts":

> The following facts are derived from the record and viewed in the light most favorable to the Plaintiff in accordance with the standard of review applicable to a motion for summary judgment. Due to the factual complexity of this litigation and the familiarity of the parties and the Court with the record, we briefly state the pertinent facts herein and supplement them as necessary with additional facts throughout our analysis.
>
> This action arises out of an aircraft accident involving a 1976 Cessna 172N airplane on July 10, 2005 at the Transylvania County Airport in Brevard, North Carolina. The accident resulted in the death of David Sikkelee ("the decedent"), husband of Jill Sikkelee ("Plaintiff"), and significant injuries to the decedent's brother, Craig Sikkelee ("the

---

[5]This Court recently discussed the law of the case doctrine in some detail in Young v. Pleasant Valley Sch. Dist., 2013 WL 1856573, *3 (M.D. Pa. May 2, 2013).

passenger"). Shortly after takeoff on July 10, 2005, the plane crashed to the ground, resulting in the death of the decedent and serious injuries to the passenger. Plaintiff alleges that the accident was caused by a faulty carburetor, specifically a loosening throttle body to bowl assembly within said carburetor, installed in the subject engine.

Lycoming designed and manufactured a certain 0–320–D2C aircraft engine, bearing serial number L–6590–39A ("engine S/N L–6590–39A" or "the subject engine"), in Williamsport, Pennsylvania. (Doc. 253, ¶ 1). Lycoming shipped the subject engine to Beagle Aircraft, Inc., on September 4, 1969. (Id. ¶ 2). The Lycoming O–320 engine, S/N L–6590–39A, was installed on the Cessna 172N aircraft when it crashed on July 10, 2005. (Id. ¶ 3). Plaintiff admits that the carburetor that was installed on the Cessna 172N was not the same carburetor Lycoming shipped with the subject engine in 1969 but was instead a different carburetor. (Doc. 221, ¶ 5). The carburetor installed in the subject engine on the accident aircraft ("replacement carburetor"), a Precision MA–4SPA carburetor, was manufactured by the Precision Defendants and was completely overhauled by the Kelly Defendants on or about August 3–5, 2004. (Id. ¶ 6; Doc. 253, ¶ 5).

Lycoming holds the FAA-issued Type Certificate for the MA–4SPA model carburetors and the MA–4SPA carburetor at issue here was manufactured pursuant to Lycoming design, which cannot be modified or altered without approval from Lycoming (Doc. 234, ¶ 5). Defendant Precision and its predecessors were permitted to manufacture the carburetor pursuant to a licensing agreement with Lycoming. (Id.). The MA–4SPA carburetor design is not approved separately and is part of the Lycoming engine type design. (Id.).

As the holder of the Type Certificate for the engine, Lycoming approved and implemented the engineering change which effected the throttle body to bowl screw design at issue here in lieu of a safety wire assembly. (Id. ¶ 5, 22). This change was made in 1965. (Id. ¶ 22). Since 1972, Lycoming has been made aware of various reports of malfunctions and defects related to its O–320 series engines and the MA–4SPA carburetors, specifically concerning loosening throttle body to bowl assemblies. (Id. ¶¶ 24–25).

The 2004 overhaul of the subject engine, including the overhaul of the carburetor, was accomplished pursuant to and required by Lycoming's continued airworthiness instructions, which the FAA mandates Lycoming, as the Type Certificate holder for the entire engine design, maintain in compliance with federal aviation regulations. (Id. ¶¶ 5–6). The Kelly Defendants further complied with Lycoming's Service Bulletin 366, which was intended to alleviate the known throttle body to bowl assembly defects. (Id. ¶ 6). Lycoming's continued airworthiness instructions recommend that the carburetor be replaced at the time of the engine overhaul, and its Type Certificate Data Sheet ("TCDS") instructs mechanics to use MA–4SPA replacement carburetors when overhauling this engine. (Id.). Accordingly, as required by Lycoming's design, an MA–4SPA carburetor was installed on the subject engine during the 2004 overhaul.

The replacement carburetor on the subject engine at the time of the crash was a Lycoming-approved Marvel Schebler MA–4SPA model 10–5135 carburetor, which bore Lycoming part number, LW–13659. (Id.). Plaintiff's three experts conclude that the carburetor design was and is defective and dangerous. (Docs. 234–4, 234–5, 234–6). Donald E. Sommer, P.E., an expert who investigated the subject engine subsequent to the crash, noted that the carburetor bowl screws had loosened in the subject engine; he conducted several tests and concluded that "[t]he accident O–320 MA–4SPA carburetor is unreasonably dangerous and caused the death of David Sikkelee." (Doc. 234–6, pp. 34). He ultimately concluded that Lycoming "failed to exercise reasonable care in the design, manufacture, and support of the accident aircraft's engine and carburetor" and that Lycoming's O–320–D2C engine "is a defective engine due to the incorporation of the Precision MA–4SPA carburetor." (Id.)

(Mem. & Order at 7-10).

## III.    Discussion

### (a)    The July 3, 2012 Memorandum & Order

Lycoming's motion for reconsideration challenges the subject Order's holding on – in the words of the subject Order – a "critical preliminary issue": whether Sikkelee's claims fail because Lycoming was not "a manufacturer, distributor or seller of the allegedly offending product." (Mem. & Order at 10-11 (citing Pennsylvania caselaw for the proposition that, under both negligence-based and strict liability-based products liability regimes, the defendant, to be liable, must be a manufacturer, distributor, or seller who casts a defective product into the stream of commerce)).

In moving for summary judgment, Lycoming argued that, "while it admittedly sold the subject engine in 1969, the allegedly defective replacement parts installed during the engine's overhaul in 2004 were manufactured and sold by others." (Mem. & Order at 11-12). As a consequence, argued Lycoming, "[Sikkelee's claims] fail[] the preliminary requirement of a Pennsylvania products liability action" because Lycoming "did not manufacture, distribute, sell, or otherwise cast into the stream of commerce the allegedly defective replacement carburetor and its component parts." (Id. at 12). In support of its position, Lycoming cited the following undisputed facts:

> that [Lycoming] manufactured the subject engine, S/N L–6590–39A, in 1969 (Doc. 253, ¶ 1); that said engine was installed on the subject Cessna 172N aircraft when it crashed on July 10, 2005 (Id. ¶ 3); that the carburetor installed at the time of the 2005 crash was not the same

carburetor shipped with its S/N L–6590–39A engine in 1969 (Id. ¶ 5); that the carburetor installed at the time of the crash was in fact a replacement carburetor, a Precision MA–4SPA (Id. ¶ 5); that the replacement carburetor was completely rebuilt or overhauled by the Kelly Defendants in 2004, which installed new or as new parts and components with the carburetor (Id.); and that the Kelly Defendants manufactured the carburetor's replacement component parts, rebuilt or overhauled the replacement carburetor, and shipped the replacement carburetor. (Id. ¶ 6).

(Mem. & Order at 12-13).

The subject Order conceded that "Lycoming's argument, at first blush, appear[ed] sound," but ultimately concluded that Lycoming was advocating a "tunnel vision approach to this case" by asking the Court to "neglect[] critical facts regarding [Lycoming's] role in the manufacture of the replacement carburetor and the overhaul of the engine." (Mem. & Order at 16). These facts included:

that the replacement carburetor on the subject engine at the time of the crash was a Lycoming-approved Marvel Schebler MA–4SPA model 10–5135 carburetor (Doc. 234, ¶ 5); that the MA–4SPA carburetor was manufactured by Defendant Precision and its predecessors pursuant to a licensing agreement with Lycoming (Id.); that MA–4SPA carburetors are assigned a Lycoming part number, LW–13659 (Id.); that Lycoming holds the FAA Type Certificate for the MA–4SPA model carburetors and that the MA–4SPA carburetor at issue here was manufactured pursuant to Lycoming design drawings, which cannot be modified or altered without approval from Lycoming (Id.); that Lycoming approved the allegedly defective throttle body to bowl screw design at issue here (Id.); that the subject engine and carburetor were overhauled in 2004 pursuant to Lycoming's manual and Service Bulletin 366 (Id. ¶ 6); that Lycoming, in its continued airworthiness instructions, recommends that MA–4SPA carburetors be replaced when an engine is serviced or overhauled (Id.); and that Lycoming's Type Certificate Data Sheet

("TCDS") instructs mechanics to use MA–4SPA replacement carburetors when overhauling this engine. (Id.).

(Mem. & Order at 14-15).[6] The subject Order reasoned that these facts "created

---

[6]Lycoming argues that the Court was wrong to credit (for purposes of evaluating whether a genuine dispute of material fact existed) Sikkelee's assertion that "the subject engine and carburetor were overhauled in 2004 pursuant to Lycoming's manual." (Def.'s Br. at 19-21). Lycoming points out that Sikkelee did not cite to the record in support of this assertion, and argues that the record shows that the overhaul was performed using a Precision manual, not a Lycoming manual. (Id.). While Sikkelee should have complied with L.R. 56.1 (requiring "references to the parts of the record that support" a party's contention that a genuine dispute of material fact exists), the issue whether the overhaul was performed using "Lycoming's manual" is open to dispute, as shown by the record. (See, e.g., ECF No. 234-6 (quoting Lycoming Overhaul Manual instruction providing that "[a]ll repair and replacement procedures [with respect to carburetors] must be carried out in conjunction with the manufacturer's publications. Consult Avco Lycoming Service Bulletins nos. 297A, 306, 309, and 323 and be certain the carburetor has been modified to conform with these bulletins"); ECF No. 234-11 at 4 (Airworthiness Approval Tag stating that overhaul was performed in compliance with Lycoming service bulletins); ECF No. 234-17 at 4 (Lycoming Maintenance Flyer stating that "[t]he Lycoming overhaul manual and all applicable service bulletins and service instructions, used in conjunction with the appropriate operator's manuals, constitute the engine maintenance manual required" by the Federal Aviation Administration)). Particularly because of the Court's obligation to "draw all inferences in a light most favorable to the nonmoving party," Sheridan v. NKG Metals Corp., 609 F.3d 239, 250 n.12 (3d Cir. 2010), the Court did not err in finding that Sikkelee could potentially prove Lycoming's manual, in some shape or form, was used in the overhaul.

Lycoming claims that Sikkelee's assertion with respect to the use of Lycoming's manual in the overhaul is just one "illustration" of a general flaw in the subject Order, namely that it is "replete with 'facts' that are not facts at all," so much so that Lycoming's brief supporting its motion for reconsideration "[could not] discuss all such instances given the page limitations in the Local Rules."

genuine issues of material fact with respect to whether Lycoming is indeed a manufacturer of the defective engine following its 2004 overhaul." (Id. at 16).

Specifically, the subject Order accepted what it understood to be Sikkelee's argument in opposition to summary judgment – that "because Lycoming exercised such control over the MA–4SPA carburetor and the engine overhaul in its entirety, . . . Lycoming c[ould] fairly be said to be a de facto manufacturer of the overhauled engine, rendered defective by the replacement carburetor installed pursuant to its direction." (Mem. & Order at 15). The subject Order reasoned that to not impose liability on a "de facto manufacturer" on the same terms as any other "manufacturer" would "entirely defy concepts of fairness and justice and run counter to the considered history of products liability policy." (Id. at 16). Accordingly, the subject Order refused "to permit Lycoming to shift liability for a defective engine to its physical component part manufacturers and overhauling

_____

(Def.'s Br. at 19-21). This is hard to take seriously in light of at least seven previous motions to exceed page limitations (one filed by Lycoming, Sept. 14, 2010, ECF No. 163) in this case, all of which appear to have been granted. Since the Court assumes that Lycoming's additional instances of "'facts' that are not facts at all" are less substantial than the single unmeritorious "illustration" provided, the Court holds that the subject Order's denial of Lycoming's motion for summary judgment should not be overturned on this basis.

mechanics simply by physically removing itself from the overhaul process even though its directives control every aspect of said process." (Id. at 19). The subject Order denied Lycoming's motion for summary judgment (with the exception of claims arising from Lycoming's 1969 sale of the engine), permitting Sikkelee to proceed with her design defect and inadequate warning claims on strict liability and negligence theories.

## (b) Reconsideration

Using the taxonomy discussed in Section II above, Lycoming asserts that an intervening change in the controlling law (from the application to Restatement 2d to Restatement 3d) and the need to correct a clear error of law (the Court's conclusion that Lycoming could be liable as a <u>de facto</u> manufacturer) compel this Court to reconsider the subject Order and grant Lycoming's motion for summary judgment. The Courts disagrees.

### (1) There is no intervening change in law that warrants reconsideration and reversal.

Overstating the case somewhat, Lycoming asserts that "[t]he only question before this Court on reconsideration is whether Section 20 of the Restatement (Third) permits liability under this Court's de facto manufacturer theory of

liability." (Def.'s Reply Br. at 3).[7]

As one would expect, Lycoming argues that the answer is "no," reasoning that liability for a product defect under § 1 of Restatement 3d can only be placed on a defendant "engaged in the business of selling or otherwise distributing products who sells or distributes a defective product." Because § 20 of Restatement 3d defines what it means to "sell a product"[8] and "otherwise distribute[] a product"[9] under § 1, and because Lycoming does not fit either definition with respect to the carburetor and engine overhauled in 2004, Lycoming concludes that it cannot be liable for the design and warning defects alleged by Sikkelee. (Def.'s Br. at 5-8; Def.'s Reply Br. at 6-7).

---

[7]In its opening brief, Lycoming argued that the Court erred in its application of Federal Rule of Civil Procedure 56(a). (Mem. & Order at 15-17). Because the Court finds that Lycoming's argument in this regard simply recasts its primary argument – that, as a matter of law, Lycoming cannot be liable as a <u>de facto</u> manufacturer – the Court does not consider the argument separately.

[8] Restatement 3d § 20(a) provides: "One sells a product when, in a commercial context, one transfers ownership thereto either for use or consumption or for resale leading to ultimate use or consumption. Commercial product sellers include, but are not limited to, manufacturers, wholesalers, and retailers."

[9]Restatement 3d § 20(b) provides: "One otherwise distributes a product when, in a commercial transaction other than a sale, one provides the product to another either for use or consumption or as a preliminary step leading to ultimate use or consumption. Commercial nonsale product distributors include, but are not limited to, lessors, bailors, and those who provide products to others as a means of promoting either the use or consumption of such products or some other commercial activity."

The problem with this argument is that it assumes that Restatements are adopted wholesale when they are not. <u>See Covell v. Bell Sports, Inc.</u>, 651 F.3d 357, 364-65 (3d Cir. 2011) (reaffirming the prediction that Pennsylvania's highest court will adopt §§ 1 & 2 of Restatement 3d, but avoiding the prediction that it will adopt § 4).[10] Lycoming's argument relies heavily on definitions supplied by <u>§ 20</u> of Restatement 3d, but § 20 has not been adopted (or even cited) by the courts of Pennsylvania, and the Third Circuit has not predicted that it will be.

Furthermore, Lycoming has provided no support for the notion that Pennsylvania will adopt § 20, and this Court has discovered none. To this Court's knowledge, the caselaw that guides Pennsylvania courts in extending liability for product defects to particular parties has not been the source of significant dissatisfaction. <u>Cf. Bugosh v. I.U. N. Am., Inc.</u>, 601 Pa. 277, 279, 971 A.2d 1228, 1229 (2009) (Saylor, J., dissenting) (arguing that the standard of care applied to defective design claims under Pennsylvania law is "severely deficient" and encouraging adoption of standard from Restatement 3d in its place). Accordingly,

---

[10](<u>See also</u> Def.'s Reply Br. at 11 (criticizing Sikkelee for failing "to cite any case law or other authority that would support a prediction by this Court that Pennsylvania would adopt the post-sale provisions [found in § 10] of the Restatement (Third)"); <u>id.</u> at 13 (criticizing Sikkelee for "ask[ing] this Court to predict that Pennsylvania will impose a duty to recall [found in Section 11 of the Restatement 3d] where Pennsylvania has never recognized such a claim")).

it is unlikely that Pennsylvania would jettison that caselaw, especially considering that it is entirely compatible with §§ 1 & 2 of Restatement 3d. Indeed, not unlike § 20 of Restatement 3d, the existing caselaw generally limits negligence and strict liability to parties who are "manufacturer[s], distributor[s], or seller[s] of the allegedly offending product," as the Court recognized in the subject Order. (Mem. & Order at 11 (citing <u>Mellon v. Barre–Nat'l Drug Co.</u>, 431 Pa. Super. 175, 636 A.2d 187, 191 (1993))). The Court holds, therefore, that at least with respect to the caselaw that guides the extension of liability for product defects and inadequate warnings to particular parties, the application of §§ 1 & 2 of Restatement 3d instead of § 402A of Restatement 2d does not constitute an intervening change in controlling law warranting reconsideration.

> **(2)** **The subject Order did not make a clear error of law when it held that Lycoming could be liable as a <u>de facto</u> manufacturer.**

The conclusion that there has been no change in relevant law leaves Lycoming with the argument that the subject Order made a clear error of law when it concluded Lycoming could be liable as a <u>de facto</u> manufacturer.

In this regard, Lycoming argues that Pennsylvania law limits product liability defendants to those "who distribute the allegedly defective product."

(Def.'s Orig. Br. at 11-14 (citing various cases)).[11] Extending products liability to

de facto manufacturers contravenes of Pennsylvania law, Lycoming argues, and in

recognizing de facto manufacturer liability prior to any Pennsylvania court, the

subject Order improperly "disregard[ed] legal and factual bars to recovery based

simply on the court's own theory of justice." (Def.'s Br. at 17).[12]

---

[11]Lycoming's brief of its "Renewed Motion for Reconsideration" focused on § 20 of Restatement 3d, which the Court has concluded does not apply. However, Lycoming's brief of its original, mooted "Motion for Reconsideration," (July 17, 2012, ECF No. 301), also argued that the subject Order, in recognizing de facto manufacturer liability, erred under existing Pennsylvania precedents. Since Sikkelee is not prejudiced by consideration of Lycoming's brief of the original "Motion for Reconsideration" – Sikkelee also submitted a brief, which the Court has considered, in opposition to Lycoming's original motion, (Pl.'s Orig. Opp'n Br., Oct. 2, 2012, ECF No. 320) – the Court here considers certain arguments from Lycoming's brief of its original "Motion for Reconsideration."

[12]In its opening brief, Lycoming argued that the subject Order "defie[d]," "explicitly contradict[ed]," and "attempt[ed] to preempt federal law" by labeling Lycoming a de facto manufacturer and holding that, as such, it could be liable for design and warning defects in the overhauled engine and carburetor. (Def.'s Br. at 9-10). Lycoming reasoned that definitions of certain terms – "overhaul" and "rebuild" – found in federal aviation regulations conflicted with the idea that Lycoming could "sell" (using the definition in § 20 of Restatement 3d, see n.8 supra) a defective product in 2004.

But this argument was a fair weather friend to Lycoming, whom, in its Reply brief, criticized Sikkelee for "offering up a mind-numbing cacophony of arguments based on assorted federal regulations and statutes" while failing to "offer any reason why federal law can or should override [state law] requirements." (Def.'s Reply Br. at 7). The Court agrees with Lycoming's about-face: state law "determines what parties may be liable . . . whereas federal law defines the standard of care governing defendants who may be liable." (Id. at 8). (See

It is worrisome that, to the Court's knowledge, no court applying Pennsylvania law – in more than forty years since the Supreme Court of Pennsylvania adopted § 402A of Restatement 2d as the law of Pennsylvania in Webb v. Zern, 422 Pa. 424, 427, 220 A.2d 853, 854 (1966) – has ever before this case imposed products liability on a "de facto manufacturer." And the Court agrees that the subject Order too quickly labeled Lycoming a "de facto manufacturer" and, as such, considered it a "manufacturer" for liability purposes, when Lycoming could just as easily have been labeled, for example, a "non-manufacturing designer" of the allegedly defective carburetor and engine, and thereby have avoided liability in accordance with the subject Order's methodology.

The Court nevertheless rejects Lycoming's argument for reversal because the examination of caselaw from foreign jurisdictions tends to show that the subject Order's holding was not clearly erroneous, and because the Court believes it is likely that the courts of Pennsylvania would conclude that Lycoming owed a duty of care to Sikkelee.

**(A)    Caselaw from foreign jurisdictions tends to show that**

---

also Mem. & Order, Aug. 13, 2010, ECF No. 158 (concluding the Third Circuit's opinion in Abdullah v. Am. Airlines, Inc.,181 F.3d 363 (3d Cir. 1999) – which held that state law remedies may support an action for violation of federal aviation safety standards, but that federal aviation safety standards preempt state law standards of care – controls this action)).

**the subject Order's holding was not a clear error of law.**

The seeming novelty of the subject Order is lessened upon consideration of a number of instructive decisions from outside Pennsylvania that were overlooked or ignored by the parties. See Clark v. Modern Grp. Ltd., 9 F.3d 321, 332 (3d Cir. 1993) ("Reasoned scholarly opinion and the views of other state courts are sometimes useful in a diversity case in predicting the course the law will take in the jurisdiction whose law governs."). These cases reveal that, whether considered a de facto manufacturer or non-manufacturing designer, there is precedent for reaching the conclusion that Lycoming's role in the production and overhaul of the carburetor renders it potentially liable to Sikkelee.

For example, in Denekamp v. Hetronic USA, Inc., 2008 WL 4646954 (D.S.D. 2008), the injured plaintiff alleged that the seller of a secondhand industrial crane had retrofitted the crane with defective "manual backup controls" in compliance with a "conversion kit," engineering drawings, and extensive guidance provided by the defendant, who was also the original manufacturer of the crane. Id. at *1, *4. Applying the law of South Dakota (which has adopted § 402A of Restatement 2d), the district court reasoned that the defendant could be strictly liable for design defects in the retrofitted crane if the defendant was "significantly involved in designing the

19

defective product." Id. at *3. The court denied the defendant's summary judgment motion even though the plaintiff had presented no evidence showing that the defendant was physically involved in the manufacture of the retrofitted crane or its sale.

In Alm v. Aluminum Co. of Am., 717 S.W.2d 588 (Tex. 1986), the plaintiff, his eye injured by an exploding bottle top, alleged that his bottle had been manufactured by a bottler using "[defendant]-designed and patented resealable caps under licensing agreements with [defendant]." Id. at 589. The Supreme Court of Texas, applying the law of Texas (which has adopted § 402A of Restatement 2d) to the question of "[w]hether a designer who is not a manufacturer has a duty to warn of hazards associated with the use of its designed product," reasoned that a designer has both a duty to exercise ordinary care in its design and the duty of a reasonably prudent person to warn of the hazards associated with its product. Id. at 590-91.[13]

In Taylor v. Gen. Motors, Inc., 537 F. Supp. 949 (E.D. Ky 1982), a widow sought damages on behalf of her husband, who was killed when a fan blade detached from under the hood of his G.M. automobile, fatally striking him in the chest. The widow alleged that G.M., and not the manufacturer of the fan itself, was liable under

_____

[13]On appeal, the plaintiff had waived any claim that the designer was strictly liable.

theories of negligence and strict liability for the fan's design defect, even though she was unable to prove that the fan – which could have been obtained from a spare parts yard and installed by the decedent, who was known to tinker under the hood – had ever passed through the hands of G.M. Id. at 950. The widow predicated G.M.'s liability on its intimate involvement in the design of the fan, as well as on G.M.'s influence over the manufacturer as the primary customer for the fan. Id. The district court, applying the law of Kentucky (which has adopted § 402A of Restatement 2d), held that the case could reach a jury on theories of negligence and "Kentucky's approach to the design defect problem," which the Court explained was "closely related to negligence principles." Id. at 951.

There are decisions that go the other way on similar, if distinguishable, facts. See, e.g., Firestone Steel Prod. Co. v. Barajas, 927 S.W.2d 608 (Tex. 1996). In particular, in Goldsmith v. Olon Andrews, Inc., 941 F.2d 423 (6th Cir. 1991), the plaintiffs asserted negligence and strict liability theories against defendant Bell Helicopter for "damages resulting from the crash of a helicopter assembled by Olympic Helicopters using manuals, descriptions, and new and used parts from [Bell]." Id. at 424. Specifically,

> [plaintiff] purchased the helicopter from Olympic Helicopters . . . in July of 1982. Olympic had assembled the helicopter to the specifications of a "Bell Model 47" helicopter from spare, new, and surplus parts acquired from various sources, including defendant Bell. To assemble the

helicopter, Olympic used Bell maintenance, overhaul and parts manuals, service bulletins and instructions. Although Olympic did not have any license or contractual relationship with Bell for the assembly or sale of helicopters, Bell knew something about Olympic's activities because Olympic called Bell on several occasions for technical information.

. . .

Bell [had] manufactured the Model 47 helicopter from 1947 to 1974. Even though the last Model 47 was sold in 1974, Bell . . . continued to provide product support to operators of the Model 47s.

Id. at 424-25.

The United States Court of Appeals for the Sixth Circuit, applying the law of Ohio (which has adopted § 402A of Restatement 2d) to plaintiffs's claim that Bell was liable for the helicopter's defectively designed fuel system, upheld the district court's grant of summary judgment in Bell's favor. The Sixth Circuit reasoned that, on the one hand, imposing liability on a mere designer under § 402A of Restatement 2d would be inconsistent with the rationale of that section because (1) "[i]f the defendant is not engaged in the business of selling the product, then it cannot be said to have 'undertaken and assumed [the] special responsibility toward ... the consuming public'"; (2) "has not been afforded the opportunity to treat the risk of producing the product 'as a cost of production against which liability insurance [could have been] obtained'"; and (3) "has no ability to control the quality of the product or the conformance of the product with its design." Id. at 426 (quoting Restatement 2d §

402A cmt. c (1965)). On the other hand, even conceding that Bell's "design of the Model 47 and its fuel system" could be considered a "product" for purposes of § 402A of Restatement 2d, the Court found that there was "no evidence that Bell was in the business of placing this design in commerce," considering that "Bell did not offer for sale any designs, plans, or blueprints for the Model 47 or its fuel system,"  and "never licensed, sanctioned, or approved Olympic's use of Bell's design to manufacture the helicopter." Goldsmith, 941 F.2d at 427. Accordingly, the Sixth Circuit held that Bell could not be liable under § 402A of Restatement 2d and, without separate analysis, concluded that "the manner in which we resolve plaintiffs' strict liability claim also resolves the negligence claim." Goldsmith, 941 F.2d at 425 n.3.

The Court need not parse the fine distinctions among, or assess the wisdom of, these decisions on a motion for reconsideration.[14] It is sufficient to say that the various outcomes tend to show not that the subject Order made, as Lycoming claims, a clear error of law, but rather that the Court's holding was well within the realm of reasonableness.

_____

[14]The Court may have done so in deciding the subject Order, had any of these cases been brought to the Court's attention by the parties. In order to make their submissions more helpful, the Court encourages the parties to open-mindedly research and incisively address the particular dispute at issue in their briefs and to avoid talking past each other. To simply repeat entrenched arguments – at least when they are of little relevance to the matter at hand – is to waste an opportunity to persuade the Court.

**(B)** **The Court believes that Pennsylvania courts would likely hold that Lycoming had a duty of care with respect to Sikkelee.**

Even more important than the decision of any foreign jurisdiction is, of course, the caselaw of Pennsylvania and binding Third Circuit decisions interpreting Pennsylvania law. Neither the parties nor the Court have identified any such decisions that speak particularly to the facts of this case, but see Snyder v. ISC Alloys, Ltd.,772 F.Supp. 244, 255-56 (W.D. Pa. 1991) (Smith, J.) (plaintiff permitted to pursue theory of negligent design against licensor of, among other things, "drawings illustrating major components of [a] physical plant" for converting solid zinc into zinc dust), but analysis of the generally relevant caselaw brings the Court to the conclusion that it was not a clear error of law for the subject Order to conclude, at least, that Sikkelee's negligence claim survives summary judgment.

Citing Mellon v. Barre-Nat'l Drug Co, 431 Pa. Super. 175, 184, 636 A.2d 187, 191 (1993), Lycoming argues that a "defendant must be identified as the manufacturer, distributor, or seller of the offending product" before the defendant can be said to have a duty towards a plaintiff injured by the product, (Def.'s Supplemental Br., Apr. 20, 2012, ECF No. 8-9), a position the subject Order appears to have adopted. (Mem. & Order at 29). But upon reconsideration, the Court can agree only – along with the court in Mellon itself – that this is generally the case, not always. See

24

Mellon, 431 Pa. Super. at 184, 636 A.2d at 191 (emphasis added) ("In general, a defendant must be identified as the manufacturer, distributor, or seller of the offending product before . . . there can be . . . allegations of duty, breach of duty, or legal causation."). Thus, even if Lycoming is considered not a "de facto manufacturer," but rather a "non-manufacturing designer" of the allegedly defective carburetor, it may still owe a duty of care to Sikkelee.

To determine whether Lycoming, as a non-manufacturing designer, had a duty of care towards Sikkelee on the facts of this case, the Court must consider the factors of the so-called "Althus test." See Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 61 (3d Cir. 2009) ("In Pennsylvania, the determination of whether a duty of care is owed is a policy decision that requires the trial court to apply the 'Althaus test.'"). Those factors are:

> (1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution. No one of these five factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant.

Phillips v. Cricket Lighters, 576 Pa. 644, 659, 841 A.2d 1000, 1008-09 (2003)).

As to the first factor – the relationship between the parties – the connection between Sikkelee and Lycoming was indirect. On the other hand, as the Type

Certificate holder for the MA-4SPA carburetor, Lycoming was assured that such carburetors would be manufactured and overhauled in accordance with its designs and instructions and installed in aircraft intended for users like Sikkelee. Thus, while the relationship was indirect, it was all but inevitable, and the Court finds that this factor weighs in favor of finding a duty.

The social utility of Lycoming's conduct, the second factor, clearly weighs in favor of finding a duty. Giving credence to Sikkelee's proof (as the Court must at this juncture), Lycoming has known of various malfunctions and defects associated with the engine and carburetor it designed – as well as the existence of safer feasible alternatives – and yet has continued to license production of the allegedly defective carburetors and to direct overhaulers to install them in its engines. Lycoming has also failed to warn potential victims of its design. Needless to say, this is not conduct with great social utility. Cf. Phillips, 576 Pa. at 659, 841 A.2d at 1009 ("A butane lighter has obvious social utility as a reliable, convenient method to create a flame. Yet, the benefits of one lacking a child resistant feature are not so plain.").

The third factor – the nature of the risk imposed and foreseeability of the harm incurred – also likely weighs in favor of finding a duty. While the Court is without sufficient data to make a fully informed assessment as to the likelihood of injury resulting from the defect alleged in this case, common sense suggests that potentially

grievous injury is an undoubtedly foreseeable result of the malfunction of a necessary component in an airplane's engine.

The fourth factor – the consequences of imposing a duty upon the [defendant] – also weighs in favor of finding a duty. Indeed, considering that standards of care supplied by federal aviation law will govern this action, (see n.12 supra), Lycoming already has various duties with respect to the safety of its designs, (see Mem. & Order at 30-31), and to the degree these burden Lycoming, the federal government has already determined that the costs associated with the regulations are outweighed by the benefits.

Finally, the overall public interest in the proposed solution weighs in favor of finding a duty. According to plaintiffs, it is only Lycoming – and no one else in the chain of production – that can alter its carburetor design to make it safer. In spite of its awareness of the danger associated with its design, Lycoming has neglected to do so. Forcing Lycoming to internalize the costs of this neglect directly may provide it with the incentive to provide a safer design to the public.

Weighing the factors, the Court concludes that even if Lycoming is considered a mere non-manufacturing designer, the subject Order did not make a clear error in concluding that Lycoming has a duty of care in relation to Sikkelee – namely, a duty of reasonable care in the design of the accident aircraft's carburetor and the warnings

associated with it.

Of course, the subject Order also concluded that Sikkelee could proceed on a strict liability theory. The Court concludes that it need not address whether this was proper on reconsideration for the following reasons. First, in light of the Third Circuit holding in Abdullah, federal standards of care will govern Lycoming's liability in any case. (See n.12 supra). Second, in light of the Third Circuit prediction that Pennsylvania will adopt §§ 1 & 2 of Restatement 3d, any practical distinction between "strict liability" and negligence in a design defect and inadequate warning case (such as this one) is vanishingly thin. See Phillips, 576 Pa. at 665-, 841 A.2d at 1012 (Saylor, J., concurring) (arguing that design defect analysis should be guided by negligence principles and advocating adoption of § 2 of Restatement 3d, which deems a product "defective in design when the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design, and when the failure to utilize such a design has caused the product to be 'not reasonably safe'").[15] Indeed, § 2 of

_____

[15] See also Restatement 3d § 2 cmt. a ("Subsections (b) and (c), which impose liability for products that are defectively designed or sold without adequate warnings or instructions and are thus not reasonably safe, achieve the same general objectives as does liability predicated on negligence."); id. cmt. d ("[T]he test [for defective design] is whether a reasonable alternative design would, at reasonable cost, have reduced the foreseeable risks of harm posed by the product and, if so, whether the omission of the alternative design by the seller or a predecessor in the distributive chain rendered the product not reasonably safe."); id. ("Assessment of a product design in most instances requires a comparison between an alternative

Restatement 3d is indifferent to the "doctrinal tort categories such as negligence or strict liability [that are] utilized in bringing the claim." Restatement 3d § 2 cmt. n. Where, as here, both negligence and strict liability theories are alleged,

> two or more factually identical defective-design claims or two or more factually identical failure-to-warn claims should not be submitted to the trier of fact in the same case under different doctrinal labels. Regardless of the doctrinal label attached to a particular claim, design and warning claims rest on a risk-utility assessment. To allow two or more factually identical risk-utility claims to go to a jury under different labels, whether "strict liability," "negligence," or "implied warranty of merchantability," would generate confusion and may well result in inconsistent verdicts.

> In proceedings in which multiple theories are alleged, the Restatement leaves to local law the question of the procedural stage in a tort action at which plaintiff must decide under which theory to pursue the case.

Id. Since Sikkelee's strict liability and negligence theories ultimately merge into respective design defect and inadequate warning claims, each governed by the negligence principles of § 2 of Restatement 3d, the Court expresses no opinion on the subject Order's determination that Sikkelee could proceed on a "strict liability" theory. It is enough to hold, as the Court does, that the subject Order did not make a

---

design and the product design that caused the injury, undertaken from the viewpoint of a reasonable person. That approach is also used in administering the traditional reasonableness standard in negligence."); id. cmt. i ("Subsection (c) adopts a reasonableness test for judging the adequacy of product instructions and warnings. It thus parallels Subsection (b), which adopts a similar standard for judging the safety of product designs.").

clear error in denying Lycoming's motion for summary judgment on Sikkelee's negligence claim.

**IV.    Conclusion**

For the foregoing reasons, AVCO's "Renewed Motion for Reconsideration of Order Entered July 3, 2012" is denied.

An Order follows.

s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL SIKKELEE, individually and | : | Case No. 4:07-cv-00886 |
| as personal representative of the | : | |
| estate of DAVID SIKKELEE, | : | |
| desceased, | : | |
| | : | |
| Plaintiff | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| PRECISION AIRMOTIVE | : | |
| CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

**ORDER**

AND NOW, this 3rd  day of June, 2013, it is hereby ORDERED in

accordance with the accompanying memorandum that AVCO's "Renewed Motion

for Reconsideration of Order Entered July 3, 2012" (ECF No. 332) is DENIED.


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge