IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JILL SIKKELEE, individually and as personal representative of the ESTATE OF DAVID SIKKELEE, Deceased, | No. 4:07-CV-00886 |
| | (Judge Brann) |
| Plaintiff, | |
| v. | |
| PRECISION AIRMOTIVE CORPORATION, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**MARCH 1, 2021**

## I.    BACKGROUND

In 2007, Jill Sikkelee filed a complaint related to the 2005 death of her husband, David Sikkelee; that complaint was subsequently twice amended, most recently in 2011.[1]  In the second amended complaint, Sikkelee alleges that David Sikkelee's private plane crashed after the screws holding the plane's MA-4SPA model carburetor's fuel bowl to its throttle body loosened, causing the engine to lose power.  She alleges that Lycoming Engines ("Lycoming"), a subsidiary of Avco Corporation, designed, manufactured, and sold the engine that incorporated the allegedly defective carburetor. Sikkelee further alleges that Lycoming was

---

[1]    Doc. 205.

aware of numerous problems and defects with the screws and locking mechanism that attached the carburetor halves together but failed to correct those issues and instead covered them up.  Lycoming in turn argues that no mechanical issues contributed to the crash.  Rather, it asserts that Mr. Sikkelee tried to climb in altitude too quickly to avoid mountains during takeoff, which resulted in an aerodynamic stall that caused the plane to lose lift and crash.

In 1969, Lycoming manufactured the engine installed on David Sikkelee's aircraft at the time of the accident.  The engine underwent an overhaul in 2004, during which an overhauled model MA-4SPA carburetor was installed on the airplane.  The carburetor was designed and manufactured by Marvel-Schebler and was overhauled by Kelly Aerospace ("Kelly").  Kelly holds a Federal Aviation Administration (FAA) Parts Manufacturer Approval (PMA) certificate[2] and an FAA repair station certificate authorizing it to manufacture replacement parts, and to repair and overhaul carburetors independently of the engine manufacturer. During the 2004 carburetor overhaul, Kelly replaced a number of parts, including the fuel bowl screws, lock tab washers, and fuel bowl gasket.  The carburetor also

---

[2]   An FAA PMA certification is a combined design and production approval for modification and replacement articles.  The design approval phase of the PMA process certifies that a replacement or modification article complies with the airworthiness standards of eligible products (aircraft, engine, or propeller). The applicant shows this compliance through tests and computations unless the article is identical to the article design on a type-certificated product.

included a replacement throttle body and fuel bowl of unknown age, origin, and condition.[3]

In 2014, this Court granted Lycoming partial summary judgment on the ground that the FAA's issuance of a type certificate for the engine meant that the federal standard of care had been satisfied and Lycoming was not negligent or strictly liable.[4]  The Court denied summary judgment on Sikkelee's failure-to-warn claims, which were based on Lycoming's alleged violation of 14 C.F.R. § 21.3 due to its failure to "report any failure, malfunction, or defect in any product, part, process, or article" that Lycoming made.[5]

On appeal, the United States Court of Appeals for the Third Circuit held that "field preemption does not apply to state-law aircraft products liability claims because (1) the Federal Aviation Act, the General Aviation Revitalization Act of 1994, and the regulations promulgated by the [FAA] reflect that Congress did not intend to preempt aircraft products liability claims in a categorical way; (2) Congress has not created a federal standard of care for persons injured by defective airplanes; and (3) the type certification process cannot as a categorical matter displace the need for compliance in this context with state standards of care."[6]  The

---

[3]   Doc. 617 at 8-9.
[4]   Doc. 495.
[5]   *Id.*
[6]   *Sikkelee v. Precision Airmotive Corp.*, 907 F.3d 701, 708 (3d Cir. 2018) (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 683, 696 (3d Cir. 2016)) (internal quotation marks omitted).

Third Circuit thus held that "aircraft products liability cases like Sikkelee's may proceed using a state standard of care, subject to traditional principles of conflict preemption, including in connection with the specifications expressly set forth in a given type certificate."[7]

On remand, Lycoming again moved for summary judgment, asserting that Sikkelee's claims were subject to conflict preemption and would, in any event, fail under Pennsylvania law.[8] This Court again granted summary judgment in Lycoming's favor, concluding that Sikkelee's claims were conflict-preempted and, even if they were not, Lycoming was entitled to summary judgment on Sikkelee's strict liability and negligence claims based on Pennsylvania law.[9] Sikkelee again appealed, and the Third Circuit again reversed in part, holding that this "Court erred in concluding Sikkelee's claims are conflict-preempted because Lycoming has not produced clear evidence that the FAA would not have allowed it to change the engine's design as set forth in the type certificate. The Court also erred in granting Lycoming summary judgment on Sikkelee's strict liability and negligence claims because there are genuine disputes of material fact concerning, among other things, causation."[10]

---

[7]   *Id.* (internal quotation marks omitted).
[8]   Doc. 534.
[9]   Doc. 565.
[10]  *Sikkelee*, 907 F.3d at 704-05.

After the matter was again remanded to this Court, preparations for trial began, and *Daubert* motions were filed and ruled upon.[11]  The parties have now filed a number of motions *in limine*. Sikkelee has filed five motions *in limine*, including motions to preclude: (1) evidence of statistics and studies upon which Lycoming's expert witness Jeffrey Edwards relies in reaching his expert opinion; (2) evidence of propeller damage comparisons conducted by Lycoming's expert witness Leslie Doud; (3) certain statements made by an FAA inspector; (4) complaints about the airplane's prior maintenance—or lack thereof; and (5) evidence of claims that were previously resolved.[12]  Lycoming in turn has also filed five motions *in limine*, including motions to exclude: (1) evidence of service difficulty reports, service information records, warranty claims, and other lawsuits; (2) the expert testimony of Michael Thomson; (3) evidence of alleged carburetor defects that indisputably were not related to the accident; (4) evidence of subsequent remedial measures and other post-accident evidence; and (5) the untimely affidavit and deposition testimony of Emagene Maar.[13]

The parties have filed response and reply briefs, and the motions are ripe for disposition.  After reviewing the briefs and evidence, as discussed below, some of the motions will be granted, while some will be denied.

---

[11]   Docs. 707, 708.
[12]   Docs. 651, 653, 655, 657, 659.
[13]   Docs. 662, 664, 666, 668, 670.

## II.   DISCUSSION

Courts exercise discretion to rule *in limine* on evidentiary issues "in appropriate cases."[14]  While motions *in limine* may serve as a useful pretrial tool that enables more in-depth briefing than would be available at trial, a court may defer ruling on such motions "if the context of trial would provide clarity."[15] "[M]otions *in limine* often present issues for which final decision is best reserved for a specific trial situation."[16]  Thus, certain motions, "especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context."[17]  Specifically, "*pretrial* Rule 403 exclusions should rarely be granted . . . [as] a court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence."[18]  Regardless, "*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."[19]

---

[14]   *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

[15]   *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 707 (E.D. Pa. 2012).

[16]   *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997).

[17]   *Leonard v. Stemetech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013).

[18]   *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990).

[19]   *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

## A.      Motion to Preclude Evidence of Statistics and Studies

First, Sikkelee seeks to preclude Lycoming's expert, Jeffrey Edwards, from introducing evidence of statistics and studies that demonstrate that the majority of airplane accidents are caused by pilot error.[20]  Sikkelee argues that such evidence is irrelevant and, thus, inadmissible under Federal Rule of Evidence 402.[21] Specifically, Sikkelee contends that the prior accidents referenced in those statistics and studies are not substantially similar to the accident at issue here, and there is no way to examine the underlying data.[22]  She further asserts that the negligence of other pilots is not probative of what caused Mr. Sikkelee's crash and constitutes improper propensity evidence.[23]  Finally, Sikkelee argues that, regardless of whether the evidence is facially admissible, it should be excluded under Federal Rule of Evidence 403, as any probative value is substantially outweighed by the danger of unfair prejudice.[24]

Lycoming responds that Edwards may testify regarding the facts and data that form the basis of his expert opinion, in accordance with Federal Rule of Evidence 703, as the studies and statistics are the type relied upon by experts in the

---

[20]   Doc. 651.
[21]   Doc. 652.
[22]   *Id.* at 8-10.
[23]   *Id.* at 10-12.
[24]   *Id.* at 12-13.

field of aircraft accident reconstructions, and the probative value of that evidence substantially outweighs its prejudicial effect.[25]

Federal Rule of Evidence 703 provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Thus, "[i]f the facts are of the type 'reasonably relied upon' by experts in the particular field in forming opinions or inferences upon a subject, the facts or data need not be independently admissible in evidence" for the expert to rely upon them.[26] However, in order for those facts to be presented to the jury, the Court must determine that the balancing test described by Rule 703 weighs in favor of admitting the evidence at trial.

The Court concludes that, under that balancing test, the studies and statistics upon which Edwards relies in reaching his expert opinion are not admissible at trial in their raw form.[27] As Lycoming notes in its brief in opposition to this motion,

---

[25] Doc. 682.

[26] *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

[27] Although Sikkelee disputes that the studies and statistics are the type of evidence that aircraft accident investigators reasonably rely upon in conducting their investigations (Doc. 687 at 2-4), Edwards testified at the *Daubert* hearing that such evidence is important in determining the cause of airplane accidents, helps frame the accident and its most likely cause, and is often

Edwards relies upon the statistics and studies "to evaluate *potential* risk factors and identify other *potentially* relevant factors regarding general aviation accidents and evaluated whether those risk factors were present under the facts in this case."[28] After identifying risk factors that David Sikkelee allegedly presented, Edwards "conducted a full reconstruction of the accident, considered witnesses statements, the aircraft wreckage, and the pilot's experience, among other factors, to determine" the cause of the crash.[29]

Given this, the Court sees relatively little probative value in revealing to the jury the statistics and information that Edwards used to determine general risk factors for crashes—and certainly not a sufficient amount of probative value that the Court could reasonably determine that the "probative value in helping the jury evaluate the opinion *substantially* outweighs their prejudicial effect."[30]  This does not means that Edwards will not be permitted to testify as to the bases of his opinion and how he reached that opinion.

Nevertheless, there is no reason why Edwards cannot explain his expert opinion by merely referencing the fact that he identified certain pilot risk factors, explain how he determined that these risk factors were present when the aircraft

---

relied upon by aircraft accident investigators. The Court concludes, as it did in resolving the *Daubert* motion, that experts in Edwards' field reasonably rely upon that evidence, and Edwards therefore may rely on such statistics and studies in formulating his expert opinion.

[28] Doc. 682 at 11.

[29] *Id.*

[30] Fed. R. Evid. 703 (emphasis added).

that Mr. Sikkelee piloted crashed,[31] and then explain why he believes that Mr. Sikkelee's actions caused the accident. There is nothing terribly difficult to comprehend about Edwards' opinion as it relates to the risk factors or how those factors may have played a role in the accident. Moreover, the use of statistics and studies to explain how Edwards determined that certain risk factors are present in pilots may confuse the jury. Rather than be presented with a straightforward discussion of risk factors for flying, the jury would be inundated with numbers, statistics, and studies to try to make sense of—after having been instructed that such numbers and statistics may not be used for any purpose other than to evaluate Edwards' opinion.

Accordingly, Sikkelee's motion *in limine* to preclude the admission of statistics and studies referenced in Edwards' expert report is conditionally granted. Edwards may testify that he identified certain pilot risk factors, set forth what those risk factors are, and explain why he believes that those risk factors were present when the aircraft that Mr. Sikkelee piloted crashed shortly after takeoff. Edwards may not, however, directly reference the statistics and studies that he used to determine that pilots in general present certain risk factors. The Court may revisit this determination at the time of trial upon appropriate motion, should it become

---

[31] Under the Rules of Evidence, Edwards may offer his opinion without disclosing to the jury the facts and data underlying that opinion, except that "the expert may be required to disclose those facts or data on cross-examination." Fed. R. Evid. 705.

clear that such evidence is necessary for the jury to properly understand and evaluate Edwards' expert opinion.

### B.  Motion to Preclude Evidence of Propeller Damage Comparisons

Next, Sikkelee seeks to preclude the use of propeller damage comparisons that Lycoming's expert Leslie Doud conducted based on aircraft accidents contained on the NTSB's Public Docket.[32]  Doud reviewed eight accidents where an airplane allegedly impacted the ground under high engine power, and five accidents where an airplane allegedly impacted the ground under low or no engine power to confirm certain damage signatures to the propeller blades under both scenarios.[33]  Sikkelee contends that Doud analyzes too few accidents for his findings to be proffered as a general principal, and he does not sufficiently analyze the conditions involved in those accidents.[34]  Sikkelee argues that, additionally, Doud fails to define what is high power and, thus, fails to establish that Mr. Sikkelee's accident falls into either the high or low power category, meaning that Doud's analysis is not sufficiently probative to be admitted into evidence.[35]

Sikkelee also asserts that Lycoming has not demonstrated that the accidents that Doud analyzed are substantially similar to Mr. Sikkelee's accident and, therefore, has not demonstrated that the analysis is admissible.[36]  To the contrary,

---

[32]  Doc. 653.
[33]  Doc. 613-4 at 33-41.
[34]  Doc. 654 at 4-6.
[35]  *Id.* at 6.
[36]  *Id.* at 6-13.

Sikkelee argues that the accidents referenced by Doud were all markedly dissimilar to Mr. Sikkelee's accident.[37]  Finally, even if Doud's analysis were facially admissible, Sikkelee contends that it should be excluded under Federal Rule of Evidence 403, as any probative value is substantially outweighed by its prejudice and the danger of misleading the jury or wasting time at trial.[38]

Lycoming responds that Doud's analysis is admissible under Federal Rule of Evidence 703, as Doud applied reliable science, including relying on authoritative documents that detail what types of propeller damage are indicative of high or low engine power and well-accepted principals of trigonometry to calculate engine revolutions per minute (RPM) at the time that Mr. Sikkelee's plane impacted the ground.[39]  Moreover, Lycoming contends that the accidents cited by Doud need not be substantially similar to the accident at issue here, as Doud's analysis is used to verify the accuracy of the methodology that he employed to determine that propeller damage was indicative of high engine power at the moment of impact, and does not use it to prove causation.[40]  Finally, Lycoming asserts that the probative value of Doud's analysis is not substantially outweighed by any prejudice.[41]

---

[37]  *Id.*
[38]  *Id.* at 13-14.
[39]  Doc. 683 at 6-8.
[40]  *Id.* at 10-13.
[41]  *Id.* at 13-14.

As an initial matter, although Sikkelee cites *Barker v. Deere & Co.*[42] for the proposition that, for Doud's analysis to be relevant and admissible, Lycoming must demonstrate that the accidents Doud analyzed occurred under circumstances that are substantially similar to the accident at issue here,[43] the Court finds that *Barker* is not applicable here.

In *Barker*, the Third Circuit held that "when a plaintiff attempts to introduce evidence of other accidents as direct proof of a design defect, the evidence is admissible only if the proponent demonstrates that the accidents occurred under circumstances substantially similar to those at issue in the case at bar."[44]  The court emphasized that such a requirement "is especially important in cases where the evidence is proffered to show the existence of a design defect" since, "[i]n such cases, the jury is invited to infer from the presence of other accidents that a design defect existed which contributed to the plaintiffs' injuries."[45]  The Third Circuit's plain language differentiates *Barker* from this matter, as its holding was limited to circumstances where the plaintiff introduces evidence of other accidents "as direct proof of a design defect."[46]  The court further implicitly limited its holding when it noted that the general ruled it created applied to "prior occurrences and accidents

---

[42]   60 F.3d 158 (3d Cir. 1995).
[43]   Doc. 654 at 6-7.
[44]   60 F.3d at 162.
[45]   *Id.* at 162-63.
[46]   *Id.* at 162.

involving a product which is identical or substantially similar *to the product which has allegedly caused an injury*."[47]

Based upon the limitations present in that ruling, the Third Circuit has distinguished *Barker* in circumstances where evidence of other accidents was introduced to establish something other than direct proof of a design defect.  In an unpublished opinion, *Snider v. Sterling Airways, Inc.*, the Third Circuit considered an appeal of the district court's decision to admit into evidence Certificates of Compliance, Service Difficulty Reports, and other third-party evidence relating to exhaust valve guide failures.[48]  Although there was no evidence in the record that those accidents were substantially similar to the accident at issue in *Snider*, the Third Circuit noted that "[t]his case did not involve a design defect, nor was the evidence introduced to serve as direct evidence of a defect of any kind. Rather, it was introduced to show that [the defendant] had knowledge that its exhaust valve guides were dangerous."[49]  Accordingly, evidence that the other accidents were substantially similar to the accident at issue in that case was not required, and the Third Circuit concluded that the defendant's reliance on *Barker* was "patently misplaced."[50]

---

[47]  *Id.* (quoting 2A Louis Frumer & Melvin Friedman, *Products Liability* § 18.02[1], at 18-14 to 18–17 (1995) (emphasis added)).

[48]  758 F. App'x 283, 288 (3d Cir. 2018).

[49]  *Id.*

[50]  *Id.*; *see also Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 464 (D. Md. 2000) (noting that "the substantially similar test is only applicable if evidence is being offered to show product defect" and permitting evidence of other accidents, despite lack of similarity, where "evidence

Here, evidence of other accidents is not being introduced by the plaintiff as direct proof of design defect but, rather, by the defendant to gain insight into circumstances surrounding accident.  In Doud's opinion, the other accidents that he analyzed help to demonstrate that, here, the airplane's engine was operating at high power; thus, those other accidents are not direct proof of a design defect—or lack thereof—in the airplanes' carburetors.  Indeed, Doud's analysis is not even being used to prove causation—i.e., that any defect in any part of the airplane caused or did not cause the accident.  The analysis is being used to show only that the engine was operating at high power at the time of impact; such evidence leaves open the possibility that the accident could have been caused by any number of issues, including mechanical issues not related to the engine.  Moreover, Doud's opinion does not analyze the product which allegedly caused the injury—the airplane's carburetor—but rather, is analyzing an entirely different component—the airplane's propeller.

Accordingly, the Court concludes that Sikkelee's reliance on *Barker* is misplaced, and Lycoming need not demonstrate that the other accidents were substantially similar to the accident at issue here to establish that those accidents are relevant.[51]  Such evidence is not necessary for Doud's analysis to have the

---

was offered as rebuttal to [expert's] testimony about automobile stability factors, and was intended to demonstrate general weaknesses in his testing and theories on this subject").

[51] Even if *Barker* were applicable here, courts generally conclude that "[w]hether accidents are substantially similar depends largely upon the theory of the case: Differences in the nature of the defect alleged may affect a determination whether the accidents are substantially similar."

"tendency to make a fact more or less probable than it would be without the evidence."[52]  Unlike when evidence of other accidents is used to demonstrate that a defective product caused the crash, substantial similarity is not needed to demonstrate that certain characteristics are indicative of engine power at the time of a crash, since evidence of what caused the accident is not determinative of these propeller damage signatures.[53]  Although the type of surface impacted, degree of angle, and other issues may change the damage signatures, these are issues of weight to be explored on cross-examination, rather than issues of admissibility.

As Sikkelee accurately notes, the McCreary white paper—upon which Doud relies in conducting his propeller damage analysis—cautions that propeller damage is "dependent upon the obstructions encountered, such as trees, water, soil, rocks, etc., and the manner in which it engages such obstructions, as determined by the speed, attitude, and path (angle) of aircraft during the impact sequence.  Each

---

*Wheeler v. John Deere Co.*, 862 F.2d 1404, 1407 (10th Cir. 1988) (internal quotation marks omitted).  Thus, substantial similarity is required only as to the relevant factors in the accident, and "differences between the accidents not affecting their substantial similarity go to the weight of the evidence and not to its admissibility."  *Id.* at 1408.  Here, the relevant factor would be the engines' power at the time of impact and, despite Sikkelee's efforts to undermine Doud's conclusions with respect to the power being produced during the other accidents, there is sufficient evidence that the engines were operating under high or low power at the time of the accidents for that issue to go to a jury.  For example, Sikkelee contends that the accident involved in NTSB case number CEN13FA364 may have been caused by engine failure, as witnesses stated that the airplane's engine was "sputtering" before the crash; however, the NTSB determined that the crash was caused by the pilot's failure to retract the wing flaps during takeoff, not by an engine failure. *See* Doc. 654-4.

[52]  Fed. R. Evid. 401.

[53]  *Cf. Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991) (holding "that evidence of dissimilar accidents may be admitted when relevant to the witness's credibility. The problem of relevancy . . . is not present when the evidence is relevant to credibility").

accident is unique."[54]  Despite this cautionary note, the McCreary white paper

reaches conclusions about propeller damage signatures that are generally indicative

of high or low power based upon "common findings" in all airplane accidents.[55]

Thus, the fact that the general characteristics of a high power impact may

not exist in all accidents where the engine was producing high power does not

undermine the general findings of the McCreary white paper—or Doud's analysis

confirming the findings of the McCreary white paper—that certain characteristics

are generally indicative of high power—it only provides Sikkelee with fertile

ground for cross-examination.[56]  Similarly, the fact that the different circumstances

presented in the other accidents *may* have impacted the propeller damage

signatures in those instances does not render Doud's analysis wholly irrelevant

under Federal Rule of Evidence 403, as the analysis still maintains some probative

value, given that it confirms that some propeller damage signatures are generally

indicative of an engine's power output.  Propeller damage that indicates the engine

at issue here was producing high power would, in turn, make it more likely that the

---

[54]  Doc. 625-5 at 14.

[55]  *Id.* at 9; *see id.* at 9-11.

[56]  *See Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008) ("As a rule, questions regarding the factual underpinnings of the expert's opinion affect the weight and credibility of her testimony, not its admissibility"); *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005) (noting that, as a "general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination").

engine did not fail prior to the accident, meaning that Sikkelee's theory of the accident is incorrect.

With respect to Sikkelee's argument that Doud may not offer his analysis to prove that certain propeller damage is indicative of either low or high power, since the sample size is too small to establish such a broad principal, the Court agrees.[57] That is not, however, what Doud does in his opinion; Doud's opinion regarding the propeller damage characteristics that are indicative of low and high power is based primarily in the principals set forth in the McCreary white paper.[58]  Doud uses his analysis not to establish a broad principal of its own, but to confirm the information contained in an authoritative text, which is permissible.

Finally, in regard to Sikkelee's argument that Doud's analysis and opinion lacks any probative value because he does not define "high power" and "low power" and, thus, cannot establish that Mr. Sikkelee's accident falls into the high power category,[59] the Court finds this argument to be without merit.  Sikkelee's own expert opines that the airplane at issue here was not operating under high power at the time of impact but, rather, was operating under low power.[60] Therefore, Doud's analysis is clearly consistent with Lycoming's theory that the accident here occurred when the airplane's engine was operating under high

---

[57]  Doc. 654 at 4-5.

[58]  The Court previously determined that Doud's reliance on the McCreary white paper is appropriate, and that his opinion based on that document is reliable.  Doc. 707 at 44-46.

[59]  Doc. 654 at 6.

[60]  *See* Doc. 683-4.

power, and undermines Sikkelee's theory that the accident occurred when the airplane's engine was operating under low power.[61]

In sum, the Court concludes that there is no basis to exclude Doud's analysis of propeller damage that occurred in thirteen other accidents. Consequently, Sikkelee's motion *in limine* will be denied.

### C.    Motion to Preclude FAA Inspector Statements

Sikkelee seeks to exclude three statements made by lead FAA investigator Jan McDougald.  McDougald was appointed to investigate the causes of the accident in this case.[62]  Following her investigation, and as she was required to do,[63] McDougald completed an 8020-23 form documenting relevant information regarding the accident.[64]  Form 8020-23 provides for the FAA investigator to note factual information regarding an accident and offer a "brief explanation of issues involved."[65]  Any new information learned after the original form is completed must be submitted by amendment.[66]

---

[61]   The Court notes that any ambiguity in Doud's definitions of low or high power could have been cleared up had counsel inquired about this issue at the *Daubert* hearing.  Thus, any lack of clarity is partly due to Sikkelee's counsel, who knew the basis of this motion *in limine* at the time of the *Daubert* hearing but failed to avail themselves of the opportunity to explore this issue when such opportunity was presented.

[62]   Doc. 684-2.

[63]   *Id.* at 526.

[64]   Doc. 684-1.

[65]   *Id.* at 5.

[66]   Doc. 684-2 at 526.

McDougald completed the 8020-23 form for this accident on August 18, 2005.[67]  In the space provided for a narrative explanation, McDougald summarized witness statements describing the accident.[68]  She also made two comments.  The first was that "[h]ad the pilot survived the accident a reexamination of his pilot skills would be appropriate."[69]  The second was that "[i]nvestigation of the aircraft and engine components (to the extent possible due to fire damage), has not revealed any pre-impact damage or malfunction."[70]

McDougald later submitted an amended form on September 23, 2005.[71]  The amendment contained additional witness statements from a woman gardening outside her home nearby and from Sikkelee.[72]  The form provides that a copy of the passenger statement was received from the NTSB several days earlier.[73]  And it notes that "[p]rior to receiving the written passenger statement, neither the NTSB nor the FAA were able to interview the passenger due to attorney intervention."[74]

In neither the original nor the amended form does McDougald identify the factual basis for her conclusions regarding the role of malfunctioning equipment or

---

[67]   Doc. 684-1 at 5.

[68]   *Id.* at 5-6.

[69]   *Id.* at 5.

[70]   *Id.* at 6.

[71]   *Id.* at 9.

[72]   *Id.*

[73]   *Id.*

[74]   *Id.*  Sikkelee posits that the NTSB had arranged for a telephonic interview with the passenger and his counsel, but that the NTSB terminated the meeting after the passenger's counsel objected to the presence of "in-house investigators" for Lycoming and Cessna Aircraft Company.  Doc. 689 at 7.

the need for the pilot to have received retraining, had he survived.  She does not explain how she reached these determinations or elaborate on her reasoning. Further, McDougald does not provide any details regarding the procedures that she followed in completing this investigation.

Sikkelee now moves to exclude the use of the following three statements made from the 8020-23 form completed by McDougald:

- Had the pilot survived the accident a reexamination of his pilot skills would be appropriate;

- Investigation of the aircraft and engine components (to the extent possible due to fire damage), has not revealed any pre-impact damage or malfunction; and

- Prior to receiving the written passenger statement, neither the NTSB nor the FAA were able to interview the passenger due to attorney intervention.

Sikkelee asserts that these three statements are hearsay, and that they do not fall within the public-records exception.[75]  Moreover, she maintains that, in any event, all three statements should be excluded under Federal Rule of Evidence 403 because their probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury.  The Court agrees with Sikkelee that this evidence should be excluded under Rule 403.  Accordingly, Sikkelee's motion to exclude will be granted.[76]

---

[75]  Fed. R. Evid. 803(8).

[76]  Because the Court finds McDougald's statements inadmissible under Rule 403, the Court declines to reach the question of whether this evidence falls within the public-records exception to the rule against hearsay.

Under Federal Rule of Evidence 403, a court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[77]  "The Rule 403 balancing between the probative value of the evidence sought to be excluded and the prejudicial effect if the evidence is admitted, is 'at its core, an essentially discretionary one that gives the trial court significant latitude to exclude evidence.'"[78]

"Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility."[79]  In other words, "evidence may be excluded if its probative value is not worth the problems that its admission may cause."[80]  To determine whether evidence should be excluded under Rule 403, "'the proper equation places on one side the maximum reasonable probative force for the offered evidence,' while 'the

---

[77]  Fed. R. Evid. 403.

[78]  *Burdyn v. Old Forge Borough*, 330 F.R.D. 399, 413 (M.D. Pa. 2019) (quoting *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 156 (3d Cir. 2002)); *see also Apotex, Inc. v. Cephalon, Inc.*, 255 F. Supp. 3d 604, 610 (E.D. Pa. 2017) ("The court is afforded 'very substantial discretion' in conducting the Rule 403 balancing test." (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978))).

[79]  *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d, 76, 85 (3d Cir. 2019) (internal quotation marks omitted) (quoting *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 (3d Cir. 2002)).

[80]  *Coleman*, 306 F.3d at 1343; *see also Forrest v. Beloit Corp.*, 424 F.3d 344, 355 (3d Cir. 2005) (internal quotation marks omitted) ("There is a strong presumption that relevant evidence should be admitted, and thus for exclusion under Rule 403 to be justified, the probative value of evidence must be 'substantially outweighed' by the problems in admitting it." (quoting *Coleman*, 306 F.3d at 1343-44)).

other side of the equation should include the *likely* prejudicial impact of the evidence.'"[81]

### 1.    First Statement

The first statement Sikkelee challenges is: "Had the pilot survived the accident a reexamination of his pilot skills would be appropriate."  Lycoming argues that this evidence is highly probative because it can be used to show that the lead FAA investigator determined that the pilot's skills were deficient.  This in turn supports the proposition that the pilot was at fault for the accident.

The Court agrees that there is some probative value in this statement. McDougald was charged with inquiring into whether the pilot's skills (or lack thereof) were a factor in the accident.  McDougald is also experienced, which lends credibility to her ultimate determination.  However, the probative value of her statement is limited by the fact that McDougald lacked authority to directly order a pilot's reexamination; as an investigator, she was authorized only to *recommend* reexamination to the FAA, which would then make its own determination after further review.[82]  Consequently, though this evidence shows that *McDougald* would have recommended reexamination, it does not speak to whether the *FAA* would have ultimately initiated reexamination.

---

[81] *Coleman*, 306 F.3d at 1344 (emphasis in original) (quoting *Federal Rules of Evidence Manual* 242 (Stephen A. Saltzburg et al. eds., 7th ed. 1998)).

[82] Doc. 684-2 at 10.

More importantly, this statement poses a high risk of prejudice. Because the pilot died on impact, it is not possible to determine whether McDougald would have actually submitted this recommendation, or whether the FAA would have subsequently adopted it and begun the reexamination process. McDougald thus gets the last word, at least from the FAA, regarding the possible deficiency in the pilot's skills. This is prejudicial because a juror might reasonably infer that McDougald's statement is the FAA's official position on this issue, particularly since Sikkelee would be unable to rebut this inference by pointing to subsequent FAA proceedings or determinations.

Further, the risk of prejudice is heightened by the fact that Sikkelee is prohibited from introducing the NTSB's probable cause determination. McDougald's report bears the FAA and the federal government's imprimatur, and it is likely that a jury might interpret her statement as reflecting the conclusions of the FAA and the government more broadly. Sikkelee, however, is unable to counter this inference by citing to the NTSB's probable cause determination, which ultimately concluded that the accident was likely caused by a pre-impact aircraft malfunction. Sikkelee would be unfairly disadvantaged if Lycoming is able to invoke a federal agency's findings while Sikkelee is prohibited from doing the same. As a result, the Court concludes that the probative value of this statement is substantially outweighed by the risk of prejudice.

## 2.    Second Statement

The second statement Sikkelee seeks to exclude provides that: "Investigation of the aircraft and engine components (to the extent possible due to fire damage), has not revealed any pre-impact damage or malfunction." Lycoming plans to use this statement as evidence that an FAA investigator determined that there was no evidence of pre-impact aircraft malfunction.

Though this statement goes to the central issue in this case (whether a pre-impact malfunction caused the accident), its probative value is low. McDougald qualifies her conclusion that there was no evidence of pre-impact aircraft malfunction with the caveat that her investigation was hampered by fire damage. McDougald does not explain how the fire damage impacted her inspection of the plane, and does not offer any discussion as to how her investigation was conducted. As a result, the primary value in this statement is that it comes from an FAA investigator, whose duty it was to investigate and offer findings regarding the cause of the accident.

But, for reasons discussed above, this statement also poses a high risk of prejudice. Allowing Lycoming to introduce the suggestion that a federal investigator believes that there was no pre-impact aircraft malfunction without allowing Sikkelee to introduce the NTSB's probable cause finding puts Sikkelee at an unfair disadvantage. A jury considering solely this statement might believe that the only government investigation of this accident has found that the plane did not

malfunction.  And although Sikkelee intends to produce evidence showing that aircraft malfunction did indeed cause the accident, Sikkelee is statutorily prohibited from showing that a government agency agrees.  Consequently, the probative value of this statement is substantially outweighed by the risk of prejudice.

### 3.     Third Statement

Finally, the third statement that Sikkelee seeks to exclude is: "Prior to receiving the written passenger statement, neither the NTSB nor the FAA were able to interview the passenger due to attorney intervention."  Lycoming suggests that the primary purpose of introducing this evidence is to possibly impeach the credibility of the sole surviving passenger of the accident.  It also appears that Lycoming might use this evidence to frame the passenger as uncooperative with the FAA and NTSB investigations.

However, this evidence is not probative of either of these assertions.  It was the passenger's *attorney* who objected to the interviews, on the basis that Lycoming and Cessna Aircraft Company investigators were also on the line.  Moreover, it was the NTSB investigator who ultimately terminated the meeting and offered to send the passenger written questions (to which he responded).  This statement thus does not provide much, if any, evidentiary support to any characterization of the passenger as uncooperative.  Further, if Lycoming seeks to

impeach the passenger's statements, they are free to use his written responses and other evidence from these investigations.

The risk of prejudice from this statement is also relatively high, especially when compared to its low probative value.  As discussed previously, McDougald's report carries the weight of the federal government.  Consequently, it is possible that the jury might interpret McDougald's statement as implying that the government found Craig Sikkelee to be uncooperative.  It would be extremely difficult to undermine this inference because the statement comes from an FAA investigator who was not even present at the meeting.  As a result, this statement's probative value is substantially outweighed by the risk of prejudice.

### D.    Motion to Exclude Inadmissible Complaints About Maintenance

Sikkelee moves this Court to prevent Lycoming from introducing certain evidence that she believes to be irrelevant and prejudicial.[83]  Specifically, Sikkelee seeks to exclude evidence that: (1) the aircraft was "unairworthy" because the passenger seat did not have a shoulder harness; (2) the aircraft was allegedly in another accident two years prior to the event at issue, which required repair to the left wing; (3) maintenance was not conducted in a timely manner a number of years before the accident; and (4) Precision does not like its competitors' component parts installed in carburetors as replacement parts.[84]  Sikkelee claims

---

[83]   Doc. 657.
[84]   Doc. 658 at 1-2.

that because the defense experts who raised these issues do not claim that these problems were causally connected to the accident, this evidence should be excluded under Federal Rules of Evidence 401 or 403.

Lycoming's brief in opposition only contests the fourth piece of evidence. Lycoming claims that it does not intend to "introduce affirmatively the other evidence raised in Sikkelee's motion."[85]  Lycoming asks the Court to reserve ruling on the other three issues, as Sikkelee's case-in-chief may make such evidence relevant in rebuttal.  The Court will grant this request.  The motion is denied as to issues 1-3 without prejudice to Sikkelee's ability to raise her objections again during trial.

The fourth question deals with a bulletin issued by Precision Airmotive (the "Bulletin").  The Bulletin included, among others, the following statement: "This bulletin has been issued to remind owners, operators, overhaulers, and repairers of the Precision Airmotive Corporation aviation carburetors of the possible adverse consequences resulting from the use of UNAUTHORIZED parts in those carburetors."[86]  Lycoming argues that the evidence from the Bulletin, and perhaps other evidence that Precision disapproved of replacement parts, help establish that there were substantial and unforeseeable changes to the design.[87]

---

[85]  Doc. 685 at 2 n.1.
[86]  *Id*. Ex. A.
[87]  Doc. 685.

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," if that "fact is of consequence in determining the action."[88]  Relevant evidence is generally admissible, while irrelevant evidence is inadmissible.[89]  Even relevant evidence may be excluded, however, if "its probative value is *substantially* outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[90]

First, I find that the evidence at issue is relevant.  Rule 401 does not set a high bar for admissible evidence.[91]  This evidence appears to shed some light on the question of foreseeability.  Sikkelee's argument goes to the weight the jury should give this evidence, rather than the question of admissibility.  Of course, the probative value of this evidence must then be weighed against the risks contemplated by Rule 403.  Sikkelee points out a number of infirmities in the proffered evidence.  Most notably, the Bulletin "does not warn of any specific problems which actually exist in the PMA replacement components."[92]  Despite the lack of specificity, the Bulletin "contains aggressive warnings and disclaimers

---

[88]  Fed. R. Evid. 401.
[89]  Fed. R. Evid. 402.
[90]  Fed. R. Evid. 403 (emphasis added).
[91]  *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 109–10 (3d Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 782-83).
[92]  Doc. 691 at 6.

of liability."[93]  In turn, Sikkelee claims that rebutting this evidence will necessitate cross-examination and potentially calling a witness.[94]

These concerns do not justify excluding the evidence at this time.  Sikkelee has clearly laid out her plans for discrediting the evidence Lycoming intends to introduce.  It seems that any potential prejudice or confusion to the jury can be mitigated by cross-examination and, if necessary, limiting instructions.  In her reply brief, Sikkelee analogizes to no case finding that similar evidence should be excluded under Rule 403.  Given the strong cross examination that Sikkelee clearly intends to execute, the Court cannot say—again, at least at this time—that the probative value of Lycoming's evidence is *substantially* outweighed by the potential problems posed by admitting it.  The Court denies the motion as to this issue without prejudice to Sikkelee's ability to raise it again during trial.

### E.    Motion to Exclude Evidence of Resolved Claims

Sikkelee next seeks to exclude (1) any evidence that she settled with Kelly and Precision, and (2) prior allegations that she raised against Kelly and others in a South Carolina lawsuit.  Sikkelee has settled her claims against Kelly and Precision.  Naturally, Kelly and Precision do not plan to offer a defense or put on a case at trial.  Nevertheless, both parties remain as nominal defendants in this action

---

[93]  *Id*.
[94]  *Id*. at 7-8.

for the sole purpose of allowing Lycoming to establish joint-tortfeasor status.[95]

Sikkelee now moves to exclude evidence of her settlement agreements under Rule

408.  For purposes of judicial economy, the Court addresses in this decision only

whether the settlement evidence must be excluded.  The Court reserves its opinion

on whether, and under what circumstances, allegations from the South Carolina

action may be admitted against Sikkelee.

Rule 408 generally prohibits the introduction of settlement agreements into

evidence.  Motivated by "strong public policy" favoring the amicable resolution of

disputes,[96] Rule 408 precludes the admission of settlement agreements where used

to "prove or disprove the validity or amount of a disputed claim."[97]  "The purpose

of the rule is to encourage full and frank disclosure between the parties in order to

promote settlements rather than protracted litigation."[98]  And if offers to

compromise "were to be taken as an admission of liability, voluntary efforts at

settlement would be chilled."[99]

Nevertheless, Rule 408 does not rule out the admission of settlement

evidence in all circumstances.[100]  Rather, when not used to "prove or disprove the

---

[95] *Sikkelee v. Precision Airmotive Corp.*, 2011 WL 1344635, at *7 (M.D. Pa. April 8, 2011) ("[A] non-settling defendant has a 'right to require a codefendant settling on a *pro rata* release to remain in the case through trial and verdict to establish joint tortfeasor status.'" (quoting *Claudio v. Dean Mach. Co.*, 786 A.2d 224, 233 (Pa. Super. 2002), *rev'd on other rounds*, 831 A.2d 140 (Pa. 2003))).

[96] *Trout v. Milton S. Hershey Med. Ctr.*, 572 F. Supp. 2d 591, 600 (M.D. Pa. 2008).

[97] Fed. R. Evid. 408(a).

[98] *Olin Corp. v. Ins. Co. of N. Am.*, 603 F. Supp. 445, 449 (S.D.N.Y. 1985)

[99] *Perzinski v. Chevron Chem. Co.*, 503 F.2d 654, 658 (7th Cir. 1974).

[100] Fed. R. Evid. 408.

validity or amount of a disputed claim," settlements are admissible where offered for "another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."[101] The question of whether settlement evidence should be admitted for "another purpose" falls squarely within a district court's discretion.[102]

In conducting this analysis, "courts will have to consider the language that delineates the scope of the rule as well as the policy that supports it."[103] It is especially important to examine the policy goals underlying Rule 408 when deciding whether settlement evidence should be admitted for "another purpose."[104] Accordingly, the Court is cognizant that "[s]ettlements have always been looked upon with favor," and that the ultimate purpose of Rule 408 is to encourage amicable resolutions.[105] The Court also observes that "when the issue is doubtful,

---

[101] *Id.*

[102] *U.S. Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 946 (5th Cir. 1990) ("The district court has broad discretion in determining whether to admit evidence of settlement for another purpose and we will not disturb that decision lightly."); *Leon v. Fedex Ground Package Sys., Inc.*, 163 F. Supp. 3d 1050, 1069 (D.N.M. 2016) ("Settlement evidence is not . . . automatically admissible because a party offers it for 'another purpose' under Rule 408.") (citations omitted); *Sterling Sav. Bank v. Citadel Dev. Co., Inc.*, 656 F. Supp. 2d 1248, 1254-55 (D. Or. 2009) (citing *Josephs v. Pac. Bell*, 443 F.3d 1050, 1064 (9th Cir. 2006); *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir. 1988)).

[103] *Sterling Sav. Bank*, 656 F. Supp. 2d at 1254-55 (internal quotation marks omitted) (first quoting Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5314 (2009); and then citing *Hudspeth v. C.I.R.*, 914 F.2d 1207, 1213-14 (9th Cir. 1990)).

[104] *See, e.g.*, *Trout*, 572 F. Supp. 2d at 599 (relying on Rule 408's "strong public policy" when determining whether a party's settlement agreement was admissible under Rule 408(b)).

[105] *Scaramuzzo v. Glenmore Distilleries, Co.*, 501 F. Supp. 727, 733 (N.D. Ill. 1980) (internal quotation marks omitted) (quoting *Hawthorne v. Eckerson Co.*, 77 F.2d 844, 847 (2d Cir. 1935)).

the better practice is to exclude evidence of compromises or compromise offers."[106]

Lycoming claims that it is necessary to introduce evidence that Sikkelee has settled with Kelly and Precision in order to provide "factual background" to the jury explaining why these parties are absent at trial. Lycoming intends to reduce its liability by establishing that Kelly and Precision, not Lycoming, are primarily or wholly at fault for Sikkelee's injuries. As a result, Lycoming maintains that informing the jury why Kelly and Precision are no longer involved in the case is crucial to preventing juror speculation or confusion. In Lycoming's view, this evidence is admissible because it is not offered for purposes of proving or disproving liability but for "another purpose" (i.e., providing context to the jury).

In support, Lycoming cites *Haynes v. Manning*.[107] There, the court found that introducing the fact that the plaintiff had settled with three non-parties was appropriate under Rule 408 to "assist the trier of fact in understanding the factual background" of the case.[108] The court reasoned that the settlements were not being proffered to prove or disprove liability, and that "[w]ithout evidence of why the

---

[106] *Bradbury v. Phillips Petrol. Co.*, 815 F.2d 1356, 1364 (10th Cir. 1987).
[107] 717 F. Supp. 730 (D. Kan. 1989), *aff'd in part, rev'd in part on other grounds*, 917 F.2d 450 (10th Cir. 1990).
[108] *Id.* at 734.

other [parties] were not litigants, the jury would be confused and left to speculate."[109]

However, as Sikkelee points out, several courts from within this Circuit facing similar situations have reached the opposite conclusion.[110]  For example, in *Trout v. Milton S. Hershey Medical Center*, the defendant, a doctor charged with malpractice, sought to introduce evidence of the plaintiff's settlement with the automobile driver who had injured him (and whose actions led to the plaintiff being treated by the doctor).[111]  The defendant attempted to do so on the basis that providing evidence of this settlement was necessary to preventing the plaintiff from receiving a double recovery.[112]  Nevertheless, the court declined to admit this evidence because it was in conflict with the policy goals of Rule 408.[113]

---

[109] *Id.* (internal quotation marks omitted) (quoting *MCI Comm'n v. AT&T*, 708 F.2d 1081, 1152 (7th Cir. 1983) ("[S]ettlement negotiations are admissible to explain another dispute and to assist the trier of fact in understanding the case.").

[110] *E.g.*, *Trout*, 572 F. Supp. 2d at 594 (deciding to instruct the jury at the outset of the case only that the plaintiff had "resolved" his claims against other parties); *Mavrinac v. Emergency Med. Ass'n of Pittsburgh*, 2007 WL 4190714, at *1 (W.D. Pa. Nov. 21, 2007) (quoting *Sweeten v. Layson's Home Improvement*, 2007 WL 1189359, at *2 (M.D. Pa. April 19, 2007) (rejecting this exception because "[t]o hold otherwise . . . would 'discourage future plaintiffs from settling with less than all defendants.'").

[111] *Trout*, 572 F. Supp. 2d at 600.

[112] *Id.*

[113] *Id.* (noting that admitting the evidence "would result in the [plaintiff's] compromise being 'offered against the compromiser' to disclaim liability for a claim unrelated to the settlement," and that this would run "contrary to the policies underlying Rule 408." (quoting *Young v. Verson Allsteel Press Co.*, 539 F. Supp. 193, 196, 198 (E.D. Pa. 1982))).  The court also found that "admission of the settlement agreement and claim documents would infect these proceedings with collateral issues and that this taint cannot be cured by a limiting instruction." *Id.*

Given this, the Court concludes that admitting evidence of Sikkelee's settlements with Kelly and Precision is unwarranted. Though Lycoming maintains that this evidence is necessary to *prevent* juror confusion, its admission actually presents a high risk of *causing* it. Because Lycoming plans to present evidence of Kelly's and Precision's culpability, it is likely that a jury may infer that Kelly and Precision ultimately settled with Sikkelee because they were in fact liable. This is highly problematic because it may lead the jury to reduce Lycoming's liability on an improper basis. This in turn would serve to punish Sikkelee for settling a portion of her claims and thus would run counter to the policy goals underlying Rule 408.

While wholesale admission of this evidence is inappropriate, Lycoming's efforts to provide the jury with factual background is not all for naught. In *Trout*, after finding settlement evidence inadmissible under Rule 408, the court nevertheless found a limiting instruction appropriate. Specifically, the court instructed the jury at the outset of the case that "the claims against the automobile tortfeasor have been resolved and that it must evaluate only the liability and damages that proximately resulted from defendants' actions."[114]

In this case, and with an eye towards fashioning a limiting instruction that balances the interests of both parties, the Court finds itself with three options.

---

[114] *Id.* (citing *Mavrinac*, 2007 WL 4190714, at *2). The Court determined it most appropriate to allow the parties to deliberate and come to an agreement regarding the appropriate phrasing of such an instruction. *Id.* at 600 n.2.

First, it might inform the jury that Sikkelee has settled with Kelly and Precision, but instruct the jury not to speculate on the basis of this information.  Second, it might issue the same instruction but use a word or phrase other than "settlement" (i.e., stating that the parties "resolved" their claims).[115]  And third, the Court may refrain from addressing the nature of the relationship between Kelly, Precision, and Sikkelee and simply instruct the jury not to speculate as to why Kelly Aerospace and Precision are not present at trial.

 After careful consideration, the Court deems the third option most appropriate.  Rule 408 is motivated by a strong policy favoring settlement.  And adopting an approach that might prejudice Sikkelee for entering into settlement agreements is inconsistent with the Rule's purpose and aims.  In a case such as this one where the question is "doubtful," it is best practice to err on the side of caution.  Accordingly, the Court grants Sikkelee's motion to exclude evidence of her settlements with Kelly and Precision.  But it will instruct the jury at the outset of the case, and before it is charged, that it should not speculate as to why Kelly and Precision are not at trial.

### F. Motion to Exclude Service Defect Reports, Service Information Records, Warranty Claims, Other Lawsuits, and Subsequent Similar Accidents

Lycoming seeks to exclude Service Defect Reports ("SDRs"), Service Information Records ("SIRs"), warranty claims, other lawsuits, and an NTSB

---

[115] *E.g.*, *id.*

report documenting an accident occurring in 2015. All of the challenged documents relate to prior or subsequent incidents unrelated to the accident underlying this case. Specifically, Sikkelee seeks to introduce the SDRs to demonstrate that Lycoming was on notice that the carburetor lock-tab washers were possibly defective. Sikkelee also seeks to introduce the NTSB report to demonstrate causation and the existence of a defect.

This evidence is admissible only if the Court finds that the prior or subsequent incidents documented in these reports are "substantially similar" to the accident at issue in this case.[116] Given the parties' efforts to narrow the focus of Lycoming's motion, the only issue the Court need address is whether the incidents from the SDRs and the NTSB report are substantially similar to the accident in this case, and thus whether they are admissible.[117]

The FAA maintains an SDR database that allows individuals who come in contact with an aircraft to report problems or issues that they believe may impact

---

[116] *Nesbitt v. Sears, Roebuck & Co.*, 415 F. Supp. 2d 530, 535-36 (E.D. Pa. 2005) (internal quotation marks omitted) (emphasis added) (quoting *Barker v. Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995)).

[117] Sikkelee has not contested Lycoming's assertions that evidence of past warranty claims and other lawsuits are inadmissible. Because the burden of establishing substantial similarity falls on Sikkelee, and because Sikkelee has made no effort to meet this burden, the Court grants Lycoming's motion on the warranty claims and other lawsuits without further discussion. *Barker*, 60 F.3d at 162 (noting that the burden of demonstrating substantial similarity falls upon the proponent of the evidence). The Court defers ruling on whether the SIRs should be admitted, as Sikkelee has indicated she intends to file these documents under seal in a later motion.

aviation safety.[118]  When a person seeks to report such a problem, she does so by submitting an SDR, which is sent to the FAA and is then incorporated into the larger database.[119]  SDRs are frequently completed by certified mechanics and repair stations who service aircraft on a "day-to-day basis."[120]  However, there is no prohibition forbidding a non-mechanic (such as an owner or manufacturer) from submitting an SDR.[121]

The SDR database is fully searchable, and it allows interested persons to query the system to identify reports dealing with certain types of parts or certain types of aircraft.[122]  For example, one might search for all reports involving a Cessna 172 aircraft, or all reports involving aircraft that used a Lycoming 0-320 engine.  The purpose of this database is "to provide assistance to aircraft owners, operators, maintenance organizations, and the [FAA] in identifying aircraft problems encountered during service."[123]

The accident at issue in this case involved a Cessna 172 aircraft, with a Lycoming O-320-D2C engine, and a MA-4SPA carburetor.  Sikkelee claims that properly installed lock-tab washers used to secure the carburetor's throttle body-to-

---

[118]  Doc. 663-2 at 38:24-39:5.  The primary players submitting SDRs are aircraft maintenance facilities, owners, and operators.  *Id.* at 45:15-16.

[119]  *Id.* at 39:8-22, 42:1-22.  In the field, an SDR is sometimes referred to as an "M or D form," which stands for a "malfunction or defect form."  *Id.* at 38:24-39:10.

[120]  *Id.* at 40:3-5.

[121]  *Id.* at 41:12-18 (noting that an aircraft's owner may submit an SDR, but opining that this would be unlikely given that owners "are usually not maintaining carburetors").

[122]  *Id.* at 42:13-22.

[123]  *Id.* at 45:7-11 (citations omitted).

bowl screws malfunctioned and allowed the screws to come loose.  Sikkelee maintains that these loose screws caused air and fuel seepage, which resulted in the aircraft's engine losing power.  Further, Sikkelee argues that Lycoming's Service Bulletin 366 ("SB-366") failed to prevent, and instead contributed to, the accident; SB-366, issued in 1973, instructed those servicing the MA-4SPA carburetor to adjust the lock-tab washers in a way that Sikkelee alleges damaged them.

The fifteen SDRs that Lycoming seeks to exclude share the following characteristics.  Each involved: (1) a Cessna 172 aircraft; (2) a Lycoming O-320 engine, although there is some variety as to the precise engine configuration used (some aircrafts had an O-320-H2AD engine, some had an O-320-D2C engine, and others had an O-320-E2C engine); (3) an MA-4SPA carburetor; (4) an incident where the carburetor's throttle body-to-bowl screws became loose; and (5) an "anomaly in engine operation."[124]  All except one of the SDRs were submitted before the accident in this case.[125]  The NTSB report was submitted following an aircraft accident in 2015.

In general, "evidence of prior accidents involving the same product under similar circumstances" is admissible to show notice, causation, or the existence of a defect.[126]  But admission is only appropriate where "the proponent demonstrates

---

[124] Doc. 678 at 2.  Most SDRs reported that the engine would not turn off.  *E.g.*, Doc. 663-3 at 3, 6, 7, 13, 16, 20.  However, other complaints made in the SDRs include: throttle stickiness, vibration, air seepage and leakage, and a carburetor fire.  *Id.* at 4, 9, 11, 13, 16, 17, 20.

[125] *Id.* at 18 (submitted on July 29, 2005).

[126] *Gumbs*, 718 F.2d at 97.

that the accidents occurred under circumstances *substantially similar* to those at issue in the case at bar."[127]  Sikkelee seeks to introduce the SDRs to show only that Lycoming had *notice* that the lock-tab washers were not adequately preventing the MA-4SPA carburetor body-to-bowl screws from loosening.[128]  However, Sikkelee also seeks to use the NTSB report as evidence of causation and to show the existence of a defect.

## 1.  SDRs

Lycoming seeks to exclude the SDRs on three grounds.  First, Lycoming maintains that establishing notice of a possible defect is irrelevant to Sikkelee's design defect claims.  Second, Lycoming argues that the SDRs are not substantially similar to the accident in this case.  Third, Lycoming asserts that the probative value of the SDRs is substantially outweighed by the risk of prejudice and should be excluded under Rule 403.

---

[127] *Nesbitt*, 415 F. Supp. 2d at 535-36 (emphasis added) (internal quotation marks omitted) (quoting *Barker*, 60 F.3d at 162). Because Sikkelee seeks to introduce the SDRs and NTSB report to demonstrate, *inter alia*, that Lycoming had notice of the allegedly defective condition, the Court's prior discussion with respect to Sikkelee's motion *in limine* to exclude propeller damage comparison (Doc. 653) is inapplicable here, and Sikkelee must demonstrate substantial similarity.

[128] Lycoming maintains that the SDRs constitute hearsay and thus are inadmissible for purposes of proving the truth of the matter asserted.  Specifically, Lycoming contends that the SDRs consist of unverified statements from persons whose identities and whereabouts are unascertainable.  The Court agrees.  However, it recognizes that the rule against hearsay does not prohibit Sikkelee from introducing the SDRs for purposes of establishing notice. *See Collins By and Through Kay v. Seaboard Coast Line R.R. Co.*, 675 F.2d 1185, 1193-94 (11th Cir. 1982) (citations omitted) (recognizing that similar accidents offered to prove notice are not hearsay).

### a.    Relevance

Lycoming first argues that the question of notice is irrelevant to Sikkelee's remaining claims, and thus that the SDRs may not be admitted for that purpose. Sikkelee asserts two products-liability claims, one sounding in strict liability and the other sounding in negligence.  Both are based on the same alleged design defect (regarding the lock-tab washers) and, under these theories, Sikkelee seeks compensatory and punitive damages.  Nevertheless, Lycoming maintains that notice is irrelevant because Sikkelee's failure to warn claim was dismissed, and because notice is not related to, or probative of, Sikkelee's remaining design-defect claims.

Lycoming's argument falls flat because it fails to acknowledge that just because notice is irrelevant to a design-defect claim based on *strict liability* does not mean notice is irrelevant to a design-defect claim based on *negligence*.  In *Phillips v. Cricket Lighters*, the Supreme Court of Pennsylvania discussed the distinctions between strict liability and negligence.[129]  As *Phillips* explained, "[s]trict liability examines the product itself, and sternly eschews considerations of the reasonableness of the conduct of the manufacturer."[130]  Conversely, "a negligence cause of action revolves around an examination of the conduct of the defendant."[131]  *Phillips* subsequently acknowledged that whether a harm is

---

[129]  841 A.2d 1000, 1008 (Pa. 2003).
[130]  *Id.* (citing *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590 (Pa. 1987)).
[131]  *Id.*

foreseeable to the defendant is relevant to determining the defendant's

negligence.[132]  Of particular significance, *Phillips* considered evidence of past

similar accidents as probative of foreseeability.[133]

    The reasoning in *Phillips* is instructive, and the Court finds that notice of

past similar accidents is sufficiently relevant to Sikkelee's negligence claim.[134]

Moreover, even if notice was not relevant to Sikkelee's negligence claim, it

certainly is relevant to her request for punitive damages.  Under Pennsylvania law,

punitive damages "may be awarded for conduct that is outrageous, because of the

defendant's evil motive or his reckless indifference to the rights of others."[135]  An

inquiry into what Lycoming knew about prior similar accidents is thus highly

relevant because it tends to show whether Lycoming acted with "evil motive" or

---

[132] *Id.* at 1009.  *Phillips* found foreseeability of the harm to be one of five factors necessary to determining the existence of a duty of care.

[133] *Id.*

[134] *See, e.g.*, *id.* at 1009 (considering evidence of past similar accidents in determining whether harm from an allegedly defective design of lighters was foreseeable); *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 985-86 (Pa. Super. Ct. 2005) (considering whether evidence that a manufacturer was aware of a defect should be admitted under the substantial similarity test); *cf. Smith v. Yamaha Motor Corp., U.S.A.*, 5 A.3d 314, 323 (Pa. Super. 2010) (finding knowledge of "safer alternatives" relevant to determining whether a manufacturer's decision not to adopt such an alternative was unreasonable, and therefore negligent); *Blacker v. Oldsmobile Div., General Motors Corp.*, 1995 WL 143123, at *4 (E.D. Pa. Mar. 31, 1995) (quoting *Carrecter v. Colson Equip. Co.*, 499 A.2d 326, 330 (Pa. Super. Ct. 1985) (internal quotation marks omitted) ("What a defendant 'should have known' is a classic negligence inquiry which our courts have held unequivocally does not belong in a [strict liability] action.").

[135] *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) (internal quotation marks and citations omitted).

"reckless indifference."[136]  Accordingly, the Court declines to exclude the SDRs on the basis that notice is irrelevant to Sikkelee's claims.[137]

### b.  Substantial Similarity

Next, Lycoming contends that the SDRs are not substantially similar to the accident in this case.  The proponent of the evidence of past similar accidents bears the burden of demonstrating substantial similarity.[138]  Though the accidents need not be identical, district courts must carefully consider the facts and circumstances underlying each scenario.[139]  Nevertheless, courts retain wide discretion to determine the admissibility of evidence under the Federal Rules of Evidence, including on the question of substantial similarity.[140]

Importantly, where past similar incidents are offered to prove notice (as opposed to causation or the existence of a defect), the usual standards governing

---

[136] *See, e.g.*, *Richetta v. Stanley Fastening Sys., L.P.*, 661 F. Supp. 2d 500, 513-14 (E.D. Pa. 2009) (considering evidence of prior accidents as relevant to a determination of punitive damages but ultimately concluding that notice of prior accidents alone could not support such an award).

[137] The Court notes that it will exclude one of the SDRs as irrelevant because it was submitted *after* the accident giving rise to Sikkelee's claims.  That similar incidents occur after an accident has taken place is irrelevant to showing notice of the danger.  *See Uitts v. Gen. Motors Corp.*, 58 F.R.D. 450, 452 (E.D. Pa. 1972) ("[O]nly earlier accidents can be relevant to the issue of notice."); *O'Connor v. AM Gen. Corp.*, 1992 WL 382366, at *3 (E.D. Pa. Dec. 7, 1992) ("Discovery regarding subsequent similar accidents is relevant to the issue of causation.").  Consequently, Lycoming's motion to exclude as to this SDR is granted.

[138] *Barker*, 60 F.3d at 162.

[139] *See id.* (alterations in original) (internal quotation marks omitted) ("[W]e caution that 'substantially similar' does not mean 'identical.'") (quoting *Estate of Carey v. Hy-Temp Mfg., Inc.*, 929 F.2d 1229, 1235 n.2 (7th Cir. 1991)); *see also Gumbs*, 718 F.2d at 98; *Fassett v. Sears Holding Corp.*, 319 F.R.D. 143, 153 (M.D. Pa. 2017) (internal quotation marks omitted) (quoting *Barker*, 60 F.3d at 162) ("The almost universal requirement . . . is that the prior occurrence must involve facts and circumstances which are substantially similar to those involved in the case under consideration.").

[140] *Gumbs*, 718 F.2d at 98 (citations omitted).

substantial similarity are relaxed.[141]  When this is the case, "[t]he incidents need only be sufficiently similar to make the defendant aware of the dangerous situation."[142]  This makes sense because proving that a defendant was aware of a possible problem requires significantly less evidence than establishing that the problem exists.[143]  Because Sikkelee seeks to introduce the SDRs solely for establishing notice, the Court concludes that the relaxed standard applies.

In determining substantial similarity, the Court looks to three factors. These factors ask whether the accidents involve (1) similar products, (2) used under

---

[141]  *Evans v. Pa. R.R. Co.*, 255 F.2d 205, 210 (3d Cir. 1958) ("[W]here the offer of evidence is to prove, not negligence, but notice of the dangerous character of the crossing, the strictness of the requirement of similarity of conditions has frequently been relaxed."); *see Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1386 (4th Cir. 1995) (emphasis added) ("When prior incidents are admitted to prove *notice*, the required similarity of the prior incidents to the case at hand is more relaxed than when prior incidents are admitted to prove negligence."); *see also Exum v. Gen. Elec. Co.*, 819 F.2d 1158, 1162-63 (D.C. Cir. 1987) (internal quotation marks and citations omitted) ("[I]f the accident is offered to prove notice, a lack of exact similarity of conditions will not cause exclusion provided the accident was of a kind which should have served to warn the defendant."); *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1083 (5th Cir. 1986) ("For purposes of proving other accidents in order to show defendants' awareness of a dangerous condition, the rule requiring substantial similarity of those accidents to the accident at issue should be relaxed."); *Gardner v. S. Ry. Sys.*, 675 F.2d 949, 952 (7th Cir. 1982) (citations omitted); *Wolf by Wolf v. Proctor & Gamble Co.*, 555 F. Supp. 613, 621 (D.N.J. 1982) (citing *Evans*, 255 F.2d at 210); *Moon v. Advanced Med. Optics, Inc.*, 2010 WL 11500832, at *2 (N.D. Ga. Dec. 29, 2010).

[142]  *Benedi*, 66 F.3d at 1386 (citing *Gardner*, 675 F.2d at 952; and then citing *Young v. Illinois Cent. Gulf R.R.*, 618 F.2d 332, 339 (5th Cir. 1980)).

[143]  *See Barker*, 60 F.3d at 162 (citing *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1268-69 (7th Cir. 1988)) (noting that the "foundational requirement of establishing substantial similarity is especially important in cases where the evidence is proffered to show the existence of a design defect.").  Greater scrutiny is justified where evidence is offered to prove causation or the existence of a defect because "the jury is invited to infer from the presence of other accidents that a design defect existed which contributed to the plaintiffs' injuries." *Id.* at 162-63 (citing *Nachtsheim*, 847 F.2d at 1269).

similar circumstances, and (3) suffering from similar defects.[144]  The Court

discusses each in turn while remaining cognizant that no factor is by itself

dispositive; rather, each goes to support or undermine the ultimate question of

whether the SDRs are substantially similar to the case at hand.

First, the SDRs involve substantially similar products.  The only issue

relating to this factor involves the importance (or nonimportance) of the different

engine configurations involved in the SDRs.[145]  Lycoming claims that the

distinctions between these engine configurations (i.e., whether it is an O-320-

H2AD engine or an O-320-D2C engine) are significant.  However, the Court is

satisfied with Sikkelee's expert testimony opining that configuration of the engine

has no impact on the determining the effectiveness of the lock-tab washers.[146]

Second, the aircrafts, engines, and carburetors from the SDRs were operated

under sufficiently similar circumstances.  Lycoming points to expert testimony

stating that component parts in the carburetor at issue in this case deviated in

design from the original carburetor parts.  Further, Lycoming asserts that Sikkelee

has not adequately explained whether these parts could have impacted the

---

[144] *See Brooks v. Chrysler Corp.*, 786 F.2d 1191, 1195-96 (D.C. Cir. 1986) (looking to both similarity of products as well as to the similarity of alleged defects); *see also Stramara v. Dorsey Trailers, Inc.*, 1998 WL 848053, at *2 n.1 (E.D. Pa. Dec. 7, 1998) (citing similar factors in determining substantial similarity).

[145] It appears from the record, and Lycoming does not contest, that the aircrafts and the carburetors are the same.

[146] Doc. 663-2 at 188:10-25; *see also DiFrancesco v. Excam, Inc.*, 642 A.2d 529, 537 (Pa. Super. Ct. 1994) (admitting evidence of similar past accidents even though they involved a different gun model).

carburetor.  Lycoming thus contends that Sikkelee cannot demonstrate substantial similarity because the SDRs do not specify what component parts were used on the carburetors in each incident.  Lycoming also challenges the SDRs because none of the SDRs indicate compliance (or non-compliance) with SB-366.

Lycoming's arguments are well taken, but the Court cannot conclude that the lack of similarity on these two elements necessarily precludes introduction of the SDRs.  Under a relaxed standard, all Sikkelee must show is that the SDRs are sufficiently similar to have provided Lycoming with *notice* that the lock-tab washers may be ineffective at preventing the carburetor body-to-bowl screws from loosening.  Expecting that all component parts be the same and that compliance with SB-366 be unequivocally demonstrated is simply too stringent a requirement.[147]  Moreover, Lycoming remains free to expand at trial upon the dissimilarities between the SDRs and the accident at hand.

Third, the alleged defects are sufficiently similar.  Though acknowledging that all of the SDRs involved incidents where the carburetor screws had come loose, Lycoming maintains that the SDRs are dissimilar because most of the SDRs involved instances where an engine failed to cool down, while the accident in this case involved an engine prematurely turning off.  In response, Sikkelee claims that

---

[147]  Sikkelee has also offered testimony stating that SB-366 was likely complied with because it is common practice for aircraft mechanics and servicers to follow with applicable maintenance bulletins.  Doc. 663-2 at 133:10-134:8.

it is sufficient to show that the carburetor screws were found loosened, and that there was *some* type of engine malfunction.

The Court agrees with Sikkelee. Sikkelee does not need to show exact similarity between the alleged defects in the SDRs and that in the present case. This is especially true under the more relaxed standard, which warrants loosening the similarity requirements. Moreover, as the Court has discussed above, Lycoming will be able to present evidence highlighting the dissimilarities between the SDRs and the accident in this case. Accordingly, after carefully considering all of these factors, the Court finds the SDRs are substantially similar and denies Lycoming's motion to exclude.

### c.        Rule 403 Balancing

Finally, the Court concludes that the probative value of the SDRs is not substantially outweighed by the risk of prejudice. The SDRs have significant probative value because they can demonstrate that Lycoming was aware that the lock-tab washers were ineffective at preventing the carburetor screws from loosening. In turn, this evidence may be used to show that Lycoming knew of this issue and yet chose not to act on it. Although the Court acknowledges there is a risk that the jury may consider these SDRs as substantive evidence that a defect existed, the Court believes that a limiting instruction informing the jury that this evidence should only be considered as evidence of notice will appropriately resolve this issue.

### 2.    NTSB Report

Lycoming also seeks to exclude the NTSB report on the basis that it is not substantially similar to the present case.  Evidence of subsequent similar accidents are admissible for the purposes of showing causation or the existence of a defect.[148] Like with prior similar accidents, evidence of subsequent incidents are admissible only upon a showing of substantial similarity.[149]  Lycoming argues that such a showing has not been made because the NTSB report contains little information regarding the specific type of carburetor from the plane, and because it is not clear whether the aircraft had been maintained pursuant to SB-366.

The Court agrees.  The NTSB report does not specify whether the carburetor from the 2015 accident was the same model as that at issue here.  Moreover, it appears that the plane in the 2015 accident had not been serviced pursuant to SB-366.  This is significant for purposes because a central theory in Sikkelee's case is that SB-366 failed to prevent, or contributed to, the accident.  While proof of compliance may not be necessary to show *notice*, the Court believes that greater similarity is needed to demonstrate causation or the existence of a defect.  Taken as a whole, the Court cannot find that the 2015 incident is sufficiently similar to warrant admission.  Accordingly, Lycoming's motion to exclude the NTSB report is granted.

---

[148]  *Uitts*, 58 F.R.D. at 452; *O'Connor*, 1992 WL 382366, at *3.
[149]  *Uitts*, 58 F.R.D. at 452.

### G.     Motion to Exclude the Testimony of Michael Thomson

Lycoming has filed a motion to exclude testimony from one of Sikkelee's expert witnesses.  This request is nothing more than a mislabeled *Daubert* motion filed long after this Court's set deadline for such motions.  But even though this motion is undoubtedly untimely, the Court has an underlying, separate responsibility to fulfill its function as a gatekeeper of expert testimony and will exercise its authority to review Dr. Thomson's opinions.

The motion is denied as to Dr. Thomson's conclusion regarding Mr. Sikkelee's earning potential but granted as to the opinion regarding the value of Mr. Sikkelee's household services.  Additionally, Lycoming's request that Dr. Thomson's updated report be stricken is denied.  As Lycoming acknowledges, Dr. Thomson's report withdraws one of his original conclusions and does not add new conclusions.  There is no indication that Lycoming has been prejudiced by this new, more narrow report.[150]

### 1.     The Timeliness of the Motion

At the outset, Sikkelee notes that this motion to exclude Dr. Thomson's testimony is untimely.  It is.  This Court set an October 2, 2020 deadline for *Daubert* motions.  The parties displayed the ability to comply with this deadline, filing several *Daubert* motions seeking to exclude expert testimony.  Then Lycoming filed this request, seeking to exclude Dr. Thomson's testimony based on

---

[150]  *See, e.g.*, *Krauss v. IRIS USA, Inc.*, 2019 WL 2268975 at *2 (E.D. Pa. May 24, 2019).

*Daubert* and its progeny.  This artful attempt at performing an end-run around the Court's scheduling deadlines has not gone unnoticed.

In its opening brief in support of this motion, Lycoming did not provide any justification for why this was filed 70 days after this Court's deadline for *Daubert* motions.[151]  Perhaps in response to Lycoming's motion (though the parties do not explain the sequence of events clearly), Sikkelee represents that Dr. Thomson was in the process of updating his report to account for the passage of time.[152]  In its reply brief, Lycoming asserts that Sikkelee served Dr. Thomson's updated report on January 6, 2021.

As noted, Sikkelee mentions that this motion is untimely, but does not devote any real effort to the argument, instead addressing Lycoming's motion on the merits.  To the extent this argument is considered raised, however, the Court considers it.  Under the Federal Rules of Civil Procedure, a district court may establish deadlines for parties to file motions, including *Daubert* motions and motions *in limine*.[153]  Federal Rule of Civil Procedure 16 states that scheduling orders should only be modified for good cause.  This Court has discretion to enforce its own orders.[154]  Lycoming has offered no reason for why it was incapable of complying with the Court's scheduling Order  (as evidenced by the

---

[151]  *See* Doc. 665.
[152]  Doc. 677 at 2.
[153]  Fed. R. Civ. P. 16(b).
[154]  Fed. R. Civ. P. 16(d).  *See Taylor v. Shields*, 744 Fed. Appx. 83, 87 (3d Cir. 2018).

fact that Lycoming filed several *Daubert* motions on the correct day), let alone

shown good cause.  And while the failure to comply with that Order could

arguably constitute a waiver of this objection, "courts have also recognized that

this general waiver rule should not trump its gatekeeper function."[155]  District

courts have reached differing conclusions when faced with similar issues as a

result of the tension between these two concerns.  I find that it would be

inappropriate to wholly abdicate my role as gatekeeper and allow the jury to hear

potentially unfounded expert opinions on the basis that counsel failed to comply

with the scheduling Order.[156]

Multiple Circuits have affirmed district court decisions evaluating untimely

*Daubert* motions, recognizing that it is important for the trial judge to evaluate

every expert opinion if possible.[157]  And in a non-precedential opinion, the Third

Circuit held that a Magistrate Judge of this Court did not abuse his discretion in

---

[155] *Fed. Trade Comm'n v. Innovative Designs, Inc.*, 2020 WL 758727 at *8 (W.D. Pa. Feb. 14, 2020).

[156] *Compare Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*, 650 F.Supp.2d 387, 402 (E.D. Pa. 2009) (considering an untimely *Daubert* motion on the merits) *with Nw. Sav. Bank & Fin. Servs. v. NS First St. LLC*, 2011 WL 6180874 at *5 (M.D. Pa. Dec. 13, 2011) (refusing to consider a *Daubert* motion filed more than a month after the relevant deadline). The Court in *Northwest Savings Bank* noted that the motion at issue was filed just nine days before trial was set to begin.  Here, although the motion was filed more than two months after the deadline, it was also filed almost three months before the start of trial.  That provides enough time "so that the expert's proposed testimony can be evaluated with care."  *Feliciano–Hill v. Principi*, 439 F.3d 18, 24 (1st Cir. 2006).

[157] *See, e.g.*, *United States v. Valencia*, 600 F.3d 389, 420 (5th Cir. 2010) ("At a pretrial hearing, the court stated that the motion to exclude was untimely, but indicated that it would entertain the objection pursuant to its gatekeeping duty."); *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001).

allowing an expert to testify (over an untimely *Daubert* motion), in part because the Magistrate Judge considered the expert's testimony on the merits.[158] Furthermore, the Court notes that Sikkelee also filed at least one *Daubert* motion after the October 2, 2020 deadline.  Simply put, the Court will not allow this procedural error to justify avoiding its gatekeeping duty, and therefore considers the *Daubert* motion on its merits.

### 2.    The Daubert Motion's Merits

This Court has recently ruled on a number of *Daubert* motions from both parties.  Accordingly, I recite the relevant standard as stated in that memorandum opinion.  Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony and set forth certain criteria for admissibility.  Expanding upon those Rules, the United States Supreme Court set forth the standard for admissibility of expert testimony in *Daubert v. Merrell Dow Pharm., Inc.*[159]  The Court in *Daubert* delegated to district courts a "gatekeeping responsibility" under Rule 702, which requires that courts determine at the outset whether an expert witness may "testify to (1) scientific knowledge that (2) will assist the trier of fact."[160]  That gate-keeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether

---

[158] *Taylor v. Shields*, 744 Fed. Appx. 83, 87-88 (3d Cir. 2018) (finding no abuse of discretion where, despite denying a *Daubert* motion as untimely, the Magistrate Judge also "did not neglect his underlying gatekeeper duty").

[159] 509 U.S. 579 (1993).

[160] *Id.* at 592.

that reasoning or methodology properly can be applied to the facts in issue."[161]   A district court "exercises more control over experts than over lay witnesses," since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[162]

Following *Daubert*, the Third Circuit cast expert admissibility determinations in light of three basic requirements: (1) qualification; (2) reliability; and (3) fit.[163]   The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert.[164]   To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[165]   The Third Circuit has set forth eight non-exclusive factors that "a district court should take into account" when deciding the reliability of expert testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[166]

---

[161] *Id.* at 592-93.
[162] *Id.* at 595 (internal quotation marks omitted).
[163] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 741-43.
[164] *Id.* at 741.
[165] *Id.* at 742 (*quoting Daubert*, 509 U.S. at 589).
[166] *Id.* at 742 n.8.

With regard to the fit prong, the Third Circuit explained that admissibility "depends . . . on the proffered connection between the scientific research or test result . . . and [the] particular disputed factual issues."[167]

The burden of proof for admissibility of expert testimony falls upon the party that seeks to introduce the evidence.[168]  However, as the Third Circuit has emphasized, "[t]he test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct.  Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology."[169]

> This standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.[170]

District courts must always be cognizant of the fact that "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination."[171]

Lycoming challenges Dr. Thomson's testimony on three specific issues: (1) the use of Mr. Sikkelee's salary as a human resources director to calculate his

---

[167] *Id*. at 743 (internal quotation marks omitted).
[168] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).
[169] *Id.* (internal quotation marks omitted).
[170] *Id.* (internal quotation marks omitted).
[171] *Id.* (internal quotation marks omitted).

earning potential; (2) the decision to use a $25 per hour rate for lost household services; and (3) the projected losses calculated for David Sikkelee's children.[172]

### a.    Mr. Sikkelee's Earning Potential

Dr. Thomson opines that Mr. Sikkelee would have earned an average of $200,000 per year for the remainder of his working life, totaling approximately $3,600,000 in lost earnings.  Dr. Thomson bases this conclusion on a "human capital" theory.  This method stems from the idea that Mr. Sikkelee's previous earnings of approximately $200,000 (in 2003) are a reliable indicator of his future success.  The human capital theory considers Mr. Sikkelee's earnings proof of "his labor market abilities and the economic value of his 'human capital.'"[173]  Put differently, because Mr. Sikkelee showed the "ability to produce this level of earnings in the past" it would be "reasonable to assume that he would have achieved this level of earnings in the future."[174]

Lycoming argues that this methodology is unreliable because it does not consider other mitigating factors.  Lycoming's arguments go to weight rather than admissibility because, at bottom, they constitute disagreements with Dr. Thomson's methodology, facts that it believes Dr. Thomson should have considered, and alternative methods it would have preferred.  For example,

---

[172] Lycoming represents that Dr. Thomson has withdrawn this last opinion.  *See* Doc. 693 at 2 ("First, Thomson withdraws" his opinion "regarding economic damages sustained by David Sikkelee's children.").  Accordingly, the motion is denied as moot as to this issue.

[173] Doc. 693 Ex. 1 at 5.

[174] *Id*. at 6.

Lycoming notes that David Sikkelee's pool business would have been seasonal, and Dr. Thomson did not account for that. Even granting Lycoming's position, the fact that a business varies with the seasons does not undermine a conclusion as to its *annual* success. And in any event, an expert's failure to consider every available fact or option "neither renders his methodology unreliable nor his report inadmissible but, rather, goes to the weight of his testimony."[175]

Lycoming offers several compelling reasons why Dr. Thomson's conclusion may not be accurate. But cross-examination provides the proper arena to demonstrate any shortcomings. It seems clear that defense counsel will be able to adequately address its concerns at that time. Other experts have used past income to calculate future earnings, and Lycoming has not shown that the methodology is so deficient as to warrant the extreme remedy of excluding this testimony.

Furthermore, to the extent Lycoming objects to Dr. Thomson's use of Mr. Sikkelee's pool business revenue to support his conclusion, it is overruled. "The general rule is that profits derived from a business are not to be considered as earnings and cannot be admitted as a measure of loss of earning power, but where they are almost entirely the direct result of personal management and endeavor, they are an accurate measure of earning capacity and admissible as such."[176] If a business's success "is due principally to the personal services and attention of the

---

[175] *Voilas v. Gen. Motors Corp.*, 73 F.Supp.2d 452, 462 (D. N.J. 1999).
[176] *Bell v. Yellow Cab Co.*, 399 P.A. 332, 339 (1960)

owner," the business's income can be used to support a conclusion as to the owner's earning potential.[177]  As Lycoming notes, David Sikkelee was the owner of a "start-up pool company."[178]  It seems reasonable to assume that the success of a start-up is due, in large part, to the work an owner puts in to it.  And Sikkelee asserts that Dr. Thomson uses the pool company's success as a way to illustrate and support his opinion, rather than as an independent basis for his conclusion.[179]

Lycoming's arguments are noted, but are best addressed during examination of Dr. Thomson.  If Lycoming had wished, it could have retained its own expert to rebut Dr. Thomson.  Having chosen not to, it must rely on cross-examination to make its point to the jury.

### b.    David Sikkelee's Household Services

Unlike Dr. Thomson's opinion regarding Mr. Sikkelee's lost earnings, the opinion addressing the value of the household services provided by Mr. Sikkelee cannot survive.

Dr. Thomson purports to establish the value of certain household services performed by Mr. Sikkelee.  These household services run the gamut and include activities such as automobile repairs and maintenance, lawn care, grocery shopping, childcare, laundry and ironing, cooking, and doing dishes.[180]  Dr.

---

[177] *Serhan v. Besteder*, 347 Pa. Super. 11, 17 (1985); *see also Angino v. Cincinnati Ins. Co.*, 2016 WL 245525 at *1-2 (M.D. Pa. Jan. 21, 2016).

[178] Doc. 693 at 6.

[179] Doc. 677 at 5.

[180] Doc. 693 Ex. 1 at 14.

Thomson claims that Mr. Sikkelee would have devoted somewhere between two and three hours each day to these chores, and values these tasks at $25 per hour. In sum, Dr. Thomson finds the economic value of Mr. Sikkelee's lifetime household services to be $875,744.

Dr. Thomson's methodology in forming this opinion is, put mildly, suspect. The $25 per hour value attributed to these services appears to have been pulled out of a hat. Dr. Thomson begins with the admission that "[f]or many individuals, [he has] previously used $20/hour; however, given Mr. Sikkelee's skills and technical abilities, an amount of $25/hour was used."[181] First, there is no explanation for how even a $20 per hour rate would be supported. But then Dr. Thomson imposes a premium rate based on Mr. Sikkelee's capabilities. These skills and technical abilities are never identified, and it is not apparent to the Court what they even are or how they justify an increased valuation for Mr. Sikkelee's performance of those tasks.

Sikkelee's brief in opposition does not inspire confidence on this issue. First, the opposition relies exclusively on Dr. Thomson's affidavit from 2013. Sikkelee claims that the methodology supporting the $25 per hour valuation is "sound, reliable and based upon [Thomson's] thirty [sic] plus years of expertise in the field." Sikkelee then inserts the following from that 2013 affidavit:

---

[181] Doc. 693 Ex. 1 at 7.

Replacing these services would involve locating, hiring, supervising, and paying many different types of workers, many of whom would be contracted through the use of an agency or firm which provides the needed services.  To my knowledge, there is no study available which provides information about the average market prices of so many different types of services.  Therefore, I have utilized $25 per hour as a reasonable average figure for this particular case.  I did take into consideration the decedent's level of education, as well as the information within Jill Sikkelee's deposition transcript where she indicated that David Sikkelee assisted with laundry and household chores, and with renovations, plumbing, tilework, electrical, and household finance.  It is through my ongoing work and research as a labor economist over the last 30 years that I am familiar with the replacement cost for these types of services, and they will usually exceed $25 per hour.[182]

Sikkelee then immediately ends by baldly asserting that Lycoming's concerns go to the weight that the testimony should be given, rather than its admissibility.  That is the sum total of Sikkelee's argument on this issue.  Such a conclusory statement is as unsupported as Dr. Thomson's opinion.  And that opinion is itself undercut by Dr. Thomson's strange admission that his valuation of Mr. Sikkelee's services could change depending on the testimony elicited at trial from Mr. Sikkelee's family members.  Dr. Thomson suggests that depending on whether Mr. Sikkelee "was someone who tended to be less than average, average, or above average, in the performance of household services," the $25 per hour value could "be adjusted accordingly."  The Court is left to wonder why this

---

[182]  Doc. 677 at 13.

information was not obtained earlier and how these adjustments would be quantified or calculated.

There is no way for the Court to assess Dr. Thomson's methodology because Dr. Thomson provides nothing more than conclusory assurances that his expert opinion is reliable. There is no identifiable methodology. But an expert's say-so does not satisfy *Daubert* on its own. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[183] Dr. Thomson does not even offer existing data to link his conclusion to. Unlike cases where an expert utilizes an actual source of data to determine the hourly value of household services, here, the Court is being asked to accept Dr. Thomson's word that his valuation is, as he says, "reasonable."[184] While the source used by experts in those cases is certainly not the only way to establish the value of household services, it illustrates the point that something more than an expert's guesswork is required.

Dr. Thomson's conclusion may in fact be accurate; perhaps the lost household services are worth what Dr. Thomson claims. But relying on an expert's *ipse dixit* alone does not ensure that reliable principles and methods were

---

[183] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[184] *See, e.g.*, *Herrera v. Berkley Reg'l Ins. Co.*, 2021 WL 24548 at *3 (D.N.M. Jan. 4, 2021) (admitting expert testimony where witness used "The Dollar Value of a Day: 2018 Dollar Valuation" to determine the hourly value of household services); *Riggio v. Pruneda*, 2019 WL 6792775 at *1-2 (S.D. Miss. Dec. 12, 2019) (admitting expert testimony where witness used "The Dollar Value of a Day: 2017 Dollar Valuation" to determine the hourly value of household services).

used.  Because Dr. Thomson provides nothing else, the Court cannot allow the jury to hear this testimony.

### H.    Motion to Preclude Evidence of Alleged Carburetor Defects

Lycoming next seeks to exclude any evidence of carburetor defects identified by Donald Sommer and Richard McSwain that are not alleged by Sikkelee to have played any role in the accident at issue here.[185]  Lycoming contends that any such defects are irrelevant, since the existence of those defects does not make the likelihood that the accident occurred due to loose screws any more or less likely.[186]  Even if that evidence had any relevance, Lycoming argues that any relevance is substantially outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury.[187]  Sikkelee responds that evidence of defects that are not alleged to have caused the accident are relevant to establish her claim for a design defect using the consumer expectation test and risk-utility analysis.[188]

Evidence of other alleged carburetor defects is not relevant to whether allegedly loose carburetor screws—caused by Lycoming's use of lock-tab washers—caused the accident at issue here.  Although Sikkelee argues that such evidence is admissible to establish her design-defect-claim, the Court rejects any

---

[185]  Doc. 666.
[186]  Doc. 667 at 5-6.
[187]  *Id.* at 6-7.
[188]  Doc. 681.

notion that purported defects in the carburetor that are undeniably not linked to the accident at issue here may be introduced to prove Sikkelee's claim of a design defect in the carburetor.

Sikkelee's assertion is inconsistent with Pennsylvania state law as it applies to design defect claims, which provides that "[i]n a strict liability cause of action, the plaintiff must present evidence of a defect, evidence that *the defect caused the injury*, and evidence that the defect existed at the time the product left the manufacturer's control."[189]  Under this formulation, evidence of other defects that are not alleged to have caused injury is irrelevant, as such evidence does not make it more likely than not that the relevant defect caused injury or existed at the time that the product left the manufacturer's control.  More importantly, Sikkelee's reading of the law would entirely untether the concept of causation from liability.  Under her theory, it would not be necessary to prove that a defect caused her damages, only that a defect existed that made the product unsafe.  This is clearly an untenable theory under Pennsylvania tort law.[190]

This conclusion is in accord with decisions of other courts that have considered similar circumstances.  For example, in *Carrasquilla v. Mazda Motor*

---

[189] *Barnish v. KWI Bldg. Co.*, 980 A.2d 535, 546-47 (Pa. 2009) (emphasis added); *see also Lewis v. CRC Indus., Inc.*, 7 A.3d 841, 844 n.3 (Pa. Super. Ct. 2010) ("To succeed under a strict-liability design-defect theory, a plaintiff must prove that (1) the product was defective; (2) the defect existed when the product left the hands of the defendant; and (3) the defect caused the injury to a reasonably foreseeable user").

[190] *See Ball v. Bayard Pump & Tank Co.*, 67 A.3d 759, 768 (Pa. 2013) (noting that "every tort plaintiff must prove that the defendant's conduct caused his or her injury").

*Corp.*, the undersigned's predecessor in this vicinage of this Court, the late Honorable James F. McClure, Jr., examined alleged design defects in a vehicle.[191] A claim related to "a design defect with the restraint system in the" vehicle had been dismissed from the case, leaving only "design defect claims relating to the lack of adequate seat back, seat track mechanism and knee bolsters."[192]  Because claims related to the vehicle's restraint system had been dismissed, Judge McClure concluded that evidence related to that system was "irrelevant to a decision on liability for the remaining design defects asserted by plaintiffs."[193]

Moreover, even if Sikkelee were correct that evidence of a design defect that is unrelated to the accident is admissible to prove her claim, Sikkelee (and her expert Donald Sommer) has presented no evidence that the other alleged defects present an "unknowable and unacceptable to the average or ordinary consumer, or that . . . the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions."[194]  Accordingly, there simply is not enough evidence for a claim related to those design defects to be presented at trial.

---

[191]  166 F. Supp. 2d 181, 185-86 (M.D. Pa. 2001).

[192]  *Id.* at 185.

[193]  *Id.* at 185-86. *Cf. Parvez & Razia Yazdani v. BMW of N. Am., LLC*, 188 F. Supp. 3d 486, 491-92 (E.D. Pa. 2016) (holding that evidence related to a different vehicle and "a different alleged design defect" was irrelevant (citing *Jordan v. Gen. Motors Corp.*, 624 F. Supp. 72, 77 (E.D. La. 1985))

[194]  *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 335 (Pa. 2014). Specifically, there is no evidence that the risks associated other defects are unknowable or unacceptable to the ordinary pilot, and no evidence as to what the burden or costs would be to take precautions against those alleged defects.

Finally, even if such evidence were relevant, it would be inadmissible under Federal Rule of Evidence 403, which provides that courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence of design defects that are wholly and indisputably unrelated to David Sikkelee's accident carries minimal, if any, probative value.  In contrast, such evidence would engender unfair prejudice, as it would invite the jury to conclude that the design defect alleged to have caused the accident must exist—and Lycoming must be responsible for accident—because the carburetor has several other design defects that could result in loss of engine power, instead of reaching a conclusion based on the evidence presented.[195]  Accordingly, Lycoming's motion *in limine* to exclude evidence of other, irrelevant carburetor defects will be granted.

## I.   Motion to Preclude Subsequent Remedial Measures and Other Post-Accident Evidence

Lycoming moves to exclude evidence related to subsequent remedial measures as well as other communications collected from after the accident.[196]  For example, Sikkelee seeks to introduce evidence of two post-accident revisions to

---

[195] *See Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one" (quoting Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C. App., p. 860)).

[196] Doc. 668.

SB-366.  SB-366 addresses the procedures for inspecting the tightness of the carburetor's throttle body-to-bowl attaching screws.[197]  The two post-accident versions of SB-366 revised the inspection procedures.  Sikkelee also intends to introduce a service letter issued in 2011, as well as evidence of post-accident communications "concerning loose throttle body-to-bowl screws."[198]  Lycoming argues that the post-accident changes in the design of the engine and carburetor, as well as revisions to the service bulletins, constitute subsequent remedial measures and are barred by Federal Rule of Evidence 407.  Lycoming also asks this Court to exclude evidence of the revised service bulletins and service letters under Rule 403.

### 1.    Subsequent Remedial Measures

Rule 407 instructs that evidence of a remedial measure taken subsequent to an injury, that would have made the injury less likely to occur, cannot be admitted to prove negligence, culpable conduct, defect, or the need for a warning or instruction.[199]  The rule is largely animated by a social policy which seeks to encourage "people to take, or at least not discourage[] them from taking, steps in furtherance of added safety."[200]  But Rule 407 does allow Courts to admit such

---

[197]  Doc. 669.
[198]  *Id*. at 2.
[199]  Fed. R. Evid. 407.
[200]  *Id*.  Advisory Committee Notes; *see also* Wright & Miller, Fed. Prac. & Proc. § 5282, 2d ed. ("[I]nterpretation of Rule 407 should focus on implementing the social policy of encouraging, or at least not deterring, the taking of such [remedial] measures.").

evidence when this public policy is not implicated; for example, a party may introduce this evidence for impeachment purposes. A party can also do so to prove ownership, control, or the feasibility of a precautionary measure, if any of those are in dispute.[201]

### 2. The Court Will Consider the Issues at Trial

Given the arguments the parties raise, detailing how the evidence may be used at trial, the Court finds it prudent to consider the context of the presentation. Therefore, I will deny the motion without prejudice, and consider arguments regarding the individual pieces of evidence during trial. On the day before such evidence is to first be introduced, the Court asks counsel for Sikkelee to simply advise the Court that it intends to introduce that evidence at some point on the following day.

### J. Motion to Exclude Emagene Maar's Affidavit and Deposition Testimony

Finally, Lycoming has moved to exclude the affidavit and deposition testimony of Emagene Maar, a witness to the accident.[202] Lycoming argues that Maar's affidavit should be excluded as a discovery sanction, pursuant to Federal Rule of Evidence 37(c), as (1) it was produced nearly three months after the close of discovery and there is no substantial justification for the belated affidavit, (2) the severe prejudice cannot be cured, and (3) Sikkelee willfully violated the

---

[201] Fed. R. Evid. 407.
[202] Doc. 670.

Court's Scheduling Order.[203]  Lycoming further contends that Maar's deposition testimony, also taken after the close of discovery, should be excluded because Lycoming was not provided sufficient notice of the deposition, and therefore did not have the opportunity to cross-examine Maar.[204]

Sikkelee responds that Lycoming had adequate notice of the deposition but failed to attend and failed to attempt to reconvene the deposition for the past eight years.[205]  She asserts that (1) there is no prejudice since Lycoming had sufficient time to cure any prejudice, but failed to so do, (2) Maar's deposition testimony is important to the case, as it helps establish that the airplane's engine was experiencing mechanical difficulty while in the air prior to the crash, (3) there is no bad faith—and there is substantial justification for the untimely deposition— because the deposition was taken when it became apparent that Maar would be unable to testify at trial, and (4) Lycoming was provided with adequate advanced notice of the deposition.[206]  Finally, Sikkelee argues that exclusion is not warranted under Federal Rule of Evidence 403, as Maar's deposition testimony and earlier statements are not inconsistent.[207]

Federal Rule of Civil Procedure 37(c)(1) provides for the exclusion of evidence if a party fails to make a required production under Rule 26.  Specifically,

---

[203]  Doc. 671 at 8-11.
[204]  *Id.* at 12-15.
[205]  Doc. 680.
[206]  *Id.* at 10-22.
[207]  *Id.* at 22-23.

that Rule provides that "[i]f a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that

information or witness to supply evidence on a motion, at a hearing, or at a trial,

unless the failure was substantially justified or is harmless."[208]  The "substantially

justified" standard is satisfied "if reasonable people could differ as to the

appropriateness of the contested action."[209]  Courts are not limited to exclusion as a

sanction, but may also sanction a party by "order[ing] payment of the reasonable

expenses, including attorney's fees, caused by the failure," "inform[ing] the jury of

the party's failure," or imposing any "other appropriate sanctions."[210]

As the Third Circuit has noted, although district courts have discretion to

exclude evidence in response to violations of pretrial disclosure deadlines,

"exclusion of critical evidence is an 'extreme' sanction, and thus, a district court's

discretion is not unlimited."[211]  Accordingly, in determining whether exclusion of

evidence is warranted, the Court should consider the five *Pennypack*[212] factors:

> (1) "the prejudice or surprise in fact of the party against whom the
> excluded witnesses would have testified" or the excluded evidence
> would have been offered; (2) "the ability of that party to cure the
> prejudice"; (3) the extent to which allowing such witnesses or evidence
> would "disrupt the orderly and efficient trial of the case or of other cases

---

[208] Fed. R. Civ. P. 37(c)(1).

[209] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (brackets and internal quotation marks omitted); *see also Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 811-12 (11th Cir. 2017) (noting that "[s]ubstantially justified means that reasonable people could differ as to the appropriateness of the contested action" (internal quotation marks omitted)).

[210] *Id.*

[211] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 297 (3d Cir. 2012).

[212] *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894 (3d Cir. 1977).

in the court"; (4) any "bad faith or willfulness in failing to comply with the court's order"; and (5) the importance of the excluded evidence. The importance of the evidence is often the most significant factor.[213]

### 1. Whether Violation of Scheduling Order was Substantially Justified

First, the Court finds that sanctions under Rule 37(c) are warranted, as Sikkelee's failure to timely identify Maar as a witness and depose her was not substantially justified. It is undisputed that Sikkelee obtained Maar's affidavit and conducted an *ex parte* deposition of Maar after the close of discovery, and without leave of the Court.[214] This was a breach of the deadlines set forth by this Court, and that breach was done knowingly.

Although Sikkelee asserts that her breach of the Court's Scheduling Order was justified because she needed to preserve Maar's testimony for trial, and "[t]here is legal authority supporting Plaintiff's position that a party may take a deposition after the discovery deadline when the purpose is to preserve trial testimony,"[215] the case law to which she cites is inapposite. In all three cases that Sikkelee cites to, the parties sought—and received—leave of the court to conduct trial depositions after the close of discovery.[216] Here, Sikkelee failed to follow

---

[213]  *ZF Meritor*, 696 F.3d at 298 (quoting *Pennypack,* 559 F.2d at 904-05).

[214]  *See* Docs. 671, 680.

[215]  Doc. 680 at 18; *see id.* at 18-19.

[216]  *See Manley v. Am. Base Corp.*, 337 F.3d 237, 247 (2d Cir. 2003) (noting that deposition had been conducted "pursuant to a *de bene esse* proceeding ordered by the court when it appeared that the eighty-year old California resident would not travel to New York for trial"); *Branning v. Wayne Cty.*, No. 3:15-CV-1936, 2018 WL 1998312, at *1 (M.D. Pa. Apr. 27, 2018) (observing that "Plaintiff filed the motion to take the video deposition of Robert Pickney, stating that while he was subpoenaed for this trial, he will be unavailable due to a missionary

proper procedure, which would have been to seek leave of the Court to conduct Maar's deposition; rather, Sikkelee ignored Lycoming's clear objections and unilaterally scheduled an untimely deposition without leave of Court.

The Court is unable to find any authority that would support the correctness of Sikkelee's course of conduct here.  To the contrary, the law is clear that "the Federal Rules of Civil Procedure make no distinction for use of a deposition at trial between one taken for discovery purposes and one taken for use at trial (*de bene esse*),"[217] and courts have uniformly concluded that parties have no right to take a deposition after the close of discovery and that permitting an untimely deposition rests within the discretion of the district courts.[218]  As such, "parties who decide not to take a deposition during the discovery period take the risk that they will be unable to present the testimony if the witness becomes unavailable at trial."[219]

---

trip"); *Coface Collections N. Am., Inc. v. Newton*, No. CA 11-52-LPS, 2012 WL 6738391, at *1 (D. Del. Dec. 28, 2012) ("Defendant now, after the close of discovery, seeks leave to take *de bene esse* depositions").

[217] *Tatman v. Collins*, 938 F.2d 509, 510 (4th Cir. 1991).

[218] *See, e.g., Brugh v. Mount Aloysius Coll.*, 2019 WL 7505743, at *2 (W.D. Pa. Nov. 12, 2019) (concluding that "[p]arties do not have a right to take depositions after the close of discovery, and it is within the discretion of this Court to deny a party's request to take a deposition in such a case"); *In re Horstemeyer*, 557 B.R. 427, 431-32 (Bankr. D.S.C. 2016) (concluding that, although "there is no absolute right to take a *de bene esse* deposition after the discovery period has closed, it is within the court's discretion to allow such a deposition to occur"); *Anderson v. Procter & Gamble Paper Prod. Co.*, 2013 WL 5651802, at *4 (E.D. Wis. Oct. 15, 2013) (holding that "[w]hile so-called depositions for use at trial should in appropriate cases nevertheless be allowed after the close of discovery, there is no automatic right to do so. Absent the scheduling order providing otherwise, or agreement by the parties, good cause must be shown").

[219] *Brugh*, 2019 WL 7505743, at *2.

This case law clearly demonstrates that parties must seek permission from the Court prior to conducting an untimely deposition to which the opposing party objects—this course of conduct has been the universal practice before this Court, and Sikkelee fails to point to a single case in which this practice was not followed. Sikkelee failed to follow this well-accepted procedure, despite Lycoming twice providing written objections to any deposition of Maar.[220]  The Court therefore concludes that reasonable people would not "differ as to the appropriateness of"[221] Sikkelee's actions.  Rather, reasonable people would seek leave of the Court to conduct depositions after the close of discovery.  Consequently, Sikkelee's violation of Federal Rule of Civil Procedure 37(c)(1) is not substantially justified, and sanctions are warranted.  The Court will therefore proceed to examine the relevant *Pennypack* factors to determine if Maar's affidavit and deposition testimony should be excluded.

## 2.   Whether Exclusion is Warranted Under the *Pennypack* Factors

The Court concludes that, under the Pennypack factors, exclusion is warranted.  As to the first factor, there would be a great deal of prejudice to Lycoming in admitting Maar's affidavit or deposition testimony into evidence.  In her statements, Maar asserted for the first time that the airplane engine was

---

[220]  *See* Doc. 680-6; Doc. 680-11.
[221]  *Pierce*, 487 U.S. at 565.

sputtering just prior to the accident[222]—Sikkelee's experts rely on this statement to conclude that the airplane may have been experiencing engine problems after takeoff.  This is a material change to Maar's earlier statements where she stated that the engine sounded as though it were operating at a low RPM[223] or, alternatively, that the engine sounded "[s]low, sluggish, like it wasn't go'in to run" and was "[j]ust not, not quite mak'in it, you know, just not quite in a, to the RPM's or, you know, to the speed that it would keep it on out and go'in."[224]  The changed testimony makes it more likely that engine issues contributed to the accident, although Maar's first statements do not exclude such a possibility.  Critically, because Sikkelee conducted Maar's deposition *ex parte*, Lycoming had no opportunity to cross-examine Maar and obviously would have no opportunity to cross-examine Maar at trial should the deposition be admitted.  It would be highly prejudicial to Lycoming to admit Maar's testimony without affording it the opportunity to conduct any cross-examination.[225]

---

[222] Doc. 671-3 at 3; Doc. 671-5 at 3.

[223] Doc. 671-1.

[224] Doc. 671-2 at 4.

[225] The Court is not persuaded that the cases to which Sikkelee cites dictate a contrary conclusion. In *Johnson v. Fed. Exp. Corp.*, 2014 WL 65761, at *3 (M.D. Pa. Jan. 8, 2014), the court concluded that there was no need to cure any prejudice because the plaintiff had sufficient time to review new information provided for the substitute witnesses. This conclusion did not address prejudice—the Court's determination that there was no prejudice was based on the fact that the plaintiff challenged replacement witnesses who possessed "substantially similar knowledge" to the original witnesses. *Id.* *2. In *Starry v. United States*, 2017 WL 11103576, at *1 (M.D. Pa. Sept. 13, 2017), the court determined that there was no prejudice, in part, because the United States had an opportunity for robust cross-examination at a deposition and could reasonably have anticipated the witness' testimony. *Id.* Thus, neither case stands for

As to the second *Pennypack* factor—the opportunity to cure any potential prejudice—there is no possibility that Lycoming may cure any prejudice should the affidavit or deposition testimony be presented at trial.  The only opportunity for Lycoming to cure the prejudice would be through cross-examination of Maar, which could only happen if Maar presented live testimony at the trial.

With regard to the third factor, permitting the deposition testimony at trial would likely not significantly disrupt the orderly and efficient trial of this case, as the testimony is relatively short.[226]  However, that could change if Lycoming understandably sought to reopen the deposition and cross-examine Maar prior to trial. Given that trial will occur in a matter of days, Lycoming may not have sufficient time to conduct a deposition in North Carolina, and it is possible that trial would need to be delayed in order to accommodate Maar's deposition.

With respect to the question of whether Sikkelee's actions evidence any bad faith or willfulness in failing to comply with the Court's order, the Court concludes that ample evidence demonstrates that Sikkelee willfully disregarded the Court's Scheduling Order.  While Sikkelee asserts that she intended to call Maar as a witness at trial in 2012 and did not know until after the close of discovery that Maar could not participate in trial due to surgery on her legs,[227] that does not

---

the broad proposition that prejudice does not exist simply because one party did not immediately challenge the new information or evidence.

[226] *See* Doc. 680 at 16.

[227] Doc. 680 at 6.

excuse the failure to depose Maar during the discovery period.[228]  As other courts

have noted, "parties who decide not to take a deposition during the discovery

period take the risk that they will be unable to present the testimony if the witness

becomes unavailable at trial."[229]

Moreover, while Sikkelee makes much of the fact that Lycoming did not

initially disclose that Edwards had contacted Maar regarding what she witnessed

during the accident,[230] as Sikkelee acknowledges, Edwards did not rely on that

conversation in reaching his expert opinion.  Moreover, Sikkelee noticed Maar's

deposition before a transcript of that interview was provided to Sikkelee.  It is thus

difficult to conclude that the interview conducted by Edwards somehow

precipitated Sikkelee's belated deposition of Maar.

More importantly, as discussed above with regard to the question of whether

Sikkelee's violation of the Rules of Civil Procedure were substantially justified,

Sikkelee knew of the discovery deadline and waited until after that deadline to

depose Maar.  The appropriate way to proceed at that point would have been to

seek permission of the Court to conduct the untimely deposition, which Sikkelee

did not do. Accordingly, because Sikkelee's conduct was willful, this factor weighs

against admitting Maar's affidavit or deposition testimony.

---

[228] It would seem an odd tactical decision to call a witness without first interviewing or deposing her, as counsel would have no realistic idea of what that witness would say at trial.

[229] *Brugh*, 2019 WL 7505743, at *2.

[230] Doc. 680 at 5-6, 9-10, 14-15.

Finally, as to the importance of Maar's deposition testimony, the Court cannot conclude that such evidence is critical to the case.  Plainly, Maar's *testimony* that she heard the airplane engine sputtering just before the accident is of some import, as it helps establish the possibility of an engine failure.  However, nothing in the record indicates that the *deposition testimony* is important.  There has been no explanation provided to the Court as to why Maar cannot testify at trial, which would eliminate the need to present Maar's affidavit or deposition testimony and render those written documents wholly unimportant, except possibly for impeachment purposes.[231]

Even if Sikkelee could provide a satisfactory explanation for why Maar cannot testify at trial, the Court views Maar's testimony as important, but not critical.  Her testimony tends to indicate that there may have been a mechanical issue with the airplane's engine prior to the accident, but it is not strong evidence of a mechanical failure, particularly in light of Maar's earlier statements that omitted any mention of a "sputtering" engine. In that vein, the expert opinions and other evidence that Sikkelee has gathered are far more persuasive and probative of the cause of the accident.

Thus, although Maar's testimony may be important, this factor is insufficient to outweigh the other relevant *Pennypack* factors that militate against admission—

---

[231] Sikkelee indicates that Maar could not testify at the trial which was originally scheduled for 2012 because Maar had recently undergone surgery in both legs. Doc. 680 at 7.  Surely, surgery from nine years ago would not prevent Maar from testifying at trial in 2021.

particularly the prejudice that Lycoming would suffer from its inability to cross-examine Maar.  Accordingly, the Court concludes that the *Pennypack* factors as a whole weigh in favor of excluding Maar's affidavit and deposition testimony, and Lycoming's motion *in limine* will be granted.

### III.   CONCLUSION

In accordance with the above discussion, the motions *in limine* will be granted in part, and denied in part.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge
